**Slip Op. 12-67**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **UNION STEEL MANUFACTURING CO., LTD.,** | |
| Plaintiff, | |
| and | |
| **WHIRLPOOL CORPORATION,** | |
| Plaintiff-Intervenor, | **Before: Timothy C. Stanceu, Judge** |
| v. | **Consol. Court No. 10-00106** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **UNITED STATES STEEL CORPORATION, NUCOR CORPORATION, and HYUNDAI HYSCO,** | |
| Defendant-Intervenors. | |

## OPINION AND ORDER

[Remanding a final determination in an administrative review of an antidumping duty order on certain corrosion-resistant carbon steel flat products from the Republic of Korea]

Dated: May 25, 2012

*Brady W. Mills*, Morris, Manning & Martin, LLP, of Washington, DC, argued for plaintiff Union Steel Manufacturing Co., Ltd.  With him on the brief were *Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, and *Mary S. Hodgins*, of Washington, DC.

*Donald B. Cameron*, Morris, Manning & Martin, LLP, of Washington, DC, argued for consolidated plaintiff Dongbu Steel Co., Ltd.  With him on the brief were *Brady W. Mills*, *Julie C. Mendoza*, *R. Will Planert*, and *Mary S. Hodgins*, of Washington, DC.

*William R. Rucker* and *Nicolas Guzman*, Drinker Biddle & Reath, LLP, of Chicago, IL, for plaintiff-intervenor.

*L. Misha Preheim*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, and *Claudia Burke*, Senior Trial Counsel, of Washington, DC. Of counsel on the brief was *Daniel J. Calhoun*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Ellen J. Schneider*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for defendant-intervenor and consolidated plaintiff United States Steel Corporation. With her on the brief were *Jeffrey D. Gerrish*, *Robert E. Lighthizer*, *Soo-Mi Rhee*, and *Luke A. Meisner*, of Washington, DC.

*Timothy C. Brightbill*, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor Nucor Corporation. With him on the brief was *Alan H. Price*, of Washington, DC.

*Jarrod M. Goldfeder*, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, argued for consolidated plaintiff and defendant-intervenor Hyundai HYSCO. With him on the brief were *J. David Park* and *Natalia D. Dobrowolsky*, of Washington, DC.

Stanceu, Judge: In this consolidated action, four plaintiffs, Union Steel Manufacturing Co., Ltd. ("Union"), Dongbu Steel Co., Ltd. ("Dongbu"), Hyundai HYSCO ("HYSCO"), and United States Steel Corporation ("U.S. Steel"), challenge the final determination ("Final Results") issued by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in the fifteenth administrative review of an antidumping duty order on imports of certain corrosion-resistant carbon steel flat products ("CORE" or "subject merchandise") from the Republic of Korea ("Korea") for the period of August 1, 2007 through July 31, 2008 ("POR" or "period of review"). *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Fifteenth Admin. Review*, 75 Fed. Reg. 13,490 (Mar. 22, 2010) ("*Final Results*"). Three of these plaintiffs–Union, Dongbu, and HYSCO–are Korean exporters of the subject merchandise and were respondents in the

fifteenth administrative review. The remaining plaintiff, U.S. Steel, is a member of the domestic

industry. U.S. Steel and HYSCO are also defendant-intervenors in this consolidated case, as is

Nucor Corporation ("Nucor"), a member of the domestic industry. Before the court are the

USCIT Rule 56.2 motions for judgment on the agency record filed by each plaintiff and two

motions by defendant for a voluntary remand on certain claims in this case.

　　　　The court determines that: (1) the Department's decision to use financial data pertaining

only to the 2008 fiscal year of Union's parent company in determining Union's interest expense

ratio cannot be upheld on judicial review; (2) in response to defendant's request for a voluntary

remand, the court will order the Department to reconsider the "quarterly-cost methodology" used

to apply the "recovery-of-costs" test to the home-market sales of Union and HYSCO and the

"indexing" methodology wherever used in the Final Results; (3) on remand, the Department must

reconsider the use in the Final Results of the quarterly-cost and indexing methodologies for

various other purposes; (4) the Department must reconsider its decision to depart from its normal

method for selecting comparison months of normal value sales; (5) in response to defendant's

request for a voluntary remand, the court will order the Department to reconsider its decision to

compare laminated CORE and non-laminated, painted CORE as "identical" merchandise; (6) in

response to defendant's request for a voluntary remand, the court will order that Commerce

reconsider the use of the zeroing methodology in the fifteenth review; (7) no relief is available on

Dongbu's claim seeking an individually-determined dumping margin; and (8) in response to the

defendant's request for a voluntary remand, remand is appropriate on U.S. Steel's challenge to

the date of sale used for certain sales by HYSCO through a U.S. affiliate. The court determines,

in addition, that any modifications to the weighted-average dumping margins of Union and

HYSCO resulting from this remand shall be reflected in the rate applied to Dongbu.

## I. BACKGROUND

The court summarizes below the procedural history of the fifteenth administrative review

of the order on CORE from Korea and the procedural history of this litigation, both of which are

somewhat complex.

Commerce initiated the fifteenth administrative review of the order on CORE from Korea

on September 30, 2008, identifying seven Korean exporters of subject merchandise: Dongbu;

Dongkuk Industries Co., Ltd. ("Dongkuk"); Haewon MSC Co., Ltd. ("Haewon"); HYSCO; LG

Chem, Ltd. ("LG"); Pohang Iron and Steel Co., Ltd/Pohang Coated Steel Co., Ltd. ("POSCO

Group"); and Union. *Initiation of Antidumping & Countervailing Duty Admin. Reviews &

Requests for Revocation in Part*, 73 Fed. Reg. 56,795 (Sept. 30, 2008).  On October 2, 2008,

Commerce determined that it would not examine individually each respondent in the review,

citing its authority under section 777A of the Tariff Act of 1930 ("Tariff Act" or the "Act"),

19 U.S.C. § 1677f-1(c) (2006), and provided an opportunity for parties to comment on mandatory

respondent selection. *Mem. from Int'l Trade Compliance Analyst to the File* 1-2 (Oct. 2, 2008)

(Admin. R. Doc. No. 4745) ("*Invitation to Comment on Respondent Selection*").  Dongbu filed

such comments on October 21, 2008. *Letter from Dongbu to the Sec'y of Commerce* (Oct. 21,

2008) (Admin. R. Doc. No. 4811) ("*Dongbu's Respondent Selection Comments*").

On December 8, 2008, Commerce determined in a separate memorandum (the

"Respondent Selection Memorandum") that it would examine individually only two respondents,

Union and HYSCO. *Mem. from Int'l Trade Compliance Analyst to Dir., Office 3 AD/CVD*

*Operations*, at 7 (Dec. 8, 2008) (Admin. R. Doc. No. 4817) ("*Respondent Selection Mem.*").  On

June 17, 2009, Commerce announced that it was rescinding the review as to Dongkuk because

Dongkuk exported no subject merchandise to the United States during the POR.  *Certain*

*Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of*

*Rescission of Antidumping Duty Admin. Review, In Part*, 74 Fed. Reg. 28,664, 28,665 (June 17,

2009).  On July 8, 2009, Commerce determined that it would examine the POSCO Group

individually as a voluntary respondent under section 782 of the Tariff Act, 19 U.S.C. § 1677m.

*Mem. from Program Manager to Office Dir., Office 3 AD/CVD Operation* (July 8, 2009)

(Admin. R. Doc. No. 4974).

Commerce issued the preliminary results of the fifteenth review ("Preliminary Results")

on September 8, 2009, preliminarily assigning weighted-average dumping margins of 0.43% to

HYSCO, 0.16% to the POSCO Group, 3.94% to Union, and, as a simple "average" of the only

non-*de-minimis* margin of the selected respondents, 3.94% to the non-selected respondents,

which were Dongbu, Haewon, and LG.  *Certain Corrosion-Resistant Carbon Steel Flat Products*

*from the Republic of Korea: Notice of Prelim. Results of the Antidumping Duty Admin. Review*,

74 Fed. Reg. 46,110, 46,114 (Sept. 8, 2009) ("*Prelim. Results*").  On December 16, 2009,

Commerce issued memoranda to Union, HYSCO, and the POSCO Group announcing the

Department's decision that, for purposes of margin calculations, certain costs would be

calculated using four quarterly weighted averages rather than one weighted average for the entire

POR and that the Department was departing from its normal method of determining comparison

months for normal value.  *See, e.g.*, *Mem. from Accountant to Dir., Office of Accounting*

(Dec. 16, 2009) (Admin. R. Doc. No. 5166) ("*Union's Post-Prelim. Analysis Mem.*").  On

March 22, 2010, Commerce issued the Final Results, which assigned weighted-average dumping

margins of 3.29% to HYSCO, 0.01% to the POSCO Group (a *de minimis* margin), 14.01% to

Union, and, as a simple average of the non-*de-minimis* margins of the selected respondents,

8.65% to the non-selected respondents. *Final Results*, 75 Fed. Reg. at 13,491.

Union, Dongbu, HYSCO, and U.S. Steel each challenged the Final Results, and the court

consolidated these cases on May 13, 2010.  Order (May 13, 2010), ECF No. 44.  Defendant has

requested a voluntary remand as to four claims in this consolidated litigation: (1) Union's claim

challenging the Department's comparing "painted CORE in the same category as laminated

CORE," Def.'s Resp. to Pls.' & Def.-intervenors' Mots. for J. upon the Agency R. 46-49

(Feb. 11, 2011), ECF No. 86 ("Def.'s Resp."); (2) U.S. Steel's claim challenging the

Department's using the "shipment date," rather than a later "invoice date," as the date of sale for

certain sales by HYSCO, *id.* at 59-60; (3) Union and HYSCO's claim challenging the

Department's "cost-recovery methodology," Def.'s Mot. for Partial Voluntary Remand 1

(June 21, 2011), ECF No. 130 ("Def.'s June Remand Mot."); and (4) Union's claim challenging

the Department's using the zeroing methodology in this administrative review, Def.'s Mot. for

Partial Voluntary Remand (Aug. 24, 2011), ECF No. 141 ("Def.'s Aug. Remand Mot.").

## II.  DISCUSSION

The court exercises jurisdiction over this case according to section 201 of the Customs

Courts Act of 1980 ("Customs Courts Act"), 28 U.S.C. § 1581(c) (2006).  Under this

jurisdictional provision, the court reviews actions commenced under section 516A of the Tariff

Act, 19 U.S.C. § 1516a(a)(2)(B)(iii), including an action contesting the Department's issuance,

under section 751 of the Tariff Act, 19 U.S.C. § 1675(a), of the final results of an administrative

review of an antidumping duty order.  In reviewing the final results, the court must hold unlawful

any finding, conclusion or determination that is not supported by substantial evidence on the

record, or that is otherwise not in accordance with law.  *See* Tariff Act, § 516A, 19 U.S.C.

§ 1516a(b)(1)(B)(i).

### A.  Commerce Must Reconsider its Interest Expense Ratio Calculation

In an administrative review, Commerce determines a dumping margin for entries of

subject merchandise by comparing the normal value and the export price or constructed export

price.  19 U.S.C. §§ 1675(a)(2), 1677(35)(A).  Under § 773(b)(1) of the Tariff Act, 19 U.S.C.

§ 1677b(b)(1), Commerce, when calculating normal value, in certain circumstances may exclude

from the calculation home-market sales it determines to have been made at prices below the cost

of production ("COP").[1]  In § 1677b(b)(3), Congress directed that Commerce calculate COP as

the sum of three categories of costs, defined as follows: (1) "the cost of materials and of

fabrication or other processing of any kind employed in producing the foreign like product,

---

[1] Section 773(b)(1) of the Tariff Act of 1930 ("Tariff Act") provides, in pertinent part, that:

> Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production.  If the administering authority determines that sales made at less than the cost of production–
> > (A) have been made within an extended period of time in substantial quantities, and
> > (B) were not at prices which permit recovery of all costs within a reasonable period of time,
> such sales may be disregarded in the determination of normal value.

