**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

_____
                                                )
UNION STEEL, et al.,                            )
                                                )
　　　　Plaintiffs,                              )
                                                )
　　　　v.                                       )
                                                )          Consol. Court No. 10-00106
UNITED STATES,                                  )
                                                )          PUBLIC
　　　　Defendant,                               )
                                                )
　　　　and                                      )
                                                )
UNITED STATES STEEL CORP., et al.,              )
                                                )
　　　　Defendant-Intervenors .                 )
_____               )

**DEFENDANT'S RESPONSE TO COMMENTS**
**ON THE DEPARTMENT OF COMMERCE'S REMAND RESULTS**

STUART F. DELERY
Principal Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

PATRICIA M. MCCARTHY
Assistant Director

OF COUNSEL:

L. MISHA PREHEIM
DANIEL J. CALHOUN                    Senior Trial Counsel
Attorney                             Department of Justice
Office of the Chief Counsel          Civil Division
for Import Administration            Commercial Litigation Branch
U.S. Department of Commerce          PO Box 480
                                     Ben Franklin Station
                                     Washington, DC 20044
                                     Telephone: (202) 305-3087
                                     Facsimile: (202) 305-1571

February 15, 2013                    Attorneys for Defendant

# TABLE OF CONTENTS

**PAGES**

DEFENDANT'S RESPONSE TO COMMENTS
ON THE DEPARTMENT OF COMMERCE'S REMAND RESULTS ............................1

FACTUAL AND PROCEDURAL BACKGROUND.........................................................2

    I.    Administrative Proceeding..................................................... 2

    II.    Proceedings Before The Court.................................................. 4

    III.    Results Of Redetermination Pursuant To Remand........................... 5

ARGUMENT ..........................................................................................6

    I.    Commerce's Reasonably Made Use Of A Blended Rate Using
        Both The Fiscal Year 2007 And 2008 Financial Statements In
        Calculating Union's Interest Expense Ratio ..................................6

    II.    Commerce's Revised Cost Recovery Test Should Be Sustained...............12

    III.    Commerce's Use Of Quarterly Costs Continues To Be Supported By
        Substantial Evidence And In Accordance With Law ...........................15

        A.    Application Of Quarterly Costs Is A Reasonable
            Methodology ...............................................................15

        B.    Commerce's Decision To Use Quarterly Costs Is Reasonable......16

    IV.    Commerce's Determination To Continue Comparing United States
        And Home Market Sales On A Quarterly Basis Should Be
        Sustained .....................................................................23

    V.    Commerce's Zeroing Methodology Should Be Sustained.....................28

        A.    Commerce's Additional Explanation Is Reasonable ....................28

        B.    Precedent Supports Commerce's Explanation ............................34

    VI.    Commerce's Determination To Treat The Date Of Shipment,
        Rather Than The Date Of Invoice, As The Date Of Sale For HYSCO's
        U.S. Sales Should Be Sustained...............................................38

CONCLUSION.....................................................................................42

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGES**

*AIMCOR v. United States*,
    141 F.3d 1098 (Fed. Cir. 1998) ...................................................................39

*Allied Tube and Conduit Corp. v. United States*,
    24 C.I.T. 1357 (2000) ...................................................................................39

*Camau Frozen Seafood Processing Importation Exp. Corp. v. United States*,
    880 F. Supp. 2d 1348 (Ct. Int'l Trade 2012)..............................................29

*Corus Staal BV v. Department of Commerce*,
    395 F.3d 1343 (Fed. Cir. 2005)....................................................................32

*Dongbu Steel Co. v. United States*,
    635 F.3d 1363 (Fed. Cir. 2011)............................................................. passim

*FAG Kugelfischer Georg Schafer AG v. United States*,
    332 F.3d 1370 (Fed. Cir. 2003).....................................................................36

*Far E. New Century Corp. v. United States*,
    867 F. Supp. 2d 1309 (Ct. Int'l Trade 2012) ...............................................29

*Fisher S.A. Comercio, Industria & Agricultura v. United States*,
    *Slip Op. 2012-149*, 2012 WL. 6062563 (Ct. Int'l Trade Dec. 6, 2012) ...........................29

*Grobest & I-Mei Industrial Vietnam Co. v. United States*,
    853 F. Supp. 2d 1352 (Ct. Int'l Trade 2012) ...............................................29

*Habas Sinai v. United States*,
    625 F. Supp. 2d 1339 (Ct. Int'l Trade 2009) ...............................................20

*Habas Sinai v. United States*,
    No. 05-00613, 2009 WL 4049119 (Ct. Int'l Trade Nov. 23, 2009) ..................18

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    Docket No. 109 .............................................................................................21

*JTEKT Corp. v. United States*,
    642 F.3d 1378 (Fed. Cir. 2011)............................................................. passim

*KYD v. United States*,
    613 F. Supp. 2d 1371 (Ct. Int'l Trade 2009) ...............................................26

*Koyo Seiko v. United States*,
    66 F.3d 1204 (Fed. Cir. 1995)..................................................................................24

*Mittal Steel Point Lisas Ltd. v. United States*,
    31 C.I.T. 638 (Ct. Int'l Trade 2007) ........................................................................39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)................................11

*Murray v. Schooner Charming Betsy*,
    6 U.S. (2 Cranch.) 64, 118 (1804)..........................................................................38

*National Cable & Telecomm. Association v. Brand X Internet Services*,
    545 U.S. 967 (2005)..................................................................................................34

*NMB Sing. Ltd v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009)................................................................................11

*Papierfabrik Koehler AG & Koehler America v. United States*,
    808 F. Supp. 2d 1350 (Ct. Int'l Trade 2012) .........................................................37

*Pastificio Lucio Garofalo, S.P.A. v. United States*,
    469 F. App'x. 901(Fed. Cir. March 14 2012) ..................................................16

*Pastificio Lucio Garofalo, S.P.A. v. United States*,
    783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011) ......................................................25

*SeAH Steel Corp. v. United States*,
    704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) ........................................... passim

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011)........................................................................34, 34

*Thai Plastic Bags Indus. v. United States*,
    No. 11-00086, 2013 WL 491520 (Ct. Int'l Trade Feb. 11, 2013) ....................29

*Thyssenkrupp Acciai Speciali Terni S.p.A. v. United States*,
    603 F.3d 928 (Fed. Cir. 2010)................................................................................38

*Timken Co. v. United States*,
    354 F.3d 1334 (Fed. Cir. 2004)........................................................................35, 36

*Union Steel Manufacturing Co., Ltd. v. United States*,
    837 F. Supp. 2d 1307 (Ct. Int'l Trade 2012) ......................................................1, 6

*Union Steel v. United States*,
      755 F. Supp. 2d 1304 (Ct. Int'l Trade 2011) ...............................................................8, 11

*Union Steel v. United States*,
      823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) ...................................................................29

*United States Steel Corp. v. United States*,
      621 F.3d 1351 (Fed. Cir. 2010).......................................................................................34

## STATUTES

19 U.S.C. § 1673b...............................................................................................................15

19 U.S.C. § 1677.......................................................................................................... passim

## REGULATIONS

19 C.F.R. § 351.401 .......................................................................................................39, 40

19 C.F.R. § 351.414 ..................................................................................................... passim

## MISCELLANEOUS

*Antidumping Methodologies for Proceedings that Involve Significant Cost
      Changes Throughout the Period of Investigation (POI)/Period of Review
      (POR) that May Require Using Shorter Cost Averaging Periods,*
      73 Fed. Reg. 26,364 (Dep't of Commerce May 9, 2008)
      (request for comments) ...................................................................................................15

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping
      Margin and Assessment Rate in Certain Antidumping Duty Proceedings;
      Final Modification,*
      77 Fed. Reg. 8,101 (Dep't of Commerce Feb. 14, 2012) ...................................................3

*Brass Sheet and Strip from the Netherlands,*
      65 Fed. Reg. 742, 746-748 (Dep't of Commerce Jan. 6, 2000) (final admin. review)......15

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of
Korea,*
      74 Fed. Reg. 11,082 (Dep't of Commerce, Mar. 16, 2009)
      (final results of administrative review) ...........................................................................39

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of
Korea,*
      75 Fed. Reg. 13,490 (Dep't of Commerce Mar. 15, 2010)
      (final admin. review)........................................................................................................ 2

*Certain Steel Concrete Reinforcing Bars From Turkey,*
  73 Fed. Reg. 66,218 (Dep't of Commerce Nov. 7, 2008)
  (final admin. review)............................................................................................................16

*Certain Welded Carbon Steel Pipe and Tube from Turkey,*
  61 Fed. Reg. 69,067 (Dep't of Commerce Dec. 31, 1996) (admin. review) ....................25

*Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil,*
  64 Fed. Reg. 38,756 (Dep't of Commerce July 19, 1999) (final determ.)........................39

*Light-Walled Rectangular Pipe and Tube from the Republic from Korea,*
  73 Fed. Reg. 35,655 (Dep't of Commerce June 24, 2008) (final determ.) .......................40

*Light-Walled Rectangular Pipe and Tube from the Republic from Korea,*
  73 Fed. Reg. 5,794 (Dep't of Commerce Jan. 31, 2008) (prelim. determ.)......................40

*SAA, H.R.* Doc. No. 103-316 (1994)...........................................................................................13

*Stainless Steel Plate in Coils From Belgium,*
  73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008)
  (final admin. review)............................................................................................................16

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE
_____

|                                          |   |                            |
|------------------------------------------|---|----------------------------|
| UNION STEEL, et al.,                     | ) |                            |
|                                          | ) |                            |
|     Plaintiffs,      | ) |                            |
|                                          | ) |                            |
|     v.               | ) |                            |
|                                          | ) | Consol. Court No. 10-00106 |
| UNITED STATES,                           | ) |                            |
|                                          | ) |                            |
|     Defendant,       | ) |                            |
|                                          | ) |                            |
|     and              | ) |                            |
|                                          | ) |                            |
| UNITED STATES STEEL CORP., et al.,       | ) |                            |
|                                          | ) |                            |
|     Defendant-Intervenors . | ) |                      |
| _____         | ) |                            |

**<u>ORDER</u>**

Upon consideration of the Department of Commerce's remand redetermination, the comments

thereto, and the response to comments, it is hereby

    ORDERED that the remand redetermination is sustained, and it is further

    ORDERED that judgment is entered in favor of the United States.