19 U.S.C. § 1677b(b)(1) (2006).

during a period which would ordinarily permit the production of that product in the ordinary

course of business," *id.* § 1677b(b)(3)(A); (2) "an amount for selling, general, and administrative

expenses based on actual data pertaining to production and sales of the foreign like product by

the exporter in question," *id.* § 1677b(b)(3)(B); and (3) packing and other expenses for placing

the foreign like product in condition for shipment, *id.* § 1677b(b)(3)(C).  In this case, Commerce

decided to include also interest expenses, *i.e.*, financing costs, as a component of COP, in

accordance with its practice.  Issues & Decision Mem., A-580-816, ARP 07-08, at 42-43

(Mar. 15, 2010) (Admin. R. Doc. No. 5249) ("*Decision Mem.*").  Union does not challenge this

decision before the court.  Instead, Union's claim challenges the data on which Commerce

determined the interest expenses, and the "general and administrative" ("G&A") expenses,

pertaining to the production and sale of the foreign like products.

      Considering interest and G&A expenses to be period costs, Commerce determined these

expenses according to financial statements.  *Id.*  Commerce calculated Union's G&A expense

ratio using Union's financial statement for fiscal year 2008 and calculated Union's interest

expense ratio using the consolidated financial statement of Union's parent, Dongkuk Steel Mills

Co. Ltd. ("DSM"), for fiscal year 2008.[2]  *Id.* at 43.  Because the fiscal year of DSM and that of

Union are the calendar year, Br. in Supp. of the Mot. of Union Steel for J. upon the Agency R. 3

---

[2] The International Trade Administration, U.S. Department of Commerce ("Commerce"
or the "Department") determines general and administrative ("G&A") and interest expenses by
first calculating "ratios" for G&A and interest expenses based on data in a respondent's financial
statements.  The numerator of the G&A expense ratio is the respondent's full-year G&A
expenses, and the numerator for the interest expense ratio is the respondent's full-year net
financial expenses.  *See*, *e.g.*, *Letter from Union to the Sec'y of Commerce* D-36-D-37 (Feb. 5,
2009) (Admin. R. Doc. No. 4845).  The denominator for both ratios is the respondent's full-year
cost of goods sold.  *Id.*  Commerce uses these ratios to calculate per-unit G&A and interest
expenses by multiplying each ratio by the total cost to manufacture the particular foreign like
product for which Commerce is calculating COP.  *Id.*

(Sept. 10, 2010), ECF No. 58 ("Union's Br."), these financial statements did not correspond

temporally with the POR (August 1, 2007 to July 31, 2008).  After calculating Union's G&A and

interest expense ratios using 2007 fiscal year financial statements in the Preliminary Results,

Commerce announced in the "Issues and Decisions Memorandum" it incorporated into the Final

Results ("Decision Memorandum") that, in agreement with comments on the Preliminary Results

submitted by petitioners, it had "revised Union's COP to include G&A and financial expense

ratios based on the 2008 fiscal year financial statements."  *Decision Mem.* 42.  Because DSM's

interest expenses were substantially greater in 2008 than in 2007, the change could be expected

to result in the exclusion of more home-market sales as "below-cost" sales under § 1677b(b)(1),

and apparently contributed to the increase in Union's margin from the Preliminary Results

(3.94%) to the Final Results (14.01%).  *Prelim. Results*, 74 Fed. Reg. at 46,114; *Final Results*, 75

Fed. Reg. at 13,491.[3]

Union claims that the use of the 2008 financial statements was unlawful because the

interest expenses incurred in 2008 "were aberrational and do not reasonably reflect Union's

actual data pertaining to the production and sale of the subject merchandise during the POR."

Union's Br. 9.  Union asserts that in 2008, after the close of the POR, DSM incurred "substantial

and extraordinary foreign exchange losses," *id.* at 10, that resulted from the 2008 global financial

crisis and that were reflected on DSM's 2008 financial statement, *id.* at 9-10.  Specifically, Union

contends that the 2008 financial crisis coincided with a rapid loss in the value of the Korean won,

which led to DSM's recognizing extraordinarily large foreign-currency transaction and

---

[3] Although Union challenges both the interest and the G&A expense ratios, this claim is directed mainly at the interest expense ratio.  The G&A ratio decreased slightly when Commerce changed from the 2007 to the 2008 financial statements. *Mem. from Accountant to Dir., Office of Accounting* 2 (Mar. 15, 2009) (Admin. R. Doc. No. 5260) ("*COP Analysis Mem.*").

translation[4] losses at the end of 2008.  *Id.* at 8-11.  Union argues that Commerce instead should

have used the 2007 statements to compute COP for sales in 2007 and the 2008 statements to

compute COP for sales in 2008, *id.* at 13, or, alternatively, calculated "a blended G&A and

interest rate using financial statements for 2007 and 2008 based on the relative portions of the

home market reporting period in each fiscal year," *id.* at 14.  Union also argues that the "home

market reporting period" includes the "90/60 day 'window' period outside of the POR proper,"

referring to the months in which Commerce, under its regulations, 19 C.F.R. § 351.414(e)(2)

(2010), searches for a sale of the foreign like product if no such sale is found in the months in

which the sale of the subject merchandise occurred.  Union's Br. 12.  Union submits that the

2007 statements overlapped more of the POR than did the 2008 statements when the window

period is considered in the analysis.  *Id.*

        Union raised essentially the same arguments before Commerce, arguing, *inter alia*, that

"using the 2008 financial statements would significantly distort the calculation of Union's

interest expense."  *Letter from Union to the Sec'y of Commerce* 1-2 (Jan. 27, 2010) (Admin. R.

Doc. No. 5219) ("*Union's Rebuttal Br.*").  Referencing the large increase in 2008 foreign

currency transaction and translation losses, Union argued that the "amount of such losses was not

determinable . . . until the end of 2008 and thus could not possibly have been taken into account

---

        [4] Union explains the "transaction" and "translation" categories as follows:

        Translation losses are the result of restating obligations that are denominated in a
        foreign currency into Korean Won as of December 31, so the exchange rate on
        December 31 determines the amount of loss or gain.  Transaction losses are also
        impacted by changes in exchange rates that occur between the time Union buys/sells
        on credit goods or services whose prices are denominated in a foreign currency.

Pl. Union Steel's Reply Br. 4 n.3 (Apr. 4, 2011), ECF No. 121.

by Union in setting its prices during the period of review . . . ."  *Id*. at 2.  Union argued, further,

that "[i]ncluding these exchange losses in Union's COP for the POR would be particularly

egregious in this case because . . . most of the depreciation in the Korean Won during 2008 took

place from August through December 2008, *i.e.*, in the months *after* the close of the POR."  *Id.*

at 7.  Union argued that "[f]oreign exchange transaction and translation losses attributable to the

depreciation of the Korean won *after the close of the POR* cannot, under any definition, be

considered part of the 'actual costs' incurred in producing and selling Union's home market

merchandise during the POR."  *Id.* at 8 (quoting 19 U.S.C. § 1677b(b)(3)(B)).  According to

Union, these circumstances warranted the Department's using a "blended rate" to calculate G&A

and interest, for instance, by combining the 2007 and 2008 financial data using a weighted

average.  *Id.* at 5.  Union also noted that Commerce had previously used a "blended rate" from

the financial statements of the two fiscal years covered by a POR, citing the results of an

administrative review of an antidumping duty order pertaining to CORE and cut-to-length steel

plate from Canada ("*CTL Plate from Canada 93/94*").  *Id.* at 5 (citing *Certain*

*Corrosion-Resistant Carbon Steel Flat Products & Certain Cut-to-Length Carbon Steel Plate*

*From Canada; Final Results of Antidumping Duty Admin. Reviews*, 61 Fed. Reg. 13,815, 13,829

(Mar. 28, 1996)).

A comparison of DSM's 2007 and 2008 financial statements supports Union's contention

that, primarily due to certain foreign-currency-related losses, the Department's change to the

2008 statement produced a financial expense ratio more than five times that derived from the

2007 statement.  *Letter from Union to the Sec'y of Commerce* exhibit D-29, at 8-9 (Aug. 26,

2009) (Admin. R. Doc. No. 5005) ("*DSM's Financial Statement*");[5] *Mem. from Accountant to Dir., Office of Accounting* attachment 3 (Mar. 15, 2009) (Admin. R. Doc. No. 5260) ("*COP Analysis Mem.*").  DSM's income statement shows a number of variations between 2008 and 2007 in the expenses underlying the financial ratio, but the variations that were largest, by far, were DSM's net losses of 305,946,498 million Korean won in the "foreign currency transaction" category and 332,899,437 million Korean won in the "foreign currency translation" category. *DSM's Financial Statement* 8-9; *Union's Rebuttal Br.* exhibit 1.[6]  By comparison, DSM's net loss for these two categories combined, as shown in the 2007 financial statement, was only 15,869,036 million Korean won.  *DSM's Financial Statement* 8.  All other financial expense categories accounted for only 12% of DSM's 2008 net financial expenses.  *COP Analysis Mem.* attachment 3.[7]  The record also supports Union's contention that the Korean won depreciated precipitously after the close of the POR.  Exhibits to Union's rebuttal brief before Commerce

---

[5] In its memorandum calculating the financial expense ratio, Commerce bracketed as business proprietary information the data from the financial statement of Dongkuk Steel Mills Co. Ltd. ("DSM").  *COP Analysis Mem.* attachment 3.  But the financial statements are now public information, Union having disclosed them in the public version of its August 26, 2009 questionnaire response.  *Letter from Union to the Sec'y of Commerce* exhibit D-29 (Aug. 26, 2009) (Admin. R. Doc. No. 5005) ("*DSM's Financial Statement*").

[6] The exhibit Union prepared for its rebuttal brief before Commerce indicates that "Unit= 1,000 KRW [Korean Won]."  *Letter from Union to the Sec'y of Commerce* exhibit 1 (Jan. 27, 2010) (Admin. R. Doc. No. 5219) ("*Union's Rebuttal Br.*").  This appears to be error because the document to which Union cites for this exhibit, DSM's financial statement, indicates the same figures but indicates "unit: million KRW."  *DSM's Financial Statement* 8.

[7] The Department's calculation of the financial expense ratio shows that the numerator of this ratio, "Net Financial Expenses," is comprised of several categories other than gains and losses on foreign currency transactions and translations: "Net Interest Expense," valuation and transaction gains and losses from financial derivatives, and "Short Term Interest Income."  *COP Analysis Mem.* attachment 3.  These categories, in aggregate, amount to net expenses of 86,778,305 million Korean won, or approximately 12% of DSM's net financial expenses in 2008, which was 725,624,240 million Korean won.

show that the Korean won was valued in U.S. dollars at $0.001069 on January 1, 2008,

$0.000989 on July 31, 2008, the final day of the POR, but at $0.000728 on December 31, 2008,

the final day of the year, which meant a post-POR decline of approximately 26%.  *Union's*

*Rebuttal Br.* exhibit 2.  Similarly, these exhibits show that the Korean won was valued at 0.119

Japanese yen on January 2, 2008, 0.107 Japanese yen on July 31, 2008, and 0.072 Japanese yen

on December 31, 2008.  *Id.* exhibit 3.