Dated: _____, 2013      _____
      New York, NY                JUDGE

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE
_____

|  |  |  |
|---|---|---|
| UNION STEEL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Consol. Court No. 10-00106 |
| UNITED STATES, | ) | |
| | ) | PUBLIC |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES STEEL CORP., et al., | ) | |
| | ) | |
| Defendant-Intervenors . | ) | |
| _____ | ) | |

## DEFENDANT'S RESPONSE TO COMMENTS
## ON THE DEPARTMENT OF COMMERCE'S REMAND RESULTS

Defendant, the United States, respectfully responds to the comments filed by Union Steel

(Union), Hyundai HYSCO (HYSCO), Dongbu Steel (Dongbu), United States Steel Corporation

(U.S. Steel), and Nucor Corporation (Nucor) regarding the remand results filed by the

Department of Commerce (Commerce) pursuant to the Court's opinion and order in *Union Steel*

*Manufacturing Co., Ltd. v. United States*, 837 F. Supp. 2d 1307 (Ct. Int'l Trade 2012).

In accordance with the Court's remand order, Commerce reviewed and reconsidered

several issues, including the calculation of an interest expense ratio for Union, the recovery-of-

cost test applied to Union and HYSCO, the use of a quarterly cost methodology as well as an

indexing methodology with respect to Union's and HYSCO's costs of production, the departure

from the method prescribed by Commerce's "90/60-day window period" regulation for

identifying the contemporaneous month for purposes of comparing Union's and HYSCO's

respective United States sales to monthly average comparison-market prices pursuant to the

average-to-transaction comparison method, the application of the zeroing methodology when

aggregating average-to-transaction comparisons in calculating Union's weighted average

dumping margin, and the appropriate date of sale for HYSCO's United States sales as sold

through its affiliate, Hyundai HYSCO USA, Inc. (HYSCO USA).[1]  Because Commerce's

remand results are supported by substantial record evidence and comply with the Court's remand

order, they should be sustained.

<div align="center">FACTUAL AND PROCEDURAL BACKGROUND</div>

I.      **Administrative Proceeding**

In March 2010, Commerce published the final results of the fifteenth administrative

review of the antidumping duty order on certain corrosion-resistant carbon steel flat products

(CORE) from the Republic of Korea covering the 2007-2008 period of review (POR).  *See*

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 75 Fed.

Reg. 13,490 (Dep't of Commerce Mar. 15, 2010) (final admin. review).  In those final results,

Commerce, consistent with its preference to calculate general and administrative (G&A) and

interest expense ratios based upon the fiscal year financial statement most closely corresponding

to the POR, relied upon Union's fiscal year 2008 financial statement for that purpose because

those financial statements overlapped the POR by more months than did Union's fiscal year

2007 financial statement.  *See* Decision Memorandum, P.R. Doc. 218, at 42-45.

In those same final results, Commerce also reviewed cost information on the record from

Union and HYSCO and, consistent with its recent practice, determined to use shorter cost

---

[1] Commerce also reviewed and reconsidered three other issues on remand to which no party has objected:  (1) the calculation of a general and administrative (G&A) expense ratio for Union; (2) the classification of physical characteristics, and subsequent model-match results, with respect to Union's laminated products; and (3) the dumping rate assigned to Dongbu as a non-examined respondent company.

averaging periods in calculating Union's and HYSCO's costs of production and constructed value. Commerce found both Union and HYSCO to have experienced significant cost changes during the POR that could reasonably be linked to each respondent's sales prices during each quarter. *See* Union Final Cost Memorandum, C.R. 94; HYSCO Post-Preliminary Analysis Memorandum, Exhibit 8 to HYSCO's Appendix. Accordingly, Commerce used quarterly cost averaging periods for both Union and HYSCO in the final results. *See* Decision Memorandum, P.R. 218, at 14-19.

To maintain consistency with its cost of manufacturing analysis and to avoid distortions, Commerce further concluded that it was necessary to eliminate the "90/60" day window period normally required by 19 C.F.R. § 351.414(f)[2] for comparing each respondent's home market and United States prices when calculating the dumping margin, and, instead, to make such comparisons within each quarter. *See* Decision Memorandum, P.R. 218, 19-21. In addition, Commerce applied an indexing methodology in the final results to neutralize the effect of significant cost changes between quarters and relied upon that indexing methodology, in part, to conduct a recovery-of-costs test pursuant to 19 U.S.C. § 1677b(b)(2)(D). *See id.* at 21-24.

In calculating Union's weighted average dumping margin for the final results, Commerce applied its longstanding zeroing methodology, in which it did not permit Union's nondumped sales to offset the amount of dumping found with respect to other sales pursuant to the average-to-transaction comparison method. *See id.* at 3-6. Lastly, Commerce relied upon shipment date as the date of sale for HYSCO's United States sales sold through HYSCO USA. *See id.* at 30.

---

[2] The window period was previously described in section 351.414(e)(2), but as a result of a recent modification to Commerce's regulations has been renumbered as 19 C.F.R. § 351.414(f). *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8,101, 8,114 (Dep't of Commerce Feb. 14, 2012).

Commerce calculated a final weighted average dumping margin for Union of 14.01 percent, a final weighted average dumping margin for HYSCO of 3.29 percent, and a review-specific average rate for Dongbu, which was not selected for individual company examination, of 8.65 percent.  75 Fed. Reg. at 13,491.

## II.     Proceedings Before The Court

Interested parties challenged certain aspects of the final results of administrative review before the Court, which remanded multiple issues to Commerce.  The Court found that Commerce in its final results did not "address a significant concern . . . that {Union's parent company's fiscal year 2008} financial statement was affected by aberrational foreign exchange losses stemming from exchange rate changes that occurred after the close of the POR and therefore was unrepresentative of Union's actual interest expense during the POR."  *Union Steel*, 837 F. Supp. 2d at 1318.  The Court directed Commerce to "reconsider its determination of an interest expense ratio for {Union} using only the financial statements of Union's parent company for fiscal year 2008, and, in so doing, also may reconsider its determination of a ratio for Union's general and administrative expenses."  *Id.* at 1337.

The Court additionally granted a partial voluntary remand for Commerce to reconsider its use of an indexing methodology in testing for recovery of costs pursuant to 19 U.S.C. § 1677b(b)(2)(D).  *See id.* at 1322-24.  In considering that voluntary remand request and what it considered to be Commerce's "{questioning of} aspects of the quarterly-cost methodology as applied in the fifteenth review," the Court additionally ordered Commerce to "reconsider its quarterly-cost methodology and its indexing methodology, and all applications of these methodologies, in the Final Results," and further ordered that Commerce must "reconsider the decision not to follow the method prescribed by regulation 19 C.F.R. § 351.414(e), otherwise

4

known as the '90/60-day window period,' for identifying the contemporaneous month for purposes of comparing U.S. sales to monthly average comparison-market prices pursuant to the average-to-transaction comparison method." *Id.* at 1326, 1337.

The Court also granted voluntary remands on other issues.  The Court ordered that Commerce must "reconsider its decision in the Final Results to apply its zeroing methodology and must either modify that decision or explain how the language of  19 U.S.C. § 1677(35) permissibly may be construed in one way with respect to the use of the zeroing methodology in antidumping investigations and the opposite way with respect to the use of that methodology in antidumping administrative reviews.  *Id.* at 1337.  The Court also directed Commerce to "reconsider the date of sale for U.S. sales by {HYSCO} sold through {HYSCO USA}." *Id.*

III.     Results Of Redetermination Pursuant To Remand

On remand, Commerce revisited those issues and, among other findings, determined that record evidence supported revising the calculation of an interest expense ratio for Union using financial statements for both fiscal years 2007 and 2008.  *See* Remand Results, P.R.R. 15, at 7-16.  Commerce continued to use quarterly costs in determining Union's and HYSCO's costs of production, but no longer relied upon indexing when calculating quarterly costs and annual weighted average costs.  *See id.* at 16-26.  In so doing, Commerce adopted a revised approach to the recovery-of-cost test applicable to Union and HYSCO.  *See id.* 16-20.  Commerce continued to find that, when using its quarterly-cost methodology, it is appropriate to limit comparisons between Union's and HYSCO's respective United States sales to monthly average comparison-market prices within the quarter in which sales were made.  *See id.* at 27-32.  Commerce additionally provided an explanation of its interpretation of the statute as allowing zeroing with respect to average-to-transaction comparisons in administrative reviews, while also allowing

5

Commerce not to apply zeroing with respect to average-to-average comparisons in investigations.  *See id.* at 38-60.  Lastly, Commerce found that shipment date constitutes the appropriate date of sale for HYSCO's United States sales.  *See id.* at 61-66.  As a result of those changes, Commerce, on remand, calculated a final weighted average dumping margin for Union of 9.85 percent, a final weighted average dumping margin for HYSCO of 1.46 percent, and a review-specific average rate for Dongbu, which was not selected for individual examination, of 5.66 percent.  *See id.* at 67.

## ARGUMENT

I. **Commerce's Reasonably Made Use Of A Blended Rate Using Both The Fiscal Year 2007 And 2008 Financial Statements In Calculating Union's Interest Expense Ratio**

Commerce's determination in its remand results to use the financial statements of Union's parent company for both fiscal years 2007 and 2008 to calculate an interest expense ratio for Union should be sustained.  In remanding to Commerce, the Court found that Commerce failed to address the concern raised by Union that the fiscal year 2008 financial statement was affected by "aberrational foreign exchange losses stemming from exchange rate changes that occurred after the close of the POR and therefore was unrepresentative of Union's actual interest expense during the POR."  *Union Steel*, 837 F. Supp. 2d at 1318.  Heeding the Court's instructions to reconsider its decision to base Union's interest expense ratio entirely on data obtained from the fiscal year 2008 financial statement and to consider "the relative merits of alternative methods," *id.* at 1320, Commerce adopted a different methodology on remand that made use of financial statements for both fiscal years 2007 and 2008.