      In the Final Results, Commerce based its use of the 2008 statements to calculate G&A

and interest expenses on what it described as its "typical" or "standard" practice of using the

financial statements that most closely correspond to the POR.  For G&A expense, Commerce

stated that it has a standard practice of using "'the full-year G&A expense and cost of goods sold

reported in the company's unconsolidated, audited fiscal year financial statements for the fiscal

year that most closely corresponds to the period of investigation or period of review.'"  *Decision*

*Mem.* 42-43 (quoting the Department's "Antidumping Manual," Ch. 9, at 7, *available at*

http://ia.ita.doc.gov/admanual).[8]  With respect to the interest rate ratio, the Decision

Memorandum states that "the Department typically calculates a company's net financial expenses

ratio by using the 'full-year net financial expenses and costs of goods sold reported in the

consolidated, audited fiscal year financial statements for the period that most closely

corresponds'" to the POR.  *Id.* at 43 (quoting Antidumping Manual, Ch. 9, at 7).  The Decision

Memorandum adds that "[t]he Department consistently applies those principles in its

administrative proceedings" and that "[in] virtually all past cases, the Department has determined

which financial statements most closely correspond to the POR by examining which financial

---

     [8] The Department's website for the "Antidumping Manual" states that "[t]his manual cannot be cited to establish [Department of Commerce] practice."

statements overlap the POI [period of investigation]/POR by the greatest number of months." *Id.*

Observing that the "2008 financial statements overlapped seven months of the POR, whereas the

2007 financial statements overlapped only five months of the POR," Commerce concluded that

the 2008 financial statements were the "more appropriate basis for the G&A and financial

expense ratios." *Id.*

After citing the alleged practice, Commerce rejected the arguments Union advanced

against the use of only the 2008 financial statements to determine interest and G&A expenses.  It

characterized Union as arguing that "reliance upon 2008 fiscal year financial statements led to

distortions in the margin calculation because it could not have factored into its home market

prices post-period of review events, such as year-end adjustments and changes in net foreign

currency transactions and translations." *Id.* at 44.  Commerce rejected Union's argument, so

construed, by stating, *inter alia*, that "Union fails to substantiate its assumption that it was

completely unaware of pending end-of-fiscal year 2008 adjustments when setting home market

prices during the POR." *Id.*  In response to Union's argument that the decrease in the value of

the won caused massive, unexpected foreign exchange losses, Commerce conceded that "the

decline in the value of the Korean Won occurred more rapidly in the post POR period of 2008"

but stated that "this in of itself is not conclusive." *Id.*  Commerce explained that a departure

from its "practice" was not warranted because "[t]he financial expense ratio is influenced by

many factors, not simply the movement of exchange rates" and because "[n]ormally, large

multinational companies like DSM try to minimize the risk associated with exchange rate

changes by hedging their exposure to any one foreign currency." *Id.* at 44-45.  Finally,

Commerce rejected Union's suggestion that Commerce combine the 2008 and 2007 financial

statement data using a blended rate.  Commerce distinguished the facts of the prior case in which

it had used a blended rate, *CTL Plate from Canada 93/94*, by noting that the POR in that case

was eighteen months, covering the majority of two fiscal years. *Id.* at 45. Commerce concluded

that "[a]bsent similar circumstances in this case, the Department has reasonably determined that

a departure from its normal practice of selecting the single set of fiscal year financial statements

that most closely correspond to the POR is not warranted." *Id.*

The Department's decision to use only the 2008 DSM financial statement to determine

Union's interest expenses was unlawful for two reasons. First, Commerce failed to consider an

important aspect of the question before it, which was whether determining Union's interest

expense ratio solely on the basis of data in that financial statement produced the most accurate

result. A basic purpose of the antidumping statute is the accurate determination of dumping

margins. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). In this

case, Commerce was obligated to make a reasoned decision when choosing among data sources,

mindful of its obligation to obtain the most accurate result "based on actual data pertaining to

production and sales of the foreign like product . . . ." 19 U.S.C. § 1677b(b)(3)(B). The court

cannot identify within the Decision Memorandum an indication that Commerce had as its

objective achieving the most accurate margin through the choice of data for measuring interest

expenses during the POR. Instead, Commerce reasoned that using the 2008 financial statements

accords with its practice and that Union had not met a burden of showing that Commerce must

depart from this practice. *See Decision Mem.* 45 (concluding that "the Department has

reasonably determined that a departure from its normal practice of selecting the single set of

fiscal year financial statements that most closely correspond to the POR is not warranted").

When addressing Union's suggestion that Commerce combine the 2008 and 2007 financial

statements, Commerce refused to do so not out of a concern for accuracy but due to factual

differences between the present case and *CTL Plate from Canada 93/94*, in which Commerce

used a blended rate for a respondent's G&A and interest expenses.  *Id.* (refusing to modify its

calculation "[a]bsent similar circumstances in this case," *i.e.*, a POR that overlapped the majority

of two fiscal years).  On remand, Commerce must reconsider its decision to determine Union's

interest expense using only the 2008 DSM statement, addressing specifically the issue of whether

that method, compared to available alternatives, produced the most accurate dumping margin for

Union.

      In omitting any discussion of the question of accuracy as it pertains to the obligation to

use actual data on interest expenses, Commerce failed to address a significant concern raised by

Union before Commerce: that the 2008 DSM financial statement was affected by aberrational

foreign exchange losses stemming from exchange rate changes that occurred after the close of the

POR and therefore was unrepresentative of Union's actual interest expense during the POR.

*Union's Rebuttal Br.* 8.  A remand is appropriate when Commerce fails to address all "significant

concerns" that parties raise in administrative briefing.  *SKF USA Inc. v. United States*, 630 F.3d

1365, 1374 (2011).  Here, Union argued specifically that "[f]oreign exchange transaction and

translation losses attributable to the depreciation of the Korean won *after the close of the POR*

cannot, under any definition, be considered part of the 'actual costs' incurred in producing and

selling Union's home market merchandise during the POR."  *Union's Rebuttal Br.* 8; *see*

19 U.S.C. § 1677b(b)(3)(B) (requiring that G&A expenses be "based on actual data pertaining to

production and sales of the foreign like product").  Congress intended that Commerce use data

pertaining to costs "during the period of investigation or review," as is confirmed by the

Statement of Administrative Action that accompanied enactment of section 773 of the Tariff Act,

19 U.S.C. § 1677b(b), as part of the Uruguay Round Agreements Act.  *Uruguay Round*

*Agreements Act, Statement of Administrative Action*, H.R. Doc. No. 103-316, Vol. 1, at 832

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4170 ("The determination of cost recovery is

based on an analysis of actual weighted-average prices and costs during the period of

investigation or review . . .").

  The Decision Memorandum pays scant, if any, attention to Union's argument that DSM's

2008 financial statement contained post-POR data that was not representative of Union's actual

costs of producing and selling merchandise during the POR.  While acknowledging that "Union

also contends that reliance upon 2008 fiscal year financial statements led to distortions in the

margin calculation," the document characterizes Union's argument as being based on Union's

inability to "factor[] into its home market prices post-period of review events, such as year-end

adjustments and changes in net foreign currency transactions and translations." *Decision*

*Mem.* 44.  Rejecting this aspect of Union's argument, Commerce stated that "Union fails to

substantiate its assumption that it was completely unaware of pending end-of-fiscal year 2008

adjustments when setting home market prices during the POR." *Id.*  While conceding the fact

that "the decline in the value of the Korean Won occurred more rapidly in the post POR period of

2008," Commerce responded by asserting that "[t]he financial expense ratio is influenced by

many factors, not simply the movement of exchange rates" and that "[n]ormally, large

multinational companies like DSM try to minimize the risk associated with exchange rate

changes by hedging their exposure to any one foreign currency." *Id.*  Neither of these statements

addressed Union's contention that the 2008 DSM statement was unrepresentative of Union's

"actual data."  On remand, Commerce must address this contention.

  A second reason for a remand is the Department's justifying the use of DSM's 2008

financial statement on an incorrect premise: that the Department has a consistent practice of

using the single financial statement corresponding to the largest portion the POR.  As observed in

a case involving the previous (fourteenth) administrative review of this order, *Union Steel v.*

*United States*, 35 CIT __, __, 755 F. Supp. 2d 1304, 1311 (2011), "the so-called 'practice' is

subject to exceptions" and "[w]hat Commerce describes as its practice is at most a preference for

using the financial statement most closely corresponding to the POR, a preference that

Commerce does not observe when it finds sufficient reason to use a different financial statement

or statements."  The court is unable to agree with the statement in the Decision Memorandum

that this "practice" has been consistently followed.  *Decision Mem.* 43.

In the fourteenth administrative review of the order on Korean CORE, for which the

period of review was August 1, 2006 through July 31, 2007, Commerce also determined it

appropriate to calculate Union's G&A and interest expense ratios using the financial statements

corresponding with the final seven months of the POR, *i.e.*, the 2007 statements.  Upon judicial

review, this Court upheld the Department's determination.  *Union Steel*, 35 CIT at __, 755 F.

Supp. 2d at 1309.  Union made several arguments in that case that it also makes here: that

Commerce should choose the earlier financial statements based on the greater correspondence

with the home-market reporting period (the period of review as expanded by the 90/60-day

window period) rather than the period of review, that Commerce should not use data affected by

events occurring after the close of the period of review, including a 2007 year-end adjustment for

foreign currency transaction gains and losses that Union argued it could not possibly factor into

its home-market pricing, and that Commerce, if not using only the earlier (2006) statements,

should calculate the ratios by combining data from the financial statements for both fiscal years.

*Id.* at __, 755 F. Supp. 2d at 1309-12.  Rejecting Union's arguments, the court concluded, first,

that the choice of the 2007 statements over the 2006 statements based on a greater

correspondence with the period of review was permissible on the record in that case and that the

other approach Union advocated, the use of a combination of statements for both fiscal years, did

not offer, on that record, clear advantages over use of financial statements for the single fiscal

year most closely corresponding to the period of review such that Commerce's approach must be

found unreasonable.  *Id.* at __, 755 F. Supp. 2d at 1312.  Unpersuaded by Union's argument that

Union could not factor year-end currency transaction gains and losses into its prices during the

period of review, this Court reasoned that "[a]lthough Union may have a legitimate interest in

being able to predict how Commerce will apply the Tariff Act to its sales and set prices

accordingly, that interest, in the entire circumstances of this case, is not sufficient to compel

Commerce to use the 2006 financial statements."  *Id.* at __, 755 F. Supp. 2d at 1310.  The record

in this case differs markedly from that upon which the Department's choice in the fourteenth

review was upheld.  Here, the interest cost ratio derived from the 2008 financial statement of

DSM reflects a five-fold increase from the interest cost ratio derived from the 2007 statement and

appears to have been affected significantly by currency-related losses that coincided with a

massive post-POR decline in the value of the Korean won.

      In summary, Commerce must reconsider its decision to base Union's interest expense

ratio entirely on data obtained from DSM's 2008 financial statement.  In doing so, Commerce

must consider the relative merits of alternate methods of determining the interest expense ratio in

the interest of obtaining the most accurate dumping margin and also must give adequate

consideration to Union's objection that, due to post-POR depreciation of the Korean won, the

interest cost ratio obtained solely from those data was not representative of the actual interest

expense that Union incurred during the POR.

The court does not identify with respect to the G&A expense ratio, also challenged by Union, the same legal infirmities it identified with respect to the interest ratio.  Because the Decision Memorandum jointly addresses the two issues, and because Commerce must reconsider its decision on the interest expense issue, the court defers any ruling on whether or not the G&A expense ratio as determined in the Final Results is in accordance with law.  Commerce may reconsider its determination of the G&A expense ratio in its remand redetermination.