Specifically, Commerce calculated a weighted average interest expense ratio using both the fiscal year 2007 and 2008 audited financial statements of Union's parent company, based upon the number of months of the POR that fall within each fiscal year.  Because the POR was

August 1, 2007, through July 31, 2008, and because the fiscal year for Union's parent company corresponds to the calendar year, Commerce based the weighted average rate upon five months of 2007 and seven months of 2008.  *See* Remand Results, P.R.R. 15, at 7-8 and Union Remand Accounting Memo, C.R.R. 10, attached as Exhibit 2 to Union's appendix to its comments on Commerce's remand.

In adopting this methodology, Commerce explained that "{i}ncorporating both the 2007 and 2008 fiscal year financial statements as part of the revised financial expense ratio calculation for Union on remand accords with the Court's emphasis in {*Union Steel*}" on insuring the most accurate results possible.  Remand Results, P.R.R. 15, at 8.  Given the lack of a perfect alignment between the POR and the fiscal year for Union's parent company, Commerce determined that "inclusion of both fiscal years' financial statements helps to ensure, based upon the unique facts present in this review…, that financial expenses for both fiscal years that encompass the POR are reflected in the financial expense ratio."  *Id.*  The approach is consistent with an approach embraced by Union in its initial brief.  *See* Union 56.2 Br. at 14.

Despite previously championing that approach, Union now rejects it.  Notwithstanding that fiscal year 2007 corresponds only to five months of the POR, Union claims that Commerce should have recalculated Union's interest expense ratio using only the fiscal year 2007 financial statement because the blended rate still includes the effect of aberrational foreign exchange losses occurring after the POR.  *See* Union Cmts. at 3-4.  However, in the remand results, Commerce found these assertions to be speculative.  As Commerce explained, "foreign exchange transaction gains and losses and borrowing activity occur throughout the year," and record evidence establishes that Union's parent company engaged in foreign currency swaps and hedging contracts to minimize its exposure to foreign currency fluctuations.  Remand Results,

P.R.R. 15, at 12.  Because of those facts, and because the extent of the Union's parent company's foreign currency exposure at the end of each month is not identified in the fiscal year 2008 financial statement, it is unknowable from record evidence whether foreign exchange losses for Union's parent company occurring after the close of the POR were as aberrational as claimed by Union even though it is undisputed that the value of the Korean won declined significantly in the last half of 2008.  Commerce for good reason refused to account for this uncertainty by completely disregarding the financial statement for fiscal year 2008.  *See id.* at 12-13.  To have done so would have resulted in an interest expense ratio that in no way reflects the fiscal year composing the majority of the POR.

Commerce also reasonably rejected Union's argument that the home market sales reporting "window" period, which includes the POR plus 90 days before and 60 days after the POR, supports exclusive reliance upon the fiscal year 2007 financial statement in calculating the interest expense rate.  *See* Union Cmts. at 4-5.  Commerce noted both the lack of legal authority for Union's novel theory and the lack any discernible correlation between the "window" period, which is concerned with sales comparisons under 19 C.F.R. § 351.414(f), and the appropriate fiscal year upon which to base the interest expense ratio, which is focused on costs of production as part of the sales-below-cost test prescribed by 19 U.S.C. § 1677b(b)(1).  *See* Remand Results, P.R.R. 15, at 13.  As previously held by the Court, because Union's reported cost information is based on its costs incurred during the POR, Commerce reasonably analyzed the interest expense ratio relative to the POR, not the "window" period.  *See Union Steel v. United States*, 755 F. Supp. 2d 1304, 1310 (Ct. Int'l Trade 2011) (". . . Commerce would not be acting unreasonably in placing more weight on the correspondence of the financial statement reporting period to the POR, as opposed to correspondence to the entire home market sales reporting period.").

Domestic industry's objections to the blended rate are similarly unavailing.  Both Nucor and U.S. Steel argue that Commerce's remand methodology constitutes a departure from Commerce's established practice that requires explanation.  *See* Nucor Cmts. at 8-12 and U.S. Steel Cmts. at 20.  However, the Court questioned in *Union Steel* whether Commerce has an established practice of using financial statements from the fiscal year most closely corresponding to the POR to calculate interest expense ratios.  837 F. Supp. 2d at 1319.  Regardless, the Court found Commerce's exclusive reliance upon the fiscal year 2008 financial statement to be unlawful, thus requiring the agency to reconsider its original determination and weigh possible alternative methodologies.  *See id.* at 1318-1320.  As Commerce explained, "{i}nclusion of both fiscal years' financial statements helps to ensure, based upon the unique facts present in this review, that financial expenses for both fiscal years that encompass the POR are reflected in the financial expense rate calculation."  Remand Results, P.R.R. 15, at 14.

Nucor also wrongly asserts that Commerce's interest expense rate calculation double counts the major input adjustment.  *See* Nucor Cmts. at 13-14.  Commerce calculated the financial expense rate for two separate fiscal years before weight averaging the results.  It was necessary to adjust each denominator reflecting the cost of goods sold by the impact of the major input adjustment before weight averaging because the resulting financial expense rate is applied to a CONNUM-specific cost that itself has been increased by the major input adjustment.  *See* Remand Results, P.R.R. 15, at 14-15 and Union Remand Accounting Memo, C.R.R. 10.  As a result, Commerce's calculation applies 5/12 of the major input adjustment in fiscal year 2007 and 7/12 of the major input adjustment in fiscal year 2008, meaning the adjustment mathematically is not double counted.  Had Commerce not made the major input adjustment to each denominator before weight averaging, the resulting calculation would have amplified the

effect of the major input adjustment.  Commerce's methodology thus insured that the calculation

reflects Union's actual experience to the extent possible, while avoiding a double counting

problem.  Similarly, Nucor's suggestion that, "to the extent {Commerce} makes an adjustment to

Union's COGS, it should make a proportional adjustment to the numerator of the ratio by

proportionally increasing Union's financial expenses" would result in a methodology that

amplifies the major input adjustment.  Nucor Cmts. at 15.

     Nucor also challenges Commerce's determination to apply the major input adjustment in

calculating the interest expense ratio.  *See* Nucor Cmts. at 14-15.  Although Nucor alleges that

Commerce relied upon hypothetical, rather than actual, expenses incurred by Union in its

calculations, the major input adjustment is a statutorily prescribed adjustment to account for any

distortion arising when a major input is purchased from an affiliated party at what Commerce has

reasonable grounds to believe is less than the cost of production.  *See* 19 U.S.C. § 1677b(f)(3).

To ensure greater accuracy, the adjustments made by Commerce in its remand calculation of

Union's interest expense ratio eliminated that very distortion recognized by the statute.

     With respect to other arguments raised by Nucor and U.S. Steel, Commerce acted in a

manner that reasonably complied with the Court's remand order.  Although Commerce in its

remand results did not directly address Nucor's allegation that the blended interest rate

methodology is flawed because the underlying data between fiscal years 2007 and 2008 differ

vastly, Nucor merely asserts, in lieu of an explanation, that such differences result in a distortion.

*See* Nucor Cmts. at 15-16.  In light of Commerce's preference to look to financial statements

most closely corresponding to the POR in calculating an interest expense ratio, it is reasonable

that Commerce's weight-averaging methodology focused more on the number of months each

fiscal year fell within the POR rather than data that, not surprisingly, varied from one fiscal year

10

to the next.  *See NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009)

("{W}hile its explanations do not have to be perfect, the path of Commerce's decision must be

reasonably discernable to a reviewing court.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

 As for U.S. Steel's contention that Union's translation and transaction losses in fiscal

year 2008 were not "extraordinary," U.S. Steel Cmts. at 21-24, the Court specifically addressed

such arguments by U.S. Steel as part of its decision and order in *Union Steel*.  837 F. Supp 2d at

1312 ("As the court has observed, the record contained evidence of {Union's parent company's}

substantial foreign currency exchange losses in 2008 relative to 2007 and evidence of the steep

post-POR decline in the value of the Korean won.").  U.S. Steel also contends that Commerce's

blended interest expense ratio results in greater inaccuracy because it encompasses data from

twelve months that are outside of the POR.  *See* U.S. Steel Cmts. at 24.  However, the Court in

an earlier decision dealing with Commerce's calculation of an interest expense ratio recognized

"the obvious point that, outside of a financial statement with perfect correspondence to the POR,

some compromise in the choice of data always will be necessary."  *Union Steel v. United States*,

755 F. Supp. 2d 1304, 1312 (Ct. Int'l Trade 2011).  With the agency operating under such

constraints, Commerce's desire to ensure that Union's interest expense ratio reflects financial

statements from both fiscal years making up the POR constitutes a reasonable compromise in

data selection.

 In recognition of the unique global events that transpired in late 2008, Commerce, on

remand, reasonably revised its approach to calculate an interest expense ratio for Union.  By

utilizing expenses from both fiscal years 2007 and 2008, Commerce accounted for the whole of

the POR while mitigating the potential effect of the post-POR foreign exchange losses incurred by Union's parent company.  That methodology should be sustained.

## II.  Commerce's Revised Cost Recovery Test Should Be Sustained

In compliance with the Court's remand order, Commerce reconsidered aspects of its quarterly cost methodology.  As a result, Commerce applied a new recovery-of-cost test with respect to Union and HYSCO and jettisoned the indexing methodology that was used in the final results.  Because Commerce's new methodology is supported by substantial evidence and is otherwise in accordance with law, it should be sustained.

On remand, Commerce did not employ the indexing methodology used in the final results to calculate each quarter's cost.  Instead, it relied upon Union's and HYSCO's reported historic quarterly-cost data.  *See* Union Remand Accounting Memo, C.R.R. 10, and HYSCO Remand Accounting Memo, C.R.R. 5.  The agency compared the unindexed historical quarterly costs of production to sales prices in each respective quarter for each company to determine whether they were below cost.  *See id.*  Where Commerce encountered control numbers (CONNUMs) with sales in a specific quarter that had no production in that quarter, it used the cost of the most similar CONNUM in its comparison.  *See* Remand Results, P.R.R. 15, at 17, n.3.