The court does not find merit in arguments U.S. Steel advances in opposition to a remand on the interest expense issue.  U.S. Steel argues, first, that the record does not show that the 2008 financial crisis was "responsible for either the decline in the value of the won or Union's increased foreign exchange losses."  Mem. in Opp'n to Pls.' Mots. for J. on the Agency R. filed by Def.-Intervenor United States Steel Corp. 12 (Feb. 11, 2011), ECF No. 105 ("U.S. Steel's Opp'n").  The Department, however, did not reach a finding that the interest expense data in DSM's 2008 financial statement were unaffected by the steep decline in the exchange rate of the Korean won occurring after the close of the POR.  The record contains evidence of a steep post-POR decline in the value of the won and evidence of DSM's large foreign exchange losses in late 2008; whether the global financial crisis was at the root of the won depreciation and DSM's post-POR exchange losses during that time period is a tangential question.

U.S. Steel next argues that Commerce correctly rejected Union's argument because factors other than unpredictable currency fluctuations–such as DSM's substantial increases in sales and costs of goods sold from 2007 to 2008–affected DSM's foreign currency transaction and translation losses.  *Id.* at 13.  Nucor makes a similar argument.  Resp. Br. of Nucor Corp. 47 (Feb. 11, 2011), ECF No. 92 ("Nucor's Resp.").  As discussed above, however, the record shows that the foreign-currency-related losses were the most important factor affecting the

Department's calculation of DSM's 2008 net financial expenses, with all other financial expense

categories accounting for only 12% of DSM's 2008 net financial expenses.  *COP Analysis Mem.*

attachment 3.

U.S. Steel points to evidence in DSM's financial statement that DSM had far greater

liability for notes payable in foreign currencies during 2008 than in 2007.  U.S. Steel's

Opp'n 13-14 (citing *DSM's Financial Statement* 55).  This argument does not address the

shortcomings in the Department's decision, which offered blanket adherence to a claimed

practice to support the choice of using only the 2008 DSM statement and lacked adequate

reasoning as to why that choice was superior to the alternatives on the record.

U.S. Steel argues, further, that "there is not a shred of evidence to suggest that the

activities giving rise to the increased transaction and translation gains and losses occurred after

the end of the POR."  *Id.* at 14.  In so arguing, U.S. Steel seems to posit that the post-POR won

depreciation did not affect the Department's calculation of the interest expense ratio, even though

that calculation was based solely on DSM's 2008 financial statement.  U.S. Steel appears to base

its argument on a factual finding which, as noted above, the Department did not reach and for

which U.S. Steel itself cites no evidence of record.

U.S. Steel also takes issue with Union's calling the foreign currency transaction and

translation losses "extraordinary," arguing that such losses are common to all businesses and

were not treated as exceptional on DSM's financial statement.  *Id.* at 14 (citing Union's Br. 11).

As the court has observed, the record contained evidence of DSM's substantial foreign currency

exchange losses in 2008 relative to 2007 and evidence of the steep post-POR decline in the value

of the Korean won.  Commerce did not find that the losses in question, however characterized in

DSM's financial statement, were typical for DSM.

Finally, U.S. Steel argues that Union's engaging in currency hedging contracts shows that Union anticipated the late-2008 currency fluctuations and modified its pricing to adjust for anticipated losses. *Id.* at 15. The record shows that Union engaged in one "currency swap" on June 18, 2008 and another on July 9, 2008, each in the amount of $3,000 (U.S.). *DSM's Financial Statement* 45. If these currency swaps suggest anything as to whether Union anticipated the decline of the Korean won, it is that Union was caught unaware: had Union anticipated that decline, presumably it would have hedged more aggressively. Nor do these contracts suggest anything about Union's pricing activity.

Defendant-intervenor Nucor also defends the Department's determination. Nucor argues that financial expenses are "period costs . . . accrued in year-end adjustments" and that "[c]ompanies project these types of expenses, and can make pricing decisions based on those projections, throughout the year." Nucor's Resp. 46. This argument does not address the question of whether Commerce permissibly used the 2008 DSM financial statement, and only that statement, to calculate the interest expense ratio despite the post-POR depreciation of the won that appeared to affect the interest expense data shown therein. Nucor also argues that Union is incorrect that "the aberrational foreign currency exchange and translation losses were incurred after the POR" because "there was a fairly steady decline in the value of the Korean won through 2008." *Id.* at 47. Nucor's argument mischaracterizes the record evidence. Although some depreciation of the won took place from January through July 2008, the record shows that depreciation was far more pronounced in the remaining five months of 2008. *Union's Rebuttal Br.* exhibit 2 (showing a decline of approximately 7.5% against the U.S. dollar from January 1, 2008 through July 31, 2008 and a decline of 26% from July 31, 2008 through December 31, 2008); *id.* exhibit 3 (showing a decline of approximately 11% against the Japanese yen from

January 2 through July 31, 2008 and a decline of 49% from July 31, 2008 through December 31,

2008).

    B.  In Response to Defendant's Request for a Voluntary Remand, the Court Will Require
Commerce to Reconsider the Quarterly-Cost Method of Applying the "Recovery-of-Costs" Test
to Home-Market Sales of Union and HYSCO and the Indexing Methodology Wherever Used

        As discussed previously, section 773(b) of the Tariff Act allows Commerce, in certain

circumstances, to disregard comparison-market sales made at less than COP when determining

normal value.  19 U.S.C. § 1677b(b) (the "below-cost" test).  Commerce may disregard such

sales only if the sales "have been made within an extended period of time in substantial

quantities" and "were not at prices which permit recovery of all costs within a reasonable period

of time." *Id.* § 1677b(b)(1).  With respect to the latter requirement, the Tariff Act, in section

773(b)(2)(D), expressly limits the Department's discretion to exclude from the normal value

determination comparison-market sales that were made at less than the cost of production.

Section 773(b)(2)(D) provides that:

> If prices which are below the per unit cost of production at the time of sale are above
> the weighted average per unit cost of production for the period of investigation or
> review, such prices shall be considered to provide for recovery of costs within a
> reasonable period of time.

*Id.* § 1677b(b)(2)(D).  Union and HYSCO claim that Commerce failed to determine weighted-

average per-unit costs of production of individual foreign like products using the one-year POR

as the averaging period and, therefore, did not comply with the recovery-of-costs test imposed by

this provision.  More broadly, both plaintiffs claim that the Department's calculating an element

of COP, manufacturing costs, using less than period-wide average costs (a methodology to which

the parties refer as the "quarterly-cost methodology") violated section 773(f)(1)(A) of the Tariff

Act, 19 U.S.C. § 1677b(f)(1)(A).  Under this provision, "[c]osts shall normally be calculated

based on the records of the exporter or producer of the merchandise, if such records . . .

reasonably reflect the costs associated with the production and sale of the merchandise."  Union's

Br. 15-34; Mem. in Supp. of the Mot. of Pl. Hyundai HYSCO for J. on the Agency R. 7-33 (Sept.

10, 2010), ECF No. 64 ("HYSCO's Mem.").

        In the fifteenth review, Commerce calculated COP using four quarterly weighted-average

cost calculations.  *Decision Mem.* 21.  In so doing, Commerce did not effectuate the recovery-of-

costs test and the below-cost test according to its usual method, under which it determines per-

unit weighted-average costs by using the POR as the averaging period.  In addition to

determining costs on a quarterly basis, the methodology Commerce used in the fifteenth review

applied a multi-step "indexing" method to the respondents' data on the cost of steel coil

substrate, a significant input in the production of CORE.  *Union's Post-Prelim. Analysis*

*Mem.* 3-5; *Decision Mem.* 24.  As described in the Decision Memorandum, "the Department

indexed the quarterly material costs to a common period cost level, thereby neutralizing the

effect of the significant cost changes for the input between quarters."  *Decision Mem.* 23.  Next,

Commerce "calculated a period of review weighted-average per unit cost," and "[f]inally, the

weighted-average per unit cost for the period of review for the substrate input was indexed back

to the appropriate quarter to keep the weighted-average per unit costs consistent with the main

input's significantly changing price levels occurring between quarters."  *Id.*

        The Department grounded its decision to use an indexed quarterly-cost methodology in

part on its findings that, for Union and HYSCO, there were significant changes–exceeding

25%–in the quarterly average cost of manufacture of the five most-frequently sold products (each

identified by an individual "Control Number," or "CONNUM") in the U.S. and home markets

during the POR.  *Id.* at 17 ("A change in costs that exceeds 25 percent, even if it was only

between two quarters of the POR, is significant enough to create distortion when using a single

annual average cost methodology.").  Commerce also based its decision on a finding that there

was evidence of reasonable correlation between the cost changes and the sales prices during the

quarterly cost periods.  *Id.* at 18-19.

In describing the change from the Department's normal methodology, the Decision

Memorandum states that "the Department usually compares a respondent's sales prices against a

single weighted-average cost of production for the period of review to determine whether sales

were made at less than costs of production and whether the sales prices permit recovery of all

costs within a reasonable period of time."  *Id.* at 21.  It concludes, however, that departure from

the normal methodology is warranted "where, as here, cost and price averages calculated over the

entire period do not permit proper comparison."  *Id.*  Commerce reasoned that

> [w]hen costs change significantly, and prices follow such cost changes, using an
> unadjusted annual average cost in performing the recovery of cost test will result in
> virtually all sales during the highest cost periods passing the recovery of costs test
> simply due to the timing of the sale in relation to the cost change cycle.

*Id.* at 23.

Defendant requests a voluntary remand on the Department's using the quarterly-cost

methodology to satisfy the recovery-of-costs test of 19 U.S.C. § 1677b(b)(2).  Def.'s June

Remand Mot.  Defendant cites a decision of this Court, *SeAH Steel Corp. v. United States*,

35 CIT __, __, 764 F. Supp. 2d 1322, 1331-35 (2011), which disallowed the Department's

applying an indexed quarterly-cost-based methodology to determine which home-market sales

did not satisfy the recovery-of-costs test.  Def.'s June Remand Mot. 3 (informing the court that

"Commerce wishes to reconsider its cost-recovery methodology as applied to Union Steel and

HYSCO in light of the Court's decision in *SeAH*, and potentially apply the reasoning in *SeAH* to

the facts of this record").  In *SeAH*, this Court concluded that the Department's indexed quarterly

methodology as applied in that case "violates the plain language of the cost recovery statute" and

directed Commerce, on remand, to conduct the cost-recovery analysis using the unindexed

weighted-average per-unit cost of production for the entire period of review.  *SeAH*, 35 CIT

at __, 764 F. Supp. 2d at 1331.[9]  Although requesting a remand on the use of indexed quarterly

costs for the "cost-recovery methodology," Commerce requests that relief be "denied with

respect to all issues except the . . . cost-recovery methodology."  Def.'s June Remand Mot.

Proposed Order; *see* Oral Tr. 8 (July 13, 2011), ECF No. 142.  Thus, defendant would have the

court not order remand on, and instead affirm, the Department's use of quarterly costs for other

purposes.  During oral argument, defendant clarified that it requests a remand so that Commerce

may reconsider the use of a quarterly-cost methodology for recovery-of-costs purposes and the

indexing methodology for the steel substrate input "wherever it was used."  Oral Tr. 158-59.

Under the remand order the court is issuing, Commerce will be required to reconsider both of

these aspects of the Final Results.  As discussed below, the court concludes that reconsideration

of the use of the indexed quarterly-cost methodology for other purposes in the Final Results is

appropriate as well.