Commerce used those unindexed costs in its revised cost recovery test.  In determining whether to exclude certain sales of foreign like product that were made below the cost of production from the calculation of normal value, Commerce considers, among other criteria, whether such sales "were not at prices that permit the recovery of all costs within a reasonable period of time."  19 U.S.C. § 1677b(b)(1).  With respect to the "recovery of costs," the statute states:  "If prices which are below the per unit cost of production at the time of sale are above the weighted average per unit cost of production for the period of investigation or review, such

prices shall be considered to provide for recovery of costs within a reasonable period of time."
19 U.S.C. § 1677b(b)(2)(D).

For its revised cost recovery test on remand, Commerce calculated an unindexed
weighted average per-unit cost of production for the entire POR using the historical quarterly
costs and production quantities as reported by Union and HYSCO. *See* Remand Results, P.R.R.
15, at 17.   After identifying disregarded below-cost sales for each company, Commerce
calculated CONNUM-specific annual weighted average prices and compared them, on a
CONNUM-specific basis, to annual weighted average unindexed costs. *See id.* at 17-18.   In
those instances where the annual weighted average price per CONNUM exceeded the annual
weighted average unindexed cost per CONNUM, Commerce restored all sales of that CONNUM
to the normal value pool of sales available for comparison with United States sales. *See* Union
Remand Accounting Memo, C.R.R. 10, and HYSCO Remand Accounting Memo, C.R.R. 5.  As
a result of Commerce's revised recovery-of-cost analysis, the number of sales included in the
dumping margin calculation increased for both Union and HYSCO. *See* Remand Results, P.R.R.
15, at 18.

Commerce's revised recovery-of-cost test applied to Union and HYSCO in the remand
results comports with the statutory requirement under 19 U.S.C. § 1677b(b)(2)(D) to use the
weighted average per unit cost of production for the POR.  It is also consistent with the
Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act ,
which clarifies that "{t}he determination of cost recovery is based on an analysis of actual
weighted-average prices and cost during the period of investigation or review."  H.R. Doc. No.
103-316, vol. 1., at 832 (1994).

HYSCO contends that Commerce committed errors in applying its revised cost recovery test and indexing methodology, but its concerns are misplaced. HYSCO first asserts that, when Commerce encountered CONNUMs with sales in a specific quarter that had no production data, Commerce should have relied on indexing rather than a surrogate cost from the most similar CONNUM. *See* HYSCO Cmts. at 3-5. HYSCO notes Commerce's apparent inconsistency when it used indexing for pre-POR sales that did not have reported cost of production data. *See id.* at 3-4. However, the administrative record includes no pre-POR production data of any sort, leaving Commerce with no option but to use indexing in that limited instance. *See* Remand Results, P.R.R. 15, at 17, n.2, & 19. For quarters within the POR, Commerce did have cost of production data, and, for those CONNUMs with sales in a particular quarter but no production data, the agency had the option of using contemporaneous surrogate costs from the most similar CONNUM. *See id.* at 19. In light of Commerce's finding of significant cost changes between quarters, its preference for a contemporaneous surrogate instead of a cost indexed across volatile time periods is both a reasonable and reliable methodological choice.

HYSCO next asserts that Commerce erred in using surrogate material costs for selected quarters in applying the revised cost recovery test rather than using available data to calculate a weighted average cost for the POR. *See* HYSCO Cmts. at 5. The same rationale as above applies here as well. Having found significant cost changes between quarters, Commerce determined it to be necessary to include a cost – even if a surrogate cost from the most similar CONNUM – for every quarter in which a sale of a CONNUM occurred to obtain the most representative POR-average cost in applying the recovery-of-cost test. *See* Remand Results, P.R.R. 15, at 19-20. Use of a contemporaneous surrogate in this context is also appropriate.

Accordingly, Commerce's application of its revised recovery-of-cost test and

reconsideration of its indexing methodology from the final results complies with the Court's

remand order in *Union Steel* and should be sustained.

**III.    Commerce's Use Of Quarterly Costs Continues To Be Supported By Substantial Evidence And In Accordance With Law**

Because of concerns raised about Commerce's indexing methodology in the final results,

the Court in *Union Steel* ordered Commerce to "reconsider its quarterly-cost methodology."  837

F. Supp. 2d at 1337.  On remand, Commerce re-examined its decision and concluded that

application of quarterly costs continues to be warranted.  Commerce's determination is supported

by substantial evidence, is otherwise in accordance with law, and should be sustained.

A.    Application Of Quarterly Costs Is A Reasonable Methodology

Although Commerce has historically used annual averages for its cost of production

analysis under 19 U.S.C. §1673b(b), it has departed from that methodology when it has

concluded that, because of significant cost or home market price changes during the period of

review, reliance upon an annual average would be distortive.  *See, e.g., Antidumping*

*Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of*

*Investigation (POI)/Period of Review (POR) that May Require Using Shorter Cost Averaging*

*Periods*, 73 Fed. Reg. 26,364 (Dep't of Commerce May 9, 2008) (request for comments); *Brass*

*Sheet and Strip from the Netherlands*, 65 Fed Reg. 742, 746-748 (Dep't of Commerce Jan. 6,

2000) (final admin. review).

More recently, Commerce has determined that it may depart from its normal

methodology and review shorter cost periods when two factors exist:  (1) the cost changes

throughout the period of review are significant, and (2) sales during the shorter cost averaging

period can be reasonably linked with the cost of production during the same averaging period.

*See, e.g.*, *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1358 (Ct. Int'l Trade 2010); *Certain Steel Concrete Reinforcing Bars From Turkey*, 73 Fed. Reg. 66,218 (Dep't of Commerce Nov. 7, 2008) (final admin. review) and accompanying issues and decision memorandum at cmt. 2; *Stainless Steel Plate in Coils From Belgium*, 73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008) (final admin. review) and accompanying issues and decision memorandum at cmt. 4. Commerce's threshold analysis of those factors for determining whether to use quarterly costs has been upheld by the Court of Appeals for the Federal Circuit and this Court in circumstances similar to those present here.  *See Pastificio Lucio Garofalo, S.P.A. v. United States*, 469 F. App'x. 901 (Fed. Cir. Mar. 14 2012) (affirming this Court's judgment sustaining Commerce's use of quarterly costs without opinion pursuant to Fed. Cir. R. 36); *SeAH Steel Corp.* F. Supp. 2d at 1363-64.

B.     Commerce's Decision To Use Quarterly Costs Is Reasonable

When given an opportunity by the Court to reconsider its quarterly cost methodology on remand, Commerce properly decided to make no changes.  As stated by Commerce, "The elimination of indexing, however, has not changed the { } determination to use quarterly costs in this administrative review because the underlying data used to determine significance and linkage remains unchanged {from the final results}."  Remand Results, P.R.R. 15, at 21.  Record evidence continues to support Commerce's determination.

As explained above, Commerce performs two inquiries when deciding whether to use something other than an annual average.  First, it determines whether the cost changes throughout the period of review are significant.  *See id.* at 23.  Second, it determines whether sales during the shorter cost averaging period can be reasonably linked with the cost of production during the same averaging period.  *See id.* at 23-24.

16

Here, in evaluating whether cost changes were significant, Commerce analyzed "on a CONNUM-specific basis, the percentage difference between the lowest quarterly average {cost of manufacturing} and the high quarterly average {cost of manufacturing}, as a percentage of the low quarterly average." Decision Memorandum, P.R. Doc. 218, at 17. If the difference in costs between the two quarters exceeded 25 percent, Commerce determined that the volatility, or change of costs, during the period of review was "significant." *See id.* In this case, record evidence shows that Union and HYSCO experienced significant changes (that is, changes that exceeded 25 percent) between the high and low quarterly cost of manufacturing during the POR. *See* Remand Results, P.R.R. 15, at 24. That change in cost of manufacturing is primarily attributable to the price volatility for coil substrate used in the production of CORE. *See id.*

HYSCO contends that Commerce erred in comparing only the highest and lowest quarters, arguing that Commerce was required to track costs "throughout the POR as a whole" rather than differences between "isolated quarters." HYSCO Cmts. at 6-7. As a preliminary matter, HYSCO's assumption that Commerce found significant cost differences only between "isolated quarters" is contradicted by record evidence. Despite Commerce's recognition that trends in cost changes throughout the period of review are not "critical factor{s} in {its} analysis," Decision Memorandum, P.R. Doc. 218, at 18, HYSCO's total cost of manufacturing

███████████████████████████████████████████████████████ CONNUMS examined by Commerce. *See* HYSCO Post-Preliminary Analysis Memorandum, Attached as Exhibit 8 to HYSCO's Appendix to its motion for judgement, at Attachment 1. Thus, contrary to HYSCO's assertion, the record does not indicate temporary spikes in HYSCO's total cost of manufacturing, but, rather, significant increases throughout the POR.

Regardless of whether HYSCO experienced progressive changes in average costs throughout the entire review period, Commerce reasonably concluded that "{a} change in costs that exceeds 25 percent, even if only between two quarters of the POR, is significant enough to create distortion when using a single annual average cost methodology.  A single annual average cost methodology still results in costs being too high in the low cost quarter and too low in the high cost quarter."  Decision Memorandum, P.R. Doc. 218, at 17.  Notably, this Court has sustained Commerce's similar comparison of the costs for the highest quarter to the costs in the lowest quarter in *Habas Sinai v. United States*, No. 05-00613, 2009 WL 4049119 (Ct. Int'l Trade Nov. 23, 2009), and in *SeAH Steel*, 704 F. Supp.2d at 1363.

Union's challenge to Commerce's analysis of significant cost differences is similarly unavailing.  Union continues to take issue with Commerce's refinement to its methodology in the final results, reincorporated in the remand results, to include the impact of the major input adjustment in its analysis because, says Union, the major input adjustment does not reflect Union's actual costs and prices.  *See* Union Cmts. at 6-10.  Prior to making that adjustment, however, Commerce preliminarily adopted a quarterly costs methodology for Union's margin calculations upon determining that four of the ten CONNUMs examined by Commerce, which accounted for ▮▮▮▮ percent of reported United States and home market sales, exceeded the 25 percent threshold for cost differences.  *See* Union Post-Preliminary Analysis Memorandum, C.R. Doc. 74, at 2 and Attachment 1, attached as Exhibit 15 to Union appendix to motion for judgment.  Union suggests that Commerce overstated the volume of Union's sales affected by significant cost differences in its post-preliminary analysis, but Union's calculations include all reported sales, including those from the "90/60" day window period, which Commerce, as

explained below, justifiably does not take into account as part of its quarterly costs analysis.  *See* Union Cmts. at 9-10.