---

[9] Other decisions of this Court have ruled on issues broadly related to the question of averaging periods.  *See Pastificio Lucio Garofalo, S.p.a. v. United States*, 35 CIT __, 783 F. Supp. 2d 1230 (2011) (upholding the decision to use quarterly costs, instead of semi-annual costs); *SeAH Steel Corp. v. United States*, 34 CIT __, __, 704 F. Supp. 2d 1353, 1364 (2010) (declining to disallow the use of quarterly cost averaging periods but remanding for further explanation on use for recovery-of-costs test); *Habas Sinai Ve Tibbi Gazlar v. United States*, 33 CIT __, __, 1371 625 F. Supp. 2d 1339, 1371 (2009) (remanding for further explanation of decision not to use quarterly costs); *Nucor Corp. v. United States*, 33 CIT __, __, 612 F. Supp. 2d 1264, 1337 (2009) (granting a voluntary remand for reconsideration of decision not to use quarterly costs).

C.  Commerce Must Reconsider the Quarterly-Cost Methodology and the Indexing Methodology
as Used for the Various Different Purposes in the Final Results

As mentioned earlier, the Decision Memorandum discloses that Commerce applied its

indexed quarterly-cost methodology in conducting both the below-cost test and the recovery-of-

costs test.  *Decision Mem.* 21.  The Decision Memorandum refers generally to the use of a single

methodology in performing both those tests as well as constructed value ("CV") determinations[10]

and difference-in-merchandise ("DIFMER") adjustments.  *Id.* at 14.  When read as a whole, the

Decision Memorandum suggests that Commerce chooses a single cost methodology (*e.g.*, either

its normal POR-wide cost methodology or a shorter-period cost methodology) to fulfill all four of

these purposes.

Union and HYSCO challenged the use of the indexed quarterly-cost methodology

generally and thereby did not limit their challenges to the Department's use of this methodology

to conduct the recovery-of-costs test.  Defendant's remand request refers to the recovery-of-costs

test and to indexing wherever used but does not specifically request a remand on the use of the

quarterly methodology (as opposed to the use of indexing) for the other purposes, *i.e.*, the below-

---

[10] Constructed value ("CV") is defined, in relevant part, as follows.

[T]he constructed value of imported merchandise shall be an amount equal to the
sum of—
> (1) the cost of materials and fabrication or other processing of any kind
> employed in producing the merchandise, during a period which would
> ordinarily permit the production of the merchandise in the ordinary course of
> business;
> (2) [providing four options for calculating amounts for selling, general, and
> administrative expenses, and for profits]; and
> (3) the cost of all containers and coverings of whatever nature, and all other
> expenses incidental to placing the subject merchandise in condition packed
> ready for shipment to the United States.

19 U.S.C. § 1677b(e).

cost test, CV, and DIFMER.  The court concludes that it is appropriate to order a remand so that the Department will reconsider the indexed quarterly-cost methodology wherever it was used in the Final Results.

The Department's discussion in the Decision Memorandum of the reasons supporting use of an indexed quarterly-cost methodology in the Final Results refers to all four applications, *i.e.*, the below-cost test, the recovery-of-costs test, CV, and DIFMER.  *See id*.  The document does not present reasons why different averaging periods or cost methodologies would be appropriate for each of those four applications.  To the contrary, with respect to identifying below-cost sales and determining which sales satisfy the recovery-of-costs test, Commerce stated that it considered the use of the methodology for both purposes to be necessary "to address significant variations in the cost of a major input that dramatically changed the per-unit cost of manufacturing during the period of review" and thereby prevent distortions.  *Id*. at 22 ("If we were to adjust for the distortion in performing the below-cost test, but fail to adjust for the distortion in performing the recovery of costs test, it would lead to similarly distorted results.").  Moreover, the Decision Memorandum, as well as defendant's oral explanation of its remand request, associate the quarterly-cost methodology with the indexing methodology.  *Id.* at 24 ("The Department's use of indices . . . was necessary to comply with statute's requirement of weighted-average costs for the period for the cost recovery test . . .");  *Union's Post-Prelim. Analysis Mem.* 4 (stating that "an average cost of production database, where each CONNUM contains the indexed annual average substrate coil cost . . . was used in the sales-below-cost and CV calculations").  At oral argument, the parties did not represent to the court that the Final Results did not apply indexing in each of the four applications of the quarterly-cost methodology, expressing some uncertainty on the question.  Oral Tr. 159.

In summary, the Decision Memorandum mentioned all four applications of the quarterly-cost methodology in a unified context and did not present reasons why the Department would consider addressing the four applications inconsistently.  As defendant clarified at oral argument, the Department seeks a remand order permitting reconsideration of the indexing methodology for steel coil substrate wherever that methodology is used.  The Decision Memorandum itself justifies the indexing methodology as a corollary of the quarterly-cost methodology.  A piecemeal remand order that confines the required reconsideration of the quarterly-cost methodology to the recovery-of-costs test would appear to be inconsistent with the scope of the remand order sought on the indexing methodology and also be inconsistent with the overall approach taken in the Decision Memorandum.  Therefore, the court considers it prudent to direct that Commerce, on remand, reconsider its use of the quarterly-cost methodology, as well as the use of the indexing methodology for steel coil substrate, wherever those methodologies were used in the Final Results.  If, on remand, the Department determines it appropriate to apply inconsistent approaches, it should explain its reasons for doing so.

D.  On Remand, Commerce Must Redetermine Whether it Is Appropriate to Depart from the
Normal Method of Determining the Contemporaneous Month

Consistent with its ordinary practice, Commerce in the Final Results compared the export price or constructed export price in an individual sales transaction of subject merchandise to a weighted average of the normal values for a single month determined to be contemporaneous with that individual transaction (the "contemporaneous month").  *Decision Mem.* 19-20; *see* 19 C.F.R. § 351.414(b)(3) (setting forth the "average-to-transaction" method), (e) (limiting the averaging of normal values to the contemporaneous month).  Commerce departed from its normal method, however, in determining the contemporaneous month.  A Department regulation

provides that "[n]ormally, the Secretary [of Commerce] will select as the contemporaneous

month the first of the following which applies," listing first the calendar month during which the

U.S. sale was made so long as a sale of the foreign like product was made during that month,

then the "most recent of the three months prior to the month of the U.S. sale in which there was a

sale of the foreign like product," and, finally, "the earlier of the two months following the month

of the U.S. sale in which there was a sale of the foreign like product." 19 C.F.R. § 351.414(e)(2).

The regulation is often identified as the "90/60-day window period" regulation.  Union and

HYSCO challenge the Department's deviating from the usual method as reflected in the

regulation.

In the Final Results, Commerce did not apply the "normal" method of the 90/60-day

window period regulation, concluding that it was not appropriate to compare U.S. sales with

home-market sales occurring outside of the quarter in which the U.S. sale occurred.  Instead,

Commerce determined that "it is appropriate in this case to match sales only within the same

quarter." *Decision Mem.* 21.  Union claims that the Department's deviating from the normal

method for identifying the contemporaneous month impermissibly produced a less accurate

dumping margin by reducing the number of matches and, accordingly, increasing the

Department's resort to constructed value.[11]  Union's Br. 30-31.

Commerce stated in the Decision Memorandum that "when applying the alternative cost

averaging methodology due to significantly changing costs, the Department has in the past

---

[11] HYSCO also argues that the Department's method of determining the contemporaneous
month in the Final Results was unlawful but states, further, that more of its sales were compared
as "identical" under the Department's method (referring, apparently, to the combined use of the
quarterly-cost methodology and the change in the contemporaneous month methodology) than
would have been the case had the regulation been applied.  Resp. to Request from Ct. 1-2 (July
18, 2011), ECF No. 133.

eliminated the '90/60' day window period . . . .  That is, the sales 'contemporaneity' period was

modified to conform with the shortened cost averaging period." *Decision Mem.* 20.  Commerce

explained that "as costs are calculated over shorter periods, it directly limits the periods of time

over which sale prices can reasonably be matched," *id.* at 15, and that "[w]hen significant cost

changes have occurred during the POR . . . we find that price-to-price comparisons should be

made within the shorter cost averaging period to lessen the margin distortions caused by changes

in sales price which result from significantly changing costs," *id.* at 20.  Thus, the Department's

decision to use a non-standard method of determining the contemporaneous month was solely a

consequence of the decision to apply a non-standard quarterly-cost methodology.  Commerce

itself now questions aspects of the quarterly-cost methodology as applied in the fifteenth review.

Because the court is ordering reconsideration of the quarterly-cost methodology as used in the

Final Results, the court also will order Commerce to reconsider its associated decision to depart

from the normal method of determining the contemporaneous month that is described in

19 C.F.R. § 351.414(e)(2).

### E.  Commerce Must Reconsider its Decision to Compare Laminated CORE and Non-Laminated, Painted CORE as Identical Merchandise

The antidumping statute directs in § 1677(16)(A) that Commerce, in determining the

foreign like product, first seek to compare a U.S. sale of subject merchandise with a comparison-

market sale of merchandise "which is identical in physical characteristics with, and was produced

in the same country by the same person as, that merchandise.''  19 U.S.C. § 1677(16)(A).  If no

such comparison can be satisfactorily made, Commerce, in accordance with § 1677(16)(B), seeks

to match the subject merchandise with merchandise produced in the same country, produced by

the same person, that is "like that merchandise in component material or materials and in the

purposes for which used," and "approximately equal in commercial value to that merchandise." *Id*. § 1677(16)(B).  If the latter comparison cannot be satisfactorily made under § 1677(16)(B), Commerce is to seek to match the subject merchandise under § 1677(16)(C) with merchandise produced in the same country and by the same person that is "of the same general class or kind as the subject merchandise . . . like that merchandise in the purposes for which used . . . [and] may reasonably be compared with that merchandise."  *Id*. § 1677(16)(C).

In the fifteenth review, as it had in previous reviews of the order on CORE from Korea, Commerce determined that Union's laminated CORE was "identical in physical characteristics with" painted, non-laminated CORE for purposes of § 1677(16)(A).  *Decision Mem.* 28-30.  In doing so, Commerce rejected the proposal Union made during the fifteenth review that Commerce treat laminated CORE as a separate type category of products for model-match purposes.  *Id.*  Union challenges the Department's decision, arguing that there are obvious physical differences separating its laminated CORE from painted CORE and that, as a result, substantial evidence on the record does not support a finding that these two groups of products are "identical."  Union's Br. 35-39.  In its response to Union's USCIT Rule 56.2 motion, defendant requests a voluntary remand so that Commerce may reconsider its decision on the model-match issue.  Def.'s Resp. 46-49.  In their responses to Union's motion, defendant-intervenors argue that Commerce properly compared laminated CORE with painted, non-laminated CORE as identical merchandise.  Nucor's Resp. 49-57; U.S. Steel's Opp'n 58-60.

In requesting a voluntary remand, defendant cites *Union Steel v. United States*, 35 CIT __, 753 F. Supp. 2d 1317 (2011), in which this Court, reviewing the final results of the thirteenth review of the order on CORE from Korea, disallowed the comparison for model-match purposes of Union's painted, non-laminated CORE with Union's laminated CORE as products "identical

in physical characteristics" within the meaning of § 1677(16).  This Court held it unlawful for

Commerce to compare the two groups of products as identical merchandise absent a finding,

supported by substantial evidence (held not to exist on the record in that case), that the physical

differences between the two product groups are minor and not commercially significant.  *Union

Steel*, 35 CIT at __, 753 F. Supp. 2d at 1322-23.  The Department's remand redetermination in

that case was filed subsequent to the February 11, 2011 date of defendant's request for a

voluntary remand on the model-match issue in this litigation.  In that remand redetermination, the

Department concluded that record evidence in the thirteenth administrative review supported

revising the physical characteristics classifications of the Department's model-match

methodology to create a separate type category for laminated CORE products.  *Final Results of

Redetermination Pursuant to Remand* (Apr. 11, 2011), ECF No. 143 (Court No. 08-00101).