     Regardless, Commerce in the final results determined that, after applying the major input adjustment, eight out of the 10 CONNUMs that it examined, which accounted for ████ percent of reported United States and home market sales, exceeded the 25 percent threshold for cost differences.  *See* Union Final Cost Memorandum, C.R. 94, at 1-2, attached as Exhibit 8 to Union's appendix to its motion for judgment.  The purpose of the major input adjustment is to account for any distortion arising when a major input is purchased from an affiliated party at what Commerce has reasonable grounds to believe is less than the cost of production.  *See* 19 U.S.C. § 1677b(f)(3).  Pursuant to the rule, Commerce may value that input on the basis of the information available regarding such cost of production.  By adjusting for the purchases of major inputs from affiliated suppliers, Commerce made certain that the significant cost change analysis relied upon the same adjusted cost data used in the antidumping margin calculations.  Accordingly, Commerce took reasonable steps to ensure that it "more accurately measure{d} the significance of the cost changes throughout the {period of review}."  Union Final Cost Memorandum, C.R. 94, at 1 and Attachment 1.

     In evaluating the second factor of the analysis – whether sales can be reasonably linked or correlated with the cost of production during the same averaging period – Commerce explained that to determine "linkage" in a given quarter between a company's costs and its home market sales, it was not necessary to show "direct traceability between specific sales and their specific production costs."  Decision Memorandum, P.R. Doc. 218, at 18.  Commerce explained that to expect proof of such a linkage would be "too strict a standard" and would "unreasonably preclude this remedy for products where there is no pricing mechanism in place and it may be

very difficult to precisely link production costs to specific sales." *Id.*  Instead, Commerce

explained it would evaluate whether a "reasonable correlation" existed between cost and home

market sales prices.  *Id.*  Commerce explained that "these correlative elements may be measured

in a number of ways depending on the associated industry, the overall production process, the

inventory tracking systems, company-specific sales data, and pricing mechanisms used in the

normal course of business (*e.g.*, surcharges, raw material pass through devices)."  *Id.* at 18-19.

In this case, there was little doubt from Union's and HYSCO's reported quarterly average

net prices and Union's and HYSCO's reported quarterly average costs that both prices and costs

were trending in the same direction throughout the period of review for both companies.  *See*

Union Post-Preliminary Analysis Memorandum, C.R. Doc. 74, at Attachment 2; HYSCO Post-

Preliminary Analysis Memorandum, Exhibit 8 to HYSCO's Appendix, at Attachment 2.  Union

and HYSCO, however, argue that past practice requires Commerce to rely upon a "direct" link

within a given quarter between costs and home market prices and that, absent evidence of such a

link, Commerce was obligated to apply an annual average cost test.  Union Cmts. at 10-14;

HYSCO Cmts. at 7-8.

As a preliminary matter, Union and HYSCO are incorrect when they insist that

Commerce has any particular practice of requiring direct linkage or traceability.  Indeed, the

Court has held that Commerce does not have any such practice.  *See SeAH Steel*, 704 F. Supp. 2d

at 1363 ("While it is true that {Commerce} has shifted position as to the requisite relationship

between production costs and sales prices, it has consistently rejected a direct traceability

requirement since early 2008.").  Similarly, in *Habas Sinai v. United States*, 625 F. Supp. 2d

1339 (Ct. Int'l Trade 2009), the Court rejected Commerce's claims in the remand determination

cited by Union in its comments regarding linkage.  *See* Union Cmts. at 13.  Holding that

Commerce had "overstate{d} its case," the Court explained that the analysis in Commerce's first remand determination was "at best fuzzy and imprecise . . . as to the requisite relationship between production costs and sales prices within the proposed shorter cost-averaging period." *Id.* at, 1362, 1366, n.26.  The Court further determined that Commerce's standard for determining "linkage" seemed to continually "morph" from case to case, and indicated that it seemed there was no real consistent "practice" as to the actual tests set forth in the "second prong of Commerce's analysis."  *Id.* at 1366, n.26, 1371.  Thus, the issue in that case was remanded to Commerce.  In its second remand determination, Commerce arrived at the same conclusion as the Court after analyzing multiple cases in which it had applied a quarterly cost analysis, stating that although Commerce had found "direct linkage" in at least one case, Commerce "has accepted varying degrees of correlation between sales and costs" in determining whether or not to apply quarterly costs.  *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, Docket No. 109, Final Results of Redetermination Pursuant to Court Remand, at 11-12.

Here, the record demonstrated a reasonable link.  *See* Remand Results, P.R.R. 15, at 25.  Commerce requested both Union and HYSCO to "compute its overall {period of review} average inventory turnover period" for input substrate and finished CORE.  *See* Union Post-Preliminary Analysis Memorandum, at 3; HYSCO Post-Preliminary Analysis Memorandum.  Union reported a substrate inventory turnover period of approximately ▮ days.  *See* Union Post-Preliminary Analysis Memorandum, at 3.  Including Union's average time between production and shipment of ▮ days, Commerce determined that "it takes on average ▮ days, from the time Union purchases the input coil to the time it is input into production, incorporated into a finished product and sold."  *Id.*  Commerce found that this turnover period was "well

within the three month shorter cost averaging period" used by Commerce in its quarterly

analysis.  *Id.*

Similarly, with respect to HYSCO, Commerce determined that the inventory periods for

raw material and finished goods were ███ and ███ days respectively, with the resulting ███ day

period "well within" the quarterly cost averaging period.  HYSCO Post-Preliminary Analysis

Memorandum, at 3.  From that analysis, Commerce concluded that "{t}he finished goods

inventory turnover ratio tells us that Union and HYSCO sell their production relatively quickly;

therefore, costs in the quarter are reasonably representative of the sales that occurred within the

same quarter.  Quick inventory turnover allows Union and HYSCO to revise their respective

prices in response to the highly volatile material costs and allows current costs to be reflected

quickly in their {cost of manufacturing}."  Decision Memorandum, P.R. Doc. 218, at 19.

Commerce further explained that, upon comparing by quarter the weighted average sales

prices for the five most frequently sold CONNUMs in the home market and the five most

frequently sold CONNUMs in the United States market and the quarterly {cost of

manufacturing} for both Union and HYSCO, "the information provided by Union and HYSCO

reveals that sales and costs for each of these CONNUMs generally trended in the same

direction."  *Id.*  In other words, Commerce found that "when the average quarterly {cost of

manufacturing} increased, generally the average quarterly price increased, and when the average

quarterly cost decreased, generally the average quarterly price decreased."  HYSCO Post-

Preliminary Analysis Memorandum, at 3.  Accordingly, because Commerce found that Union's

and HYSCO's inventory turnover periods were less than three months in length, and Union's and

HYSCO's cost of manufacturing and home market price changes followed similar trends

throughout the period of review, there existed sufficient basis to establish "a reasonable link

between the changes in Union's and HYSCO's {costs of manufacturing} and the changes in sales prices."  Decision Memorandum, P.R. Doc. 218, at 19.

Because Commerce identified for both Union and HYSCO significant cost changes throughout the POR and a reasonable linkage between those cost changes and sales prices during the POR, Commerce justifiably relied upon quarterly cost information in this administrative review.  Its redetermination on remand to make no change in this regard should be sustained.

## IV.   Commerce's Determination To Continue Comparing United States And Home Market Sales On A Quarterly Basis Should Be Sustained

In compliance with the Court's remand instructions, Commerce reconsidered whether it is appropriate to depart from the normal method of determining the contemporaneous month for sales comparison purposes and continued to find that, when using quarterly costs, it is appropriate to do so.  Thus, Commerce limited the comparisons to the quarter in which the sales were made.  That departure from the normal method is permitted by law, is supported by substantial evidence, and has been upheld by the Federal Circuit and this Court under similar circumstances.  The Court should likewise sustain Commerce's decision in this case.

The statute provides that when Commerce compares prices in the United States to a company's home market prices for its antidumping analysis, "{i}n general" the company's "normal value" will be based on home market prices, made in the ordinary course of trade, that existed "at a time reasonably corresponding to the time of sale used to determine the export price or constructed export price under 1677a(a) or (b) of this title."  19 U.S.C. § 1677b(a)(1)(A).  Commerce's regulations state that when "normal value is based on the weighted average of sales of the foreign like product, the Secretary will limit the averaging of such prices to sales incurred during the contemporaneous month."  19 C.F.R. § 351.414(e).  In describing the term

"contemporaneous month," the regulation further provides a method of determining this period

of time, stating that:

> <u>normally</u> {Commerce} will select as the contemporaneous month the first
> of the following which applies:
> (1) The month during which the particular U.S. sale under consideration
> was made.
> (2) If there are no sales of the foreign like product during this month, the
> most recent of the three months prior to the month of the U.S. sales in
> which there was a sale of the foreign like product.
> (3) If there are no sales of the foreign like product during any of these
> months, the earlier of the two months following the month of the U.S. sale
> in which there was a sale of the foreign like product.

19 C.F.R. § 351.414(f) (emphasis added).

      In other words, in administrative reviews, Commerce will first compare United States

sales of subject merchandise with weighted average home market sales within a given 30-day

period.  It is Commerce's preference to first look for comparisons to "merchandise which is

identical in physical characteristics with, and was produced in the same country by the same

person as, that merchandise."  19 U.S.C. § 1677(16)(A).  If Commerce does not find physically

identical merchandise in the home market for sales during the same month as a given United

States sale, Commerce will then look, on a month-by-month analysis, to "the three months prior"

for comparisons, and then to "the two months following" the United States sale to find

comparable sales of physically identical merchandise.  If no sales of physically identical

merchandise exist in the home market, then Commerce will return to the initial 30 day period

and match the United States sale with a "similar home-market product."  *See Koyo Seiko v.*

*United States*, 66 F.3d 1204, 1206 (Fed. Cir. 1995) (describing and sustaining Commerce's

model match methodology).  If no similar product sales were made in the home market during

that period, then Commerce's comparisons will, again, extend outward to the contemporaneous

"90/60" day window period.