Commerce reached the same conclusion in litigation contesting the final results of the fourteenth

administrative review.  *Final Results of Redetermination Pursuant to Remand* (July 15, 2011),

ECF No. 115 (Court No. 09-00130).

      The court will order that Commerce, on remand, reconsider its decision denying Union's

request for a change in the model-match methodology.  Consistent with the holding in *Union

Steel*, 35 CIT at __, 753 F. Supp. 2d at 1322, Commerce on remand may not compare as identical

merchandise Union's sales of the painted and non-laminated CORE with Union's sales of

laminated CORE absent a finding, supported by substantial evidence on the record, that the

physical differences distinguishing the two product groups are minor and not commercially

significant.

### F.  Remand is Appropriate on the Department's Use of the Zeroing Methodology

Commerce applied its "zeroing" methodology to calculate Union's weighted-average dumping margin in the fifteenth review.  Applying this methodology, Commerce determined a dumping margin for each sale of subject merchandise and then converted each negative margin to a zero margin before calculating a weighted-average percentage margin.  *See Decision Mem.* 3 (stating that "[t]hese so called 'transactions with negative margins' are simply non-dumped transactions" and explaining that "[as] no dumping margins exist with respect to sales where [normal value] is equal to or less than export price or constructed export price, the Department will not permit these non-dumped transactions to offset the amount of dumping found with respect to other sales").

Referring to the fact that the Department does not currently use the zeroing methodology for investigations of sales at less than fair value, Union argues that the use of the zeroing methodology in the fifteenth review signifies that the Department unlawfully "interprets the exact same statutory language," *i.e.*, the statutory provision defining "dumping margin," 19 U.S.C. § 1677(35)(A), "to mean different things in reviews and investigations, which is contrary to basic rules of statutory construction."  Union's Br. 39.  Although initially defending the Department's use of zeroing in its response, Def.'s Resp. 49-52, and continuing to maintain that controlling precedent allows zeroing in administrative reviews, Def.'s Aug. Remand Mot. 3, defendant now requests a voluntary remand on the zeroing issue "in light of the apparent uncertainty caused by *JTEKT*, and in the interest of judicial economy and prompt resolution of this litigation," Def.'s Aug. Remand Mot. 3 (citing *JTEKT Corp. v. United States*, 642 F.3d 1378, 1383-85 (Fed. Cir. 2011)).

In two 2011 decisions, *JTEKT Corp.* and *Dongbu Steel Co. v. United States*, 635 F.3d

1363 (Fed. Cir. 2011), the U.S. Court of Appeals for the Federal Circuit ("Court of Appeals")

questioned the legality of the Department's construction of 19 U.S.C. § 1677(35) and declined to

affirm the judgments of the Court of International Trade upholding the use of zeroing.  *See*

*Dongbu*, 635 F.3d at 1371-73; *JTEKT Corp.*, 642 F.3d at 1383-85.  In each decision, the Court of

Appeals held that the final results of an administrative review in which zeroing was used must be

remanded for an explanation by Commerce explaining the Department's interpreting the

language of § 1677(35) inconsistently with respect to the use of zeroing in investigations and the

use of zeroing in administrative reviews.  Following the decisions of the Court of Appeals in

*JTEKT Corp.* and *Dongbu*, remands to the Department for such an explanation have been

ordered in previous cases before this Court.  *See, e.g.*, *SKF USA Inc. v. United States*, 35 CIT __,

__, 800 F. Supp. 2d 1316, 1325 (2011); *SKF USA Inc. v. United States*, 35 CIT __, __, Slip Op.

11-94, at 10-13 (Aug. 2, 2011); *JTEKT Corp. v. United States*, 35 CIT __, __, 780 F. Supp. 2d

1357, 1362-63 (2011); *Union Steel v. United States*, 35 CIT __, __, 804 F. Supp. 2d 1356,

1367-69 (2011); *see also Union Steel v. United States*, 35 CIT __, 823 F. Supp. 2d 1346 (2012)

(affirming remand results that contained a more recent construction of the antidumping statute

under which Commerce concluded that the zeroing methodology is permissibly applied in an

antidumping administrative review).

As defendant acknowledges, the Decision Memorandum explains the Department's

construction of § 1677(35) as applied to investigations and reviews using a rationale essentially

the same as the one the Court of Appeals rejected in *JTEKT Corp.*  *Decision Mem.* 4-6; Def.'s

Aug. Remand Mot. 3 ("Commerce's explanation for applying zeroing in the administrative

review before the Court here mirrors that in the determination remanded by the court of appeals

in *JTEKT*.").  The Decision Memorandum provides a list of differences between investigations

and administrative reviews and then concludes that "[b]ecause of these distinctions," the

Department's inconsistent interpretation of § 1677(35) was not "improper."  *Decision Mem* 5.[12]

The Court of Appeals concluded in *JTEKT Corp.* that the Department's explanation "failed to

address the relevant question—why is it a reasonable interpretation of the statute to zero in

administrative reviews, but not in investigations?" *JTEKT Corp.*, 642 F.3d at 1384.  The court

will direct that Commerce, on remand, either modify its decision to apply the zeroing

---

[12] The entire discussion on the statutory construction issue reads as follows:

The Federal Circuit has found the language and congressional intent behind section
771(35) of the Act to be ambiguous.  Furthermore, antidumping investigations and
administrative reviews are different proceedings with different purposes.
Specifically, in antidumping investigations, the Act specifies particular types of
comparisons that may be used to calculate dumping margins and the conditions under
which those types of comparisons may be used.  The Act discusses the types of
comparisons used in administrative reviews.  The Department's regulations further
clarify the types of comparisons that will be used in each type of proceeding.  In
antidumping investigations, the Department generally uses average-to-average
comparisons, whereas in administrative reviews the Department generally uses
average-to-transaction comparisons.  The purpose of the dumping margin calculation
also varies significantly between antidumping investigations and reviews.  In
antidumping investigations, the primary function of the dumping margin is to
determine whether an antidumping duty order will be imposed on the subject
imports.  In administrative reviews, in contrast, the dumping margin is the basis for
the assessment of antidumping duties on entries of merchandise subject to the
antidumping duty order.  Because of these distinctions, the Department's limiting of
the *Final Modification* [*i.e.*, the decision to stop zeroing in investigations] to
antidumping investigations involving average-to-average comparisons does not
render its interpretation of section 771(35) of the Act in administrative reviews
improper.  Therefore, because section 771(35) of the Act is ambiguous, the
Department may interpret that provision differently in the context of antidumping
investigations involving average-to-average comparisons than in the context of
administrative reviews.

Issues & Decision Mem., A-580-816, ARP 07-08, at 5 (Mar. 15, 2010) (Admin. R. Doc.
No. 5249).

methodology in the fifteenth review or, alternatively, provide an explanation that satisfies the

requirements the Court of Appeals imposed in *Dongbu* and *JTEKT Corp.*

### G.  The Court Denies Relief on Dongbu's Claim Seeking an Individually-Determined Dumping Margin Because Dongbu Failed to Exhaust its Administrative Remedies

The Final Results assign individual weighted-average dumping margins to Union,

HYSCO, and the POSCO Group.  *Final Results*, 75 Fed. Reg. at 13,491.  The POSCO Group

received a *de minimis* margin (0.01%).  *Id.*  As discussed previously, the Final Results assigned

the remaining three respondents, including plaintiff Dongbu, a "Review-Specific Average Rate"

of 8.65%, calculated as a simple average of the margins assigned to Union (14.01%) and

HYSCO (3.29%).  *Id.*  Dongbu claims that the Department's decision not to assign it an

individually-determined dumping margin was not authorized by section 777A of the Tariff Act,

19 U.S.C. § 1677f-1(c), and seeks a remand order compelling the Department to examine its

sales individually.  Br. in Supp. of the Mot. of Dongbu Steel for J. upon the Agency R. 8-14

(Sept. 10, 2010), ECF No. 66 ("Dongbu's Br.").  The court denies relief on this claim because

Dongbu did not pursue an individually-determined margin as a voluntary respondent and thereby

failed to exhaust its administrative remedies.

On October 2, 2008, two days after initiating the review, Commerce issued a

memorandum stating that "[a]fter careful consideration of our current resources, we believe that

it would not be practicable in this administrative review to examine all producers/exporters of

subject merchandise for whom a review has been requested" and that "[in] light of our resource

constraints, the Department intends to limit the number of companies it examines in this review."

*Invitation to Comment on Respondent Selection.*  The memorandum attached proprietary U.S.

import data from U.S. Customs and Border Protection ("CBP") pertaining to subject merchandise

of Korean CORE producers and announced that Commerce was setting aside a period of seven

calendar days "for interested parties to raise issues regarding the use of CBP data for respondent

selection in this review." *Id.* at 2.

In response to the Department's October 2, 2008 memorandum, Dongbu advocated its

own selection as a mandatory respondent in a submission filed October 21, 2008. *Dongbu's*

*Respondent Selection Comments*.  Dongbu argued that the Department should examine at least

the four producers with the largest volume of exports of subject merchandise. *Id.* at 2.  It pointed

out that Commerce had examined four companies–Dongbu, Union, the POSCO Group, and

HYSCO–in the tenth, eleventh, twelve and fourteenth administrative reviews of the order and

initially had selected these same four respondents for individual examination in the thirteenth

review, ultimately reviewing three because one request for review was withdrawn. *Id.* at 2-3.

Referring to the seven exporters/producers for which it initiated the review, Commerce

stated in the Respondent Selection Memorandum that "it would not be practicable . . . to examine

individually all exporters/producers of subject merchandise for whom a review has been

initiated." *Respondent Selection Mem.* 6.  Citing its resource constraints, Commerce further

stated that "we believe it is practicable to limit examination to two of these companies." *Id.*

Commerce selected Union and HYSCO because these two companies, during the POR, were the

largest two producers/exporters and were "responsible for the majority of the imports of subject

merchandise into the United States." *Id.*

In its case brief before the Department, Dongbu did not challenge the Department's

decision not to examine it individually.  In its complaint before the court, Dongbu claimed that

"Commerce's determination not to individually examine and calculate a company-specific

dumping margin for Dongbu is not supported by substantial evidence and is otherwise not in

accordance with law." Compl. ¶ 9 (Mar. 30, 2010), ECF No. 2 (Court No. 10-00109)

("Dongbu's Compl."). As relief on this claim, Dongbu requested "that the Court remand this

matter to Commerce to calculate a company-specific dumping margin for Dongbu based on

Dongbu's own data." *Id.* Prayer for Relief.

The court denies relief on Dongbu's claim seeking an individually-determined margin

because Dongbu failed to exhaust its administrative remedies and because no recognized

exception to the exhaustion requirement applies on the facts of this case. Section 301 of the

Customs Courts Act provides with respect to cases brought under section 516A of the Tariff Act

that "the Court of International Trade shall, where appropriate, require the exhaustion of

administrative remedies." 28 U.S.C. § 2637(d). In several prior cases involving claims

challenging the Department's refusal to determine individual margins, this Court has required

that the claimant have exhausted administrative remedies by pursuing "voluntary respondent"

status under section 782 of the Tariff Act. *Schaeffler Italia S.r.l. v. United States*, 35 CIT __, __,

781 F. Supp. 2d 1358, 1364 (2011); *Asahi Seiko Co. v. United States*, 35 CIT __, __, 755 F.

Supp. 2d 1316, 1326-27 (2011); *Asahi Seiko Co. v. United States*, 34 CIT __, 751 F. Supp. 2d

1335 (2010); *see also Zhejiang Native Produce & Animal By-Products Import & Export Corp. v.