Although Commerce "normally" uses the "90/60" day contemporaneity window, where costs and prices are changed significantly because high inflation or when applying the alternative cost averaging methodology because of significantly changing costs, Commerce has modified or eliminated the "90/60" day window period to conform with the shortened cost averaging period. *See*, *e.g.*, *Certain Welded Carbon Steel Pipe and Tube from Turkey*, 61 Fed. Reg. 69,067, 69,068 (Dep't of Commerce Dec. 31, 1996) (admin. review).  Limiting the sales comparisons to within quarters when using the alternative quarterly cost methodology was affirmed by the Federal Circuit without decision in *Garofalo*.  In the underlying case that was appealed in *Garofalo*, this Court agreed with Commerce's reasoning that limiting sales comparisons to contemporaneous quarters appropriately "lessen{s} the margin distortions caused by changes in sales prices which result from significantly changing costs."  *Pastificio Lucio Garofalo, S.P.A. v. United States*, 783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011); *see also SeAH Steel*, 704 F. Supp. 2d at 1376 (recognizing that 19 C.F.R. 351.414(f) "allows for an atypical circumstance under which it may be reasonable or appropriate to depart from the *normal* procedure") (emphasis in original).

Here, upon reconsideration, Commerce again concluded that the use of a six-month window would be unreasonable because it would distort margin calculations simply by the timing of price comparisons.  *See* Remand Results, P.R.R. 15, at 29.  For the same reasons that Commerce applied a quarterly-based cost methodology, Commerce found that Union's and HYSCO's significant changes in costs and home market CORE prices due to "fluctuating raw material input costs" would lead to distortions in Commerce's calculation of each company's respective dumping margin if Commerce used the normal six-month window period.  Decision Memorandum, P.R. Doc. 218, at 20.  Commerce stated that, just as with the cost analysis, such concerns were analogous to the market conditions of an administrative review of a company

located in a hyperinflationary economy.  *Id.* ("When significant cost changes have occurred

during the {period of review}, these same conditions are typically accompanied by changes in

prices as the market reacts to changing economic conditions").  Thus, Commerce concluded that

"price-to-price comparisons should be made over the shorter cost averaging period to lessen the

margin distortions caused by changes in sales price which result from significantly changing

costs."  *Id.*

   Both Union and HYSCO contend that Commerce was not free to depart from its

regulations and disregard the "90/60" contemporaneous window.  *See* Union Cmts. at 14-19;

HYSCO Cmts. at 8-11.  Contrary to that contention, Commerce reasonably exercised the

discretion permitted by the regulation's use of the term "normally."  19 C.F.R. § 351.414(f).  It is

well established that when the term "normally" is used in a regulation, the implementing agency

has been "afforded discretion" to determine when "the 'normal'" situation "is inapplicable."

*KYD v. United States*, 613 F. Supp. 2d 1371, 1382 (Ct. Int'l Trade 2009).  The regulation

provides what Commerce must do "normally."  "Inherent in this authority is the ability to

determine whether or not the 'normal' situation applies in any given circumstance."  *SeAH Steel*,

704 F. Supp. 2d at 1376.  Either Commerce has the authority to conclude what is an "abnormal"

factual scenario on a case-by-case basis, or it does not — there is no middle ground.

   Commerce did not abuse its discretion in re-applying the regulation as it did in the

remand results.  As Commerce originally explained, "{C}omparing home market sales from one

quarter to U.S. sales during another quarter of the {period of review} when the unadjusted home

market price does not reflect the contemporaneous price changes that have occurred through the

date of the U.S. sale distorts the dumping analysis."  Decision Memorandum, P.R. Doc. 218, at

20.  Put another way, "under the standard window period analysis, U.S. prices could be

compared to average home market prices that, 90 days prior, were very different from those 30 or even 60 days prior, because of significant increases in costs of production during that time period." Remand Results, P.R.R. 15, at 31.

Moreover, both the Federal Circuit and this Court have upheld Commerce's use of a shortened contemporaneity period as supported by substantial evidence and otherwise in accordance with law. In *SeAH Steel*, the Court affirmed Commerce's determination to rely on quarterly average costs and not to apply the "90/60" day window in making price-to-price comparisons based upon the same rationale provided by Commerce in this case. *See SeAH Steel*, 704 F. Supp. 2d at 1376. The issue was litigated again in *Garofalo*, where the Court sustained Commerce's determination. *See Garofalo*, 783 F. Supp. 2d at 1239 ("In line with the Department's reasonable methodology, therefore, limiting sales comparisons to contemporaneous annual quarters in this case appropriately 'lessen{s} the margin distortions caused by changes in sales price which result from significantly changing costs.'") (citation omitted). That decision was affirmed by the Federal Circuit.

Union and HYSCO also argue that Commerce's use of a smaller window, in conjunction with Commerce's cost of manufacturing analysis, resulted in fewer matches of similar home market sales with United States sales. *See* Union Cmts. at 18-19; HYSCO Cmts. at 10-11. Union goes so far as to suggest that Commerce's "abandonment of its 90/60 day rule. . . runs afoul of the statutory preference for matching identical merchandise." Union Cmts. at 18. While the shortened window may not have provided for every identical match that could have been made using the standard window period, neither Union nor HYSCO have identified a single

instance of an unreasonable match resulting from the new methodology.  *See* Union Cmts. at 18-19; HYSCO Cmts. at 10-11.

As the Court held in *SeAH Steel*, "all Commerce did was maintain fidelity to the statute's preference for identical matches within the framework of a reasonable methodology for price-to-price comparisons of U.S. and home market sales."  *SeAH Steel*, 704 F. Supp. 2d at 1375-76. Accordingly, Commerce acted reasonably and in accordance with law in limiting comparison periods to smaller, more contemporaneous periods of time.  That aspect of Commerce's remand results should be sustained.

## V.      Commerce's Zeroing Methodology Should Be Sustained

### A.      Commerce's Additional Explanation Is Reasonable

Contrary to Union's assertions that Commerce did not follow the Court's order, Commerce on remand provided a reasonable explanation for its interpretation of the statute as permitting Commerce to use zeroing when aggregating average-to-transaction comparisons in administrative reviews and not to use zeroing when aggregating average-to-average comparisons in original investigations.  *See generally* Remand Results, P.R.R. 15, at 38-60.  Specifically, Commerce discussed the differences between average-to-transaction comparison results in administrative reviews and average-to-average comparison results in investigations and explained why such differences supported Commerce's reasonable interpretation of 19 U.S.C. § 1677(35) as it applies to zeroing in each of those contexts.

Union fails to demonstrate that Commerce's explanation is unreasonable.  Instead, Union largely contends that the Federal Circuit already considered and rejected Commerce's justifications.  *See* Union Cmts. at 20-30.  As demonstrated below, the Federal Circuit has not considered, let alone rejected, Commerce's additional explanations in the remand results.  In

fact, this Court has sustained a virtually identical explanation to that offered here on at least five other occasions.  *See Thai Plastic Bags Indus. v. United States,* No. 11-00086, 2013 WL 491520 (Ct. Int'l Trade Feb. 11, 2013) (sustaining zeroing remand determination and emphasizing the reasonableness of Commerce's explanation, which focuses on the differences between comparison methods); *Union Steel v. United States*, 823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) (appeal pending); *Grobest & I-Mei Indus. Vietnam Co. v. United States*, 853 F. Supp. 2d 1352, 1357-1362 (Ct. Int'l Trade 2012); *Far E. New Century Corp.  v. United States*, 867 F.Supp.2d 1309 (Ct. Int'l Trade 2012); *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 880 F.Supp.2d 1348 (Ct. Int'l Trade 2012); *Fisher S.A. Comercio, Industria & Agricultura v. United States*, Slip Op. 2012-149, 2012 WL 6062563 (Ct. Int'l Trade Dec. 6, 2012).  Based upon the explanations provided in the remand results, the Court should similarly sustain Commerce's use of zeroing in this administrative review.

Specifically, Commerce explained that its interpretation of the statute was supported, in part, by certain differences between the *results* of the average-to-average comparison methodology applied in investigations, and the *results* of the average-to-transaction comparison methodology applied in this administrative review.  *See id.* at 48-52.  Commerce stated that when using an average-to-average comparison methodology, Commerce divides export transactions into averaging groups.  *See id.* at 48-49.  Commerce then "averages together all prices, both high and low, for each averaging group," and "compares the average export price or constructed export price for the averaging group with the average normal value for the comparable merchandise."  *Id.* at 49.  Therefore, Commerce calculates a comparison result for each averaging group.  In doing so, Commerce averages together high and low export prices within an averaging group, allowing those export prices above normal value to offset those export prices

below normal value.  Commerce then aggregates the results of the comparison for each averaging group.  It is entirely consistent and reasonable that, when aggregating the results of the comparison for each averaging group, Commerce follows a similar methodology.  At the aggregation stage, negative averaging group comparison results offset positive averaging group comparison results.  In this manner, Commerce accounts for high and low results of the comparisons in its aggregation of the comparison results across averaging groups as it does for high and low export prices within each averaging group.  By permitting offsets in the aggregation stage, Commerce determines an "on average" aggregate amount of dumping for the numerator of the weighted-average dumping margin ratio consistent with the manner in which the comparison results being aggregated were determined.

In contrast, when Commerce uses the average-to-transaction comparison methodology, as it did in this review, Commerce compares the export price or constructed export price for a particular export transaction with an average normal value for the comparable sales of foreign like product.  *See id.* at 50.  Therefore, Commerce calculates a comparison result for specific export transactions, which establishes the amount, if any, by which a respondent sells a specific export transaction at a price that is less than its normal value.  *See id.*  Unlike the average-to-average comparison methodology that Commerce uses in investigations, under the average-to-transaction comparison methodology, Commerce does not average the prices of export transactions before comparing the export price or constructed export price to normal value.  Instead, Commerce uses the price of a single export transaction in its comparison.  Commerce then aggregates the transaction-specific comparison results.  When aggregating the results of the comparison for each export transaction pursuant to the average-to-transaction comparison methodology, it is reasonable for Commerce to follow a similar methodology, and aggregate the

transaction-specific amounts of dumping.  To the extent normal value does not exceed the export

price or constructed export price of a particular export sale, there is no dumping margin

calculated for that sale and thus no amount of dumping to include when Commerce aggregates

the amounts of dumping from each of the transaction-specific comparisons.