United States*, 33 CIT __, __, 637 F. Supp. 2d 1260, 1264-65 (2009) (discussing voluntary

respondent status in the context of exhaustion but holding that the futility exception applied in

that case). According to these cases, a respondent, in order to exhaust administrative remedies,

must pursue the statutory process for receiving an individually-determined margin before

challenging before the court the Department's decision not to assign an individual margin to it.

There is no dispute that, on this record, Dongbu failed to take the necessary actions to pursue

status as a voluntary respondent. Having declined to pursue the remedy Congress provided it as

an interested party not selected as a mandatory respondent, Dongbu may not obtain relief on its

claim before the court.

Paragraph (1) of subsection 777A(c) of the Tariff Act requires that Commerce, as a

general rule, "shall determine the individual weighted average dumping margin for each known

exporter and producer of the subject merchandise."  19 U.S.C. § 1677f-1(c)(1).  An exception to

this rule is contained in paragraph (2) of subsection (c):

> [if] it is not practicable to make individual weighted average dumping margin
> determinations under paragraph (1) because of the large number of exporters or
> producers involved in the investigation or review, the administering authority may
> determine the weighted average dumping margins for a reasonable number of
> exporters or producers by limiting its examination to–
>> (A) a sample of exporters, producers, or types of products that is statistically
>> valid based on the information available to the administering authority at the
>> time of selection, or
>> (B) exporters and producers accounting for the largest volume of the subject
>> merchandise from the exporting country that can be reasonably examined.

*Id.* § 1677f-1(c).  In support of its motion for judgment on the agency record, Dongbu argues that

the Department unlawfully determined seven respondents to be a "large number of respondents"

within the meaning of § 1677f-1(c)(2) and that, as a result, Commerce acted without authority in

limiting respondents.  Dongbu's Br. 10.[13]  In its reply brief, Dongbu argues that Commerce

unlawfully construed the statutory term "large number of respondents" to mean "any number of

exporters/producers larger than two."  Reply Br. of Pl. Dongbu Steel Co., Ltd. 8 (Apr. 4, 2011),

ECF No. 118 ("Dongbu's Reply").

---

[13] In its reply, Dongbu Steel Co., Ltd. ("Dongbu") conceded that "the pool of potential
mandatory respondents at the time Commerce made its respondent selection determination was
seven" and thus "it is more accurate to refer to the total pool of potential respondents as seven,"
rather than six, as Dongbu claimed in its initial memorandum.  Reply Br. of Pl. Dongbu Steel
Co., Ltd. 8 n.2 (Apr. 4, 2011), ECF No. 118; Br. in Supp. of the Mot. of Dongbu Steel for J. upon
the Agency R. 10 (Sept. 10, 2010), ECF No. 66.

A respondent not selected for individual examination under section 777A potentially can receive an individual margin according to section 782(a) of the Tariff Act, which provides that Commerce, upon limiting the number of respondents according to section 777A, "shall establish an . . . individual weighted average dumping margin for any exporter or producer not initially selected for individual examination" if two conditions are met.  19 U.S.C. § 1677m(a); *see* 19 C.F.R. § 351.204(d).  First, an exporter or producer seeking its own margin must submit "the information requested from exporters or producers selected for examination" by the same deadlines that apply to the selected respondents.  19 U.S.C. § 1677m(a)(1).  Second, "the number of exporters or producers who have submitted such information [cannot be] so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation."  *Id.* § 1677m(a)(2).

Dongbu addresses several arguments to the exhaustion question presented by this case.  It argues, first, that "applying a strict interpretation of the exhaustion requirement" would further neither of the "twin purposes of exhaustion," which Dongbu identifies as "protecting administrative authority and promoting judicial efficiency."  Dongbu's Reply 5 (internal quotations omitted).  Dongbu argues that requiring exhaustion "will not protect Commerce's agency authority.  To the contrary, declining to address the merits will permit Commerce to *exceed* its lawful agency authority . . . ."  *Id.*  The court must reject this circular argument.  Were the court to waive exhaustion on the premise that the claim is meritorious, the exhaustion requirement would be rendered meaningless.

As to the second purpose for the exhaustion requirement posited by Dongbu, judicial efficiency, Dongbu argues that requiring exhaustion will not promote judicial efficiency because "[h]ad Dongbu raised this issue more precisely in its comments or in a case brief, it would not

have obviated the need for judicial review." *Id.* at 6.  This is essentially an indirect way of arguing that the court should excuse Dongbu's failure to seek voluntary respondent status on the ground that objecting to the Department's respondent selection decision, as stated in the Respondent Selection Memorandum, would have been futile, an argument that Dongbu also raises directly.  But the futility exception is not warranted on the record before the court.  The Respondent Selection Memorandum did not foreclose entirely the prospect that the Department would revisit the issue of whether resources would be available should voluntary respondent status be sought, citing specifically the voluntary respondent provision of the statute and stating that "[i]f there is a change in circumstances at the Department, and if there is a voluntary submission of the requested information that complies with all other deadlines and requirements for filing, we may re-examine this matter." *Respondent Selection Mem.* 7 (citing 19 U.S.C. § 1677m(a)).  The Respondent Selection Memorandum did cast serious doubt on whether Commerce would accept voluntary respondents, but the mere fact that relief was unlikely is insufficient as a ground to waive the exhaustion requirement.  The futility exception to the exhaustion requirement is a narrow one, requiring parties to demonstrate that they "'would be required to go through obviously useless motions in order to preserve their rights.'" *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (quoting *Bendure v. United States*, 554 F.2d 427, 431 (Ct. Cl. 1977)).  Although Dongbu's chance of receiving voluntary respondent status may have appeared doubtful at the time Commerce issued the Respondent Selection Memorandum, the memorandum, when read as a whole, did not state as a certainty that voluntary respondent status would be unavailable.[14]

---

[14] As it turns out, Commerce later accepted a voluntary respondent.  When announcing in

(continued...)

Dongbu argues that "Commerce's statutory interpretation of 19 U.S.C. § 1677f-1(c)(2) is settled and was consistently followed by Commerce during the time of the administrative review at issue in this case," and thus that it "would have been futile for Dongbu to raise the issue again after Commerce made its original decision limiting the number of mandatory respondents to two producers/exporters."  Dongbu's Reply 11.  In arguing that the futility exception applies, Dongbu relies on the opinion in *Dongbu Steel Co. v. United States*, 34 CIT __, __, 677 F. Supp. 2d 1353, 1362 (2010) *rev'd on other grounds*, 635 F.3d at 1371-73, which included *dicta* to the effect that the futility exception would have excused the plaintiff's failure to challenge the zeroing methodology before the Department when defendant had conceded that there was no possibility of the Department's altering its methodology had such a challenge been raised.  In contrast, the review at issue in this case afforded Dongbu a more than *de minimis* chance of receiving an individual margin had Dongbu sought voluntary respondent status.

Dongbu also argues that its argument satisfies the factors of the "pure legal question" exception to the exhaustion requirement, which Dongbu characterizes as follows: (1) the new argument raised must be "purely legal in nature"; (2) the inquiry to resolve that argument may not require "further agency involvement nor additional fact finding or opening up the record;" and "the inquiry shall neither create undue delay nor cause expenditure of scare party time and resources."  Dongbu's Reply 7.  Submitting that each factor is satisfied, Dongbu argues that its claim presents the purely legal issue of "whether Commerce's implicit construction of 19 U.S.C.

---

[14](...continued)
July 2009 that it would determine an individual margin for the POSCO Group, Commerce gave as a reason that "there has been a change in circumstances with respect to resource constraints." *Mem. from Program Manager to Office Dir., Office 3 AD/CVD Operation*, 1-2 (July 8, 2009) (Admin. R. Doc. No. 4974).  Commerce noted that the POSCO Group "voluntarily submitted a timely response to the Department's questionnaire."  *Id.* at 1.

§ 1677f-1(c)(2) such that any number of exporters/producers larger than two was a 'large number of exporters or producers' with the meaning of that term in the statute is in accordance with law." *Id.* at 8.   The court disagrees with Dongbu's characterizing the claim as presenting only the pure legal question of the Department's construction of § 1677f-1(c)(2).   Dongbu's claim, in essence, is that the Final Results were contrary to law because Commerce did not determine therein an individual margin for Dongbu.   *See* Dongbu's Compl. ¶ 9 (challenging "Commerce's determination not to individually examine and calculate a company-specific dumping margin for Dongbu . . . ").   Commerce may or may not have misconstrued § 1677f-1(c)(2) in issuing the Respondent Selection Memorandum, but, on the record facts of this case, Dongbu still could have pursued a remedy after that memorandum was issued.   Commerce made a final decision not to determine an individual margin for Dongbu upon issuance of the Final Results, prior to which Dongbu never gave the Department the opportunity to rule on the issue of whether Dongbu should be assigned an individual margin as a voluntary respondent.   Resolving that issue would have involved more than the pure legal question of the construction of § 1677f-1(c)(2).   *See* 19 U.S.C. § 1677m(a)(2) (requiring a factual determination on whether examination of voluntary respondents would be unduly burdensome and inhibit timely completion).[15]

_____

[15] The court is also unpersuaded by the related argument Dongbu made at oral argument, which was that Dongbu should be able to challenge independently a respondent selection decision made in a memorandum issued prior to the final results of the review because that decision caused injury distinct from that caused by the Department's not determining a respondent's individual margin.   Oral Tr. 19 (July 13, 2011), ECF No. 142.   Dongbu cited "the time and expense of actually participating fully in the review," submitting responses on the mere prospect that Commerce might determine an individual margin under section 782 of the Tariff Act.   *Id.*   On the facts presented by this case, Dongbu was required to seek voluntary respondent status in order to exhaust administrative remedies because that is the specific remedy Congress provided to a respondent in Dongbu's situation.   *See* 19 U.S.C. § 1677m(a).

In summary, Dongbu failed to exhaust its administrative remedies when it declined to pursue voluntary respondent status according to 19 U.S.C. § 1677m(a).  Neither the futility exception nor the pure legal question exception applies in the circumstances of this case.  The court, therefore, will deny relief on the claim challenging the Department's refusal to determine an individual margin for Dongbu.

### H.  Commerce Must Reconsider the Date of Sale for HYSCO's Sales Through its U.S. Affiliate

For sales by HYSCO through its U.S. affiliate, Hyundai HYSCO USA, Inc. ("HYSCO USA"), Commerce used as the date of the sale the date the subject merchandise was shipped from Korea to HYSCO USA, rather than the later date on which HYSCO USA issued an invoice to an unaffiliated purchaser.  *Decision Mem.* 30.  U.S. Steel claims that this decision violated the Department's regulations and was unsupported by record evidence.  Mem. in Supp. of Consolidated Pl. United States Steel Corp.'s Mot. for J. on the Agency R. Under Rule 56.2, at 10-20 (Sept. 10, 2010), ECF No. 62 ("U.S. Steel's Mem.").  Defendant requests a voluntary remand on this issue.  Def.'s Resp. 59-60.  The court will order a remand.

According to HYSCO's questionnaire responses, HYSCO sold subject merchandise during the POR to HYSCO USA, which sold that merchandise to unaffiliated customers.  *Letter from HYSCO to the Sec'y of Commerce* A-1 (Feb. 12, 2009) (Admin. R. Doc. No. 4850) ("*HYSCO's Section A Resp.*").  For such sales, HYSCO shipped the merchandise to the United States with HYSCO USA serving as the importer of record and taking title to the merchandise, but not taking physical possession.  *Id.* at A-22.  When the merchandise arrived, HYSCO USA issued an invoice to the ultimate customer.  *Id.*  HYSCO explained that HYSCO USA's "[n]egotiations with customers can continue through the entire sales process," and that, for U.S. sales, the quantity term is subject to change "until the merchandise is shipped from HYSCO's

factory, and price can change up until [HYSCO USA] issues its invoice to the unaffiliated U.S.

customer." *Id.* at A-23-24.