Commerce's decision to use or not use zeroing is reasonable because it reflects the

underlying comparison methodology.  That is, pursuant to the average-to-average comparison

methodology applied in investigations, Commerce examines on average export prices and

constructed export prices.  High prices offset low prices within each averaging group and

Commerce does not use zeroing so that negative comparison results offset positive comparison

results.  At the same time, where Commerce examines individual export transactions – that is,

does not average the prices of export transactions – pursuant to an average-to-transaction

methodology –  Commerce does not grant offsets (*i.e.*, it uses zeroing) to ensure that the amount

of duties assessed fully reflects the results of the average-to-transaction comparisons.

The type of comparison methodology used in a given proceeding is meaningful to

Commerce's interpretation of the statute.  Commerce applies an average-to-average comparison

methodology in investigations to examine an exporter's or manufacturer's overall pricing

behavior on average.  *See id.* at 51, 54; *see also* 19 U.S.C. § 1677f-1(d)(1)(A)(i).  On average

pricing behavior is relevant to Commerce's evaluation of whether to make an affirmative

dumping determination in an investigation.

In contrast, with the antidumping order already in place, Commerce used an average-to-

transaction comparison methodology in this review to determine pricing behavior with respect to

individual United States transactions, not averages.  *See* Remand Results, P.R.R. 15, at 51, 54;

*see also* 19 C.F.R. §§ 351.414(b)(3) & (c)(2).  In other words, using zeroing enables Commerce

31

to aggregate the transaction-specific margins calculated so that the total amount of duties to be assessed equals the amount by which export transactions to the United States were sold at prices below normal value.

Contrary to Union's claim, the Federal Circuit did not consider, let alone reject, this explanation in *Dongbu Steel Co. v. United States*, 635 F.3d 1363 (Fed. Cir. 2011), *JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011), or *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343 (Fed. Cir. 2005).  In *Dongbu,* Commerce's final results in the administrative review did not address Commerce's different interpretations of the statute as they relate to the use of zeroing in administrative reviews and investigations.  635 F.3d at 1372.  Nevertheless, at oral argument, counsel for the United States provided one explanation for the exception to its general practice of zeroing:  that the exception resulted from Commerce's implementation of an adverse WTO decision.  See *id.*  In *dicta*, the Federal Circuit stated, "the government's decision to implement an adverse WTO report standing alone does not provide sufficient justification for the inconsistent statutory interpretations."  *Id.* at 1372.  Different from *Dongbu*, Commerce's implementation of an adverse WTO decision did not "stand alone" as the sole justification for Commerce's interpretation of the statute.  Rather, Commerce here provided additional explanations for its different interpretations of 19 U.S.C. § 1677(35) beyond its implementation of an adverse WTO decision.   Remand Results, P.R.R. 15, at 45-46, 48-52, 58-60.

In *JTEKT*, Commerce identified differences between investigations and administrative reviews to support its different interpretations of 19 U.S.C. § 1677(35), namely the different comparison methodologies generally applied in investigations and administrative reviews and the different purposes behind the margin calculations in administrative reviews and investigations.  However, Commerce did not explain *why* these differences supported the reasonableness of

Commerce's interpretation of 19 U.S.C. § 1677(35). *JTEKT*, 642 F.3d at 1384-1385 ("While Commerce did point to differences between investigations and administrative reviews, it failed to address the relevant question – why is it a reasonable interpretation of the statute to zero in administrative reviews, but not in investigations?").  Moreover, Commerce did not point to the inherent differences between the results of the average-to-average comparison methodology in investigations and average-to-transaction comparison methodology in administrative reviews and explain why those differences make Commerce's different interpretations of 19 U.S.C. § 1677(35) reasonable.  Remand Results, P.R.R. 15, at 48-52, 58-60.

As demonstrated above, Commerce has now provided a complete explanation for its interpretation.  Commerce's different interpretations of 19 U.S.C. § 1677(35) in administrative reviews and investigations are reasonable because each interpretation reflects the comparison methodology that Commerce uses in each proceeding.  *See id.*  Therefore, unlike in *JTEKT*, in the remand results, Commerce more thoroughly identified differences between its comparison methodologies in those investigations that do not apply zeroing and this administrative review and took the additional step of explaining *why* the differences supported the reasonableness of Commerce's interpretation of 19 U.S.C. § 1677(35).

Finally, in *Corus*, the Federal Circuit did not consider (and could not have considered) the explanation Commerce presented in the remand results.  In that case, the plaintiff challenged Commerce's use of zeroing in an investigation and attempted to persuade the Court that zeroing was prohibited by the statute under the first step of the *Chevron* analysis.  The Court held the statute *equally ambiguous* for both reviews and investigations.  In other words, the Court held that the statute permits Commerce to treat them the same, not that Commerce must always treat investigations and review identically.  *Corus* said nothing about whether, once Commerce

33

changes its practice for some comparisons in investigations, it must change it for reviews.

Moreover, the Court stated in *Dongbu* that it has "never considered the reasonableness of

interpreting 19 U.S.C. § 1677(35) in different ways depending on whether the proceeding is an

investigation or an administrative review." *Dongbu*, 635 F.3d at 1370.  Thus, the Federal Circuit

certainly has never rejected, in *Corus* or any other case, Commerce's explanation.   Indeed,

Commerce departed from the position affirmed in *Corus* when it ceased zeroing in investigations

with average-to-average comparisons.  *Cf. Nat'l Cable & Telecomm. Ass'n. v. Brand X Internet*

*Services*, 545 U.S. 967 (2005) (an agency's position is not "carved in stone" and may be reversed

when an agency provides adequate reasons for the reversal).

      B.    <u>Precedent Supports Commerce's Explanation</u>

      Union contends that past cases sustaining Commerce's use of zeroing in administrative

reviews can be distinguished because at the time of those cases Commerce maintained a

consistent practice of using zeroing in both administrative reviews and investigations.  *See* Union

Cmts. at 22-23.  In *SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011), however, the

Federal Circuit sustained Commerce's decision to use zeroing in an administrative review even

though "Commerce changed its practice for original investigations and no longer uses zeroing

for calculation of weighted average dumping margins, but it continues to use zeroing during

administrative reviews."  630 F.3d at 1375.  The Court made clear that "{e}ven after Commerce

changed its policy with respect to original investigations, we have held that Commerce's

application of zeroing to administrative reviews is not inconsistent with the statute."  *Id.*

      The Federal Circuit has not overturned *SKF*.  *See United States Steel Corp. v. United*

*States*, 621 F.3d 1351, 1361 (Fed. Cir. 2010) (applying the rule that, if panel decisions conflict,

earlier decisions prevail unless overturned *en banc*) (citation omitted).  Critically, the *SKF* Court

held that zeroing in administrative reviews is a reasonable interpretation of the statute.  630 F.3d at 1375.  Further, there can be no dispute that *SKF* examined and upheld Commerce's use of zeroing in an administrative review that was completed at a time when Commerce interpreted 19 U.S.C. § 1677(35) differently in investigations and administrative reviews, as was the case at the time of this administrative review.  *See id.*  Indeed, no facts distinguish Commerce's decision to use zeroing in *SKF* from its decision to use zeroing in this case.

That being said, we acknowledge that *Dongbu* and *JTEKT* hold differently from *SKF* and that this Court in *Union Steel* ordered Commerce to "reconsider its decision in the Final Results to apply its zeroing methodology and must either modify that decision or explain how the language of 19 U.S.C. § 1677(35) permissibly may be construed in one way with respect to the use of the zeroing methodology in antidumping investigations and the opposite way with respect to the use of that methodology in antidumping administrative reviews."  837 F. Supp. 2d at 1337.  Although *SKF* remains binding precedent on this issue, Commerce has nonetheless complied with the Court's order and provided an explanation for its statutory interpretation.

Union also incorrectly frames the issue as "Commerce's burden on remand. . . to show why, as a *matter of statutory interpretation*, it is reasonable to read section 1677(35) as providing for zeroing in reviews and not in investigations."  Union Cmts. at 25 (original emphasis).  Union also asks that the Court "hold that Commerce must adopt a consistent interpretation of 19 U.S.C. § 1677(35) with respect to zeroing that will apply both in reviews and in investigations" because "{t}his is the only result that will comply with the {Federal Circuit's} decisions" in *Dongbu* and *JTEKT*.  Union Cmts. at 21-22.  Union misunderstands what was required of Commerce.

The Federal Circuit has already held that the relevant statutory provision is ambiguous. *See, e.g., Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004).  In its remand

order, the Court specifically gave Commerce the option to "explain how the language of 19

U.S.C. § 1677(35) permissibly may be construed  in one way with respect to the use of the

zeroing methodology in antidumping investigations and the opposite way with respect to the use

of that methodology in antidumping administrative reviews." *Union Steel*, 837 F. Supp. 2d at

1337.  Thus, Commerce must provide a reasonable explanation for its interpretation, which it did

here.  *See Timken*, 354 F.3d at 1342 ("Under this second step of the *Chevron* analysis, '{a}ny

reasonable construction of the statute is a permissible construction.'") (citation omitted).

Moreover, both the Supreme Court and Federal Circuit have held that an agency may

interpret the same statutory provision differently.  For example, the Supreme Court has upheld

the Federal Communication Commission's interpretation of a statute over challenges that the

agency's interpretation was inconsistent with past practice.  *See Brand X*, 545 U.S. at 981.  The

Supreme Court stated:

> {a}gency inconsistency is not a basis for declining to analyze the agency's
> interpretation under the *Chevron* framework.  Unexplained inconsistency
> is, at most, a reason for holding an interpretation to be an arbitrary and
> capricious change from agency practice under the Administrative
> Procedures Act.  For if the agency adequately explains the reasons for a
> reversal of policy, "change is not invalidating, since the whole point of
> *Chevron* is to leave the discretion provided by the ambiguities of a statute
> with the implementing agency

*Id.* (internal citations omitted).  Accordingly, where an agency adequately explains its

inconsistent interpretation, as Commerce did in the remand results, a court may uphold different

interpretations of the same statutory provision.