For the Preliminary Results, Commerce determined the dates of sale for HYSCO's U.S.

sales using the dates that HYSCO USA shipped the subject merchandise.  U.S. Steel's Mem. 6.

U.S. Steel challenged that decision in its case brief before Commerce, arguing that the date of

sale should have been the date that HYSCO USA issued an invoice to the unaffiliated U.S.

customer because it was not until that date that the price, one of the material terms of sale, was

final.  *Decision Mem.* 30.  Commerce rejected this argument in the Decision Memorandum,

reasoning that its regulations allow it to use a date of sale other than the date of invoice when

such other date "better reflects the date on which the exporter or producer establishes the material

terms of sale," *see* 19 C.F.R. § 351.401(i),[16] and that "HYSCO provided documentation showing

the booking of the sale price and quantity, *i.e.* the material terms of sale, on the date of shipment,

before issuing an invoice to the customer."  *Decision Mem.* 30.  The documentation referenced

by Commerce was "HYSCO's April 10, 2008, supplement[al] questionnaire response."  *Id.*

at 30 n.53.

---

[16] This regulation provides in full:

In identifying the date of sale of the subject merchandise or foreign like product, the
Secretary normally will use the date of invoice, as recorded in the exporter or
producer's records kept in the ordinary course of business.  However, the Secretary
may use a date other than the date of invoice if the Secretary is satisfied that a
different date better reflects the date on which the exporter or producer establishes
the material terms of sale.

19 C.F.R. § 351.401(i) (2010).

Defendant having requested a voluntary remand as to the challenged decision, the court will order Commerce to reconsider its determination of the date of sale for HYSCO's U.S. sales made through HYSCO USA.

I.  Commerce Must Recalculate the Rate Assigned to Dongbu to Incorporate Any Adjustments Resulting from Judicial Review

As discussed previously, Commerce assigned to Dongbu a margin of 8.65% as "a simple average percentage margin (based on the two reviewed companies with an affirmative deposit rate) . . . ." *Final Results*, 75 Fed. Reg. at 13,491 n.2.  Dongbu seeks the benefit of any modifications to the margins assigned on remand to the two individually-examined respondents, Union (which received a 14.01% margin in the Final Results) and HYSCO (3.29% in the Final Results), that may result from this litigation.  Dongbu's Br. 14-15 (in which Dongbu "requests that any relief granted by the Court and resulting adjustments to the individual weighted average dumping margins for Union and HYSCO be incorporated into the revised review specific average and be applied to Dongbu").  The court determines that any changes made on remand to the margins assigned to Union and HYSCO should be reflected in any assessment and deposit rate applied to Dongbu.

In the Preliminary Results, Commerce preliminarily assigned to Dongbu a "Review-Specific Average Rate" of 3.94%, which was "based on the margins calculated for those companies that were selected for individual review, excluding de minimis margins or margins based entirely on adverse facts available."  *Prelim. Results*, 74 Fed. Reg. at 46,114, 46,114 n.8.  This preliminary rate was based only on the rate of Union because the other two selected respondents received preliminary *de minimis* margins in the Preliminary Results.  *Id.* at 46,114.

Dongbu did not file a case brief before Commerce challenging this or any other Commerce

decision.

In the Final Results, Commerce applied to Dongbu a rate of 8.65%.  *Final Results*,

75 Fed. Reg. at 13,491.  This rate was a simple average of the rates of Union (14.01%) and

HYSCO (3.29%).  *Id.* at 13,491.  In its complaint, Dongbu challenged the 8.65% margin applied

to Union, claiming that this margin was "overstated" for eight reasons: (1) the Department's

application of the quarterly-cost methodology; (2) the Department's abandoning the 90/60-day

window period regulation; (3) the Department's using 2008 fiscal year financial statements to

calculate Union's G&A and interest expenses; (4) the Department's model-match methodology

as it pertained to laminated and non-laminated, painted CORE; (5) the Department's zeroing

methodology; (6) "Commerce's decision to include Union's overrun sales in the calculation of

normal value"; (7) "Commerce's decision to make an adjustment to HYSCO's cost-of-

production under the major input rule"; and (8) "Commerce's decision to treat HYSCO's interest

revenue . . . as a post-sale price adjustment instead of as a selling expense . . . ."  Dongbu's

Compl. ¶ 7.

Dongbu narrowed this challenge in its memorandum in support of its motion for

judgment on the agency record, stating that its challenge was based on "the reasons discussed in

the briefs concurrently filed by Union Steel and HYSCO" and that it sought as relief on this

claim an order that Commerce recalculate Dongbu's dumping margin using the rates applicable

to Union and HYSCO after any relief awarded pursuant to "the separate court actions filed by

Union and HYSCO with respect to the *Final Results*."  Dongbu's Br. 14-15.  As Dongbu limited

its claim to the arguments raised by Union and HYSCO, the court considers that Dongbu has

abandoned the sixth, seventh, and eighth reasons listed in the complaint because neither Union

nor HYSCO included these arguments in their memoranda to the court.

Based on the five reasons listed in Dongbu's complaint, the court determines that Dongbu

potentially is entitled to the requested relief.  The margin the Final Results applied to Dongbu

was derived from the margins of the selected respondents and bore no connection to Dongbu's

POR sales.  The court considers it appropriate that any changes to the margins of the selected

respondents be reflected in the derivative margin applied to Dongbu.  The court notes, however,

that the Department's recalculation of the rate applicable to Dongbu also must incorporate any

modifications to the rate applied to HYSCO as a result of U.S. Steel's claim, discussed above.  If

Dongbu is to receive the benefit of any reductions in the weighted-average dumping margins of

Union or HYSCO, as a matter of consistency it also should be affected by increases in those

margins.

Defendant and defendant-intervenor U.S. Steel do not address Dongbu's claim in their

responses.  Defendant-intervenor Nucor argued that Dongbu failed to exhaust administrative

remedies on this claim because Dongbu failed to raise it "in any case or rebuttal brief to the

Department," Nucor's Resp. 11 n.2, but Nucor abandoned this position at oral argument, Oral

Tr. 88.[17]  Thus, neither defendant-intervenor now is in opposition to Dongbu's receiving the

_____

[17] The following colloquy took place at oral argument:

The Court: So are you not opposed to their getting the benefit if those other margins
should change?
Male Speaker [counsel for Nucor]: Yeah, Your Honor, in our view they reserve their
remedy through their actions so I don't think we – we would agree that they would
receive a margin . . . .

Oral Tr. 88.

potential remedy it seeks with respect to possible revisions to the margins of Union and HYSCO.

Because the arguments raised by Union and HYSCO were raised before the agency, the court

declines to deny relief *sua sponte* on grounds related to the exhaustion requirement.

### III.  CONCLUSION AND ORDER

In conclusion, the court determines that remand is required in response to several claims

brought in this consolidated action.  Relief is appropriate on the challenge to the decision to use

only the 2008 fiscal year financial statement of DSM to determine Union's interest expense ratio,

the decision to use the quarterly-cost methodology and cost indexing for the recovery-of-costs

test, the below-cost test, and the other applications in the Final Results, the decision not to

determine the comparison months using the normal 90/60-day window period prescribed by

regulation, the decision to compare laminated CORE to non-laminated, painted CORE as

identical products, the decision to use the zeroing methodology in this administrative review, and

the determination of the date of sale for sales by HYSCO through HYSCO USA.  No relief is

appropriate on Dongbu's challenge to the Department's declining to determine an individual

margin for Dongbu.  Finally, the assessment and deposit rates applied to Dongbu, which were

derived from the individual margins of Union and HYSCO, must reflect any adjustments made to

those two margins upon remand.  Therefore, upon due consideration, it is hereby

**ORDERED** that the final determination of the International Trade Administration, U.S. Department of Commerce ("Commerce"), in *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Fifteenth Admin. Review*, 75 Fed. Reg. 13,490 (Mar. 22, 2010) ("Final Results"), be, and hereby is, REMANDED for redetermination; it is further

**ORDERED** that Commerce must issue a redetermination ("Remand Redetermination") in accordance with this Opinion and Order that is in all respects supported by substantial evidence, in accordance with law, and supported by adequate reasoning; it is further

**ORDERED** that, on remand, Commerce must reconsider its determination of an interest expense ratio for plaintiff Union Steel Manufacturing Co., Ltd. ("Union") using only the financial statements of Union's parent company for fiscal year 2008, and, in so doing, also may reconsider its determination of a ratio for Union's general and administrative expenses; it is further

**ORDERED** that Defendant's Motion for Partial Voluntary Remand, as filed on June 21, 2011, ECF No. 130, regarding the "quarterly-cost methodology" be, and hereby is GRANTED IN PART and DENIED IN PART; it is further

**ORDERED** that, on remand, Commerce must reconsider its quarterly-cost methodology and its indexing methodology, and all applications of these methodologies, in the Final Results; it is further

**ORDERED** that, on remand, Commerce must reconsider the decision not to follow the method prescribed by regulation 19 C.F.R. § 351.414(e), otherwise known as the "90/60-day window period," for identifying the contemporaneous month for purposes of comparing U.S. sales to monthly average comparison-market prices pursuant to the average-to-transaction comparison method; it is further

**ORDERED** that Commerce, on remand, must reconsider the decision to compare laminated CORE with painted, non-laminated CORE as identical products under 19 U.S.C. § 1677(16)(A); it is further

**ORDERED** that Defendant's Motion for Partial Voluntary Remand, as filed on August 24, 2011, ECF No. 141, be, and hereby is, GRANTED IN PART and DENIED IN PART; it is further

**ORDERED** that Defendant's Motion for Leave to File Response to Plaintiffs' Notice of Supplemental Authority, filed March 1, 2012, ECF No. 152, be and hereby is, GRANTED, and that Defendant's Response to Plaintiffs' Notice of Supplemental Authority be, and hereby is, deemed filed on March 1, 2012; it is further

**ORDERED** that, on remand, Commerce must reconsider its decision in the Final Results to apply its zeroing methodology and must either modify that decision or explain how the language of 19 U.S.C. § 1677(35) permissibly may be construed in one way with respect to the use of the zeroing methodology in antidumping investigations and the opposite way with respect to the use of that methodology in antidumping administrative reviews; it is further

**ORDERED** that, on remand, Commerce must reconsider the date of sale for U.S. sales by Hyundai HYSCO ("HYSCO") sold through Hyundai HYSCO USA, Inc.; it is further

**ORDERED** that, on remand, Commerce must redetermine the weighted-average dumping margins of Union and HYSCO as necessary and must redetermine the margin, *i.e.*, the assessment and deposit rates, that will be applied with respect to subject merchandise of Dongbu

Steel Co., Ltd. based on any adjustments made to the weighted-average dumping margins of Union or HYSCO as a result of the Remand Redetermination; and it is further

     **ORDERED** that Commerce shall file the Remand Redetermination within ninety (90) days from the date of this Opinion and Order, that each plaintiff, plaintiff-intervenor, and defendant-intervenor shall file any comments on the Remand Redetermination within forty-five (45) days from the date on which the Remand Redetermination is filed, and that defendant shall file any response to those comments within thirty (30) days from the date on which the last comment is filed.


                                                     /s/ Timothy C. Stanceu
                                                    Timothy C. Stanceu
                                                    Judge


Dated: May 25, 2012
          New York, New York