Similarly, the Federal Circuit has upheld different interpretations of the same statutory

term.  *See FAG Kugelfischer Georg Schafer AG v. United States*, 332 F.3d 1370 (Fed. Cir.

2003).  In *FAG Kugelfischer*, the Federal Circuit held that, based upon a reasonable explanation,

Commerce may interpret the same statutory term differently depending on the context in which

that term is being interpreted.  *Id.* at 1373 (upholding Commerce's different interpretations within the same proceeding of the term "foreign like product," contained in section 19 U.S.C. § 1677(16)).  If Commerce can never interpret the same statutory terms differently, then there would have been no reason for the Federal Circuit in *JTEKT* and *Dongbu* to remand to Commerce for an explanation of that interpretation.  By remanding for an explanation from Commerce (rather than reversing), the Federal Circuit implicitly recognized that a statutory provision may be interpreted differently in different contexts.  *See Papierfabrik Koehler AG & Koehler Am. v. United States*, 808 F. Supp. 2d 1350, 1357 (Ct. Int'l Trade 2012) (concluding that "no remand would have been necessary" had the Federal Circuit intended the outcome ascribed to it by plaintiffs).

Indeed, the Federal Circuit has sustained Commerce's different interpretation of 19 U.S.C. § 1677(35) within the context of investigations.  In *U.S. Steel*, the Federal Circuit sustained Commerce's decision to cease zeroing in average-to-average comparisons in investigations.  In so doing, the Court recognized that Commerce intended to continue to use zeroing in other types of comparisons in investigations, specifically, in the targeted dumping provision that used an average-to-transaction comparison – the very same comparison at issue here.  *See U.S. Steel*, 621 F.3d at 1355, n.2, and 1362-63.  In other words, the Federal Circuit recognized that Commerce intended to interpret the statute to use zeroing in one context but not in another.  This is critical and adds to the body of binding Federal Circuit precedent that permits Commerce to use zeroing for some purposes and not for others.  *See SKF*, 630 F.3d at 1375. This is what Commerce has done here.

Finally, Union takes issue with Commerce's citation in the remand results to the *Charming Betsy* doctrine, which provides that "'an act of Congress ought never to be construed

to violate the law of nations if any other possible construction remains. . . .'"  *See* Union Cmts. at

26 (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch.) 64, 118 (1804)).  Once the

Executive Branch decided to bring Commerce's actions into compliance with an adverse WTO

report, Commerce reasonably cited *Charming Betsy* to support its authority to change its

interpretation of ambiguous statutory language to create a narrow exception to its longstanding

practice of using zeroing.  *Charming Betsy* in no way requires Commerce to modify its

interpretation of the statute for all scenarios when a limited modification will address the adverse

WTO finding that the Executive Branch has determined to implement.  *See Thyssenkrupp Acciai*

*Speciali Terni S.p.A. v. United States*, 603 F.3d 928, 934 (Fed. Cir. 2010).

Because Commerce, in the remand results, provided a reasonable explanation for its

different interpretations of 19 U.S.C. § 1677(35), the Court should sustain Commerce's use of

zeroing in this administrative review.

## VI.   Commerce's Determination To Treat The Date Of Shipment, Rather Than The Date Of Invoice, As The Date Of Sale For HYSCO's U.S. Sales Should Be Sustained

Commerce's determination that shipment date was the appropriate date of sale for

HYSCO's U.S. sales sold through HYSCO USA should be sustained.  Despite U.S. Steel's

contention that Commerce should have used invoice date as the date of sale, Commerce's

selection of shipment date both conforms with agency practice and is supported by substantial

evidence.

The antidumping statute is silent as to the manner in which Commerce is to determine the

date of sale in calculating export price or constructed export price.  However, the SAA expressly

defines date of sale as the "date when the material terms of sale are established."  SAA, H.R.

Doc. No. 103-316, at 810 (1994).  Congress therefore "expressed its intent that, for antidumping

purposes, the date of sale be flexible so as to accurately reflect the true date on which the

material elements of sale were established." *Allied Tube and Conduit Corp. v. United States*, 24 C.I.T. 1357, 1370 (2000).

Consistent with that intent, Commerce's regulations provide that invoice date is the presumptive date of sale, but with an express caveat for situations where another date" better reflects the date on which the exporter or producer establishes the material terms of sale." 19 C.F.R. § 351.401(i). One such situation is when shipment date precedes invoice date, where Commerce then operates under the assumption that material terms of the sale have been established when a party ships its product to a customer. *See Mittal Steel Point Lisas Ltd. v. United States*, 31 C.I.T. 638, 647 (Ct. Int'l Trade 2007) (citing *Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil*, 64 Fed. Reg. 38,756, 38,768 (Dep't of Commerce July 19, 1999) (final determ.) (*Steel Products from Brazil*)). Thus, Commerce's normal practice is *not* to consider dates subsequent to the date of shipment as the date of sale, *see*, *e.g.*, *Steel Products from Brazil*, 64 Fed. Reg. at, 38,768, and that practice has been "implicitly approved by the courts." *Mittal Steel*, 31 C.I.T. at 647 (citing *AIMCOR v. United States*, 141 F.3d 1098, 1104-05 (Fed. Cir. 1998)). Commerce adhered to that practice in prior administrative reviews of the CORE dumping order in determining the date of sale for HYSCO's United States sales to correspond to the date of shipment. *See*, *e.g.*, *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 74 Fed. Reg. 11,082 (Dep't of Commerce, Mar. 16, 2009) (final results of administrative review) and accompanying issues and decision memorandum at cmt. 18.

The record in this case demonstrates that the date of shipment for HYSCO's United States sales preceded the date of invoice. *See* Remand Results, P.R.R. 15, at 62; Decision Memorandum, P.R. Doc. 218, at 30. Hence, Commerce acted in accordance with its established

practice of using the date of shipment as the date of sale because "record evidence indicates that the material terms of sale with respect to quantity were established at the time of shipment." Remand Results, P.R.R. 15, at 62  Although U.S. Steel contends that Commerce's selection of shipment date as the date of sale conflicts with 19 C.F.R. § 351.401(i), *see* U.S. Steel Cmts. at 5-8, that provision of Commerce's regulations establishes only a presumption that Commerce use the date of invoice as the date of sale.  As explained above, Commerce has recognized that, when the shipment date precedes the invoice date, shipment date "better reflects the date on which the exporter or producer establishes the material terms of sale" because material terms of sale tend not to change after shipment.  19 C.F.R. § 351.401(i).

   U.S. Steel identifies one instance where it claims Commerce deviated from its practice to use an earlier shipment date for the date of sale, but that example does not disprove the rule.  *See* U.S. Steel Cmts. at 10-11.  In *Light-Walled Rectangular Pipe and Tube from the Republic from Korea*, 73 Fed. Reg. 5,794, 5,798 (Dep't of Commerce Jan. 31, 2008) (prelim. determ.) ("*Light-Walled from Korea*"), unchanged in *Light-Walled Rectangular Pipe and Tube from the Republic from Korea*, 73 Fed. Reg. 35,655 (Dep't of Commerce June 24, 2008) (final determ.), the respondent's United States sales were conducted on an export price basis, and prices for both U.S. and home market customers for that respondent were finalized in monthly invoices sent directly to United States and home market customers after shipment.  That situation bears no resemblance to HYSCO's constructed export price sales in the United States sold through its affiliate, HYSCO USA, during the POR.  Moreover, Commerce in *Light-Walled from Korea* unambiguously reiterated its "long-standing practice of finding that, where shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established."  73 Fed. Reg. at 5,798.

U.S. Steel also mistakenly claims that Commerce's use of shipment date for the date of sale is unsupported by record evidence.  *See* U.S. Steel Br. at 7-8.  Despite HYSCO's acknowledgement that negotiations for sales to United States customers could continue until actual shipment, HYSCO provided additional documentation showing that quantity, within a certain tolerance, was agreed upon when HYSCO extended an offer through HYSCO USA and was ultimately shipped to the customer in the United States in quantities within those agreed-upon tolerances.  *See* Remand Results, P.R.R. 15, at 62;  HYSCO Section A Response, C.R. 13, at A-22 and Exhibit 10, pages 1 and 11.

Likewise, available record evidence establishes that price remained stable for at least a period of time.  The transfer price from HYSCO to HYSCO USA did not vary from the offer to the commercial invoice, which was issued on the shipment date.  *See* Remand Results, P.R.R. 15, at 62-63, 65; HYSCO Section A Response, C.R. 13, at A-22 and Exhibit 10, pages 1 and 5, attached as Exhibit 1 to HYSCO's appendix to its comments on remand.  While Commerce normally does not use transfer price as a basis for United States price, the way in which Commerce relied upon that information in the remand results is reasonable because it is the only evidence on the record indicative of HYSCO's actual price-setting behavior.  In the absence of any evidence on the record of this review indicating that prices changed for any sales between shipment date and invoice date during the POR, Commerce had a legitimate basis for its conclusion.  This is particularly true given that Commerce relied upon shipment date as the date of sale in prior administrative reviews of the CORE order.  *See* Remand Results, P.R.R. 15, at 65.  Rather than shifting the burden away from HYSCO as U.S. Steel wrongly alleges, *see* U.S. Steel Cmts. at 12-13, Commerce's analysis merely examined factual information on the record of

41

this review, none of which demonstrates that the material terms of sale actually changed after shipment.

Consistent with its established practice, Commerce reasonably determined to use date of shipment as the date of sale for HYSCO's United States sales sold through HYSCO USA. Commerce's remand results should be sustained.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand results.

<div style="margin-left: 50%;">

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

</div>

OF COUNSEL:

DANIEL J. CALHOUN
Attorney
Office of the Chief Counsel
for Import Administration
U.S. Department of Commerce


February 15, 2013

s/L. Misha Preheim
L. MISHA PREHEIM
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-3087
Facsimile: (202) 305-1571

Attorneys for Defendant

42

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 12,899 words including text, footnotes, and headings.


s/L. Misha Preheim