Slip Op. 14-27

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **UNION STEEL MANUFACTURING COMPANY, LTD.,** | |
| Plaintiff, | |
| and | |
| **WHIRLPOOL CORPORATION,** | **Before: Timothy C. Stanceu, Judge** |
| Plaintiff-intervenor, | **Consol. Court No. 10-00106** |
| v. | |
| **UNITED STATES**, | |
| Defendant, | |
| and | |
| **UNITED STATES STEEL CORPORATION, NUCOR CORPORATION, and HYUNDAI HYSCO,** | |
| Defendant-intervenors. | |

## OPINION AND ORDER

[Affirming in part, and remanding in part, a remand redetermination issued by the U.S. Department of Commerce in an action contesting the final results of an administrative review of an antidumping duty order on certain corrosion-resistant carbon steel flat products from the Republic of Korea]

Dated: March 4, 2014

*Brady W. Mills* and *Donald B. Cameron*, Morris, Manning & Martin, LLP, of Washington, DC, argued for plaintiff Union Steel Manufacturing Company, Ltd. With them on the brief were *Julie C. Mendoza*, *R. Will Planert*, and *Mary S. Hodgins*, of Washington, DC.

*Donald B. Cameron*, Morris, Manning & Martin, LLP, of Washington, DC, for consolidated plaintiff Dongbu Steel Company, Ltd. With him on the brief were *Brady W. Mills*, *Julie C. Mendoza*, *R. Will Planert*, and *Mary S. Hodgins*, of Washington, DC.

*Donald Harrison*, *Andrea Fraser-Reid Farr*, and *John Christopher Wood*, Gibson, Dunn & Crutcher, LLP, of Washington, DC, for plaintiff-intervenor Whirlpool Corporation.

*L. Misha Preheim*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, of Washington, DC. Of counsel on the brief was *Daniel J. Calhoun*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Ellen J. Schneider*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for defendant-intervenor and consolidated plaintiff *United States Steel Corporation*. With her on the brief were *Jeffrey D. Gerrish* and *Robert E. Lighthizer* of Washington, DC.

*Timothy C. Brightbill*, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor Nucor Corporation. With him on the brief was *Alan H. Price*, of Washington, DC.

*Jarrod M. Goldfeder*, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, argued for consolidated plaintiff and defendant-intervenor Hyundai HYSCO. With him on the brief was *J. David Park*, of Washington, DC.

Stanceu, Judge: In this consolidated action, four plaintiffs challenge the determination ("Final Results") the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the fifteenth administrative review of an antidumping order on certain corrosion-resistant carbon steel flat products ("CORE" or "subject merchandise") from the Republic of Korea ("Korea").[1] *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Fifteenth Admin. Review*, 75 Fed. Reg. 13,490 (Mar. 22, 2010) ("*Final Results*"). The fifteenth review pertained

---

[1] Due to the presence of common issues, the court, on May 13, 2010, consolidated three actions under Consol. Court No. 10-00106. Order, ECF No. 46. Consolidated with *Union Steel Mfg. Co., Ltd. v. United States* (Consol. Court No. 10-00106) are *Dongbu Steel v. United States*, (Court No. 10-00109), *Hyundai HYSCO v. United States* (Court No. 10-00127), and *United States Steel Corp. v. United States*, (Court No. 10-00139).

to entries of subject merchandise made during the period of August 1, 2007 through

July 31, 2008 ("period of review" or "POR").  *Id.*

Before the court is a determination (the "Remand Redetermination") Commerce issued in

response to the court's remand order in *Union Steel Mfg. Co., Ltd. v. United States*, 36 CIT __,

837 F. Supp. 2d 1307 (2012) ("*Union Steel Mfg. Co., Ltd.*").  *Results of Redetermination*

*Pursuant to Remand* (Sept. 24, 2012), ECF No. 161 ("*Remand Redetermination*").

For the reasons discussed in this Opinion and Order, the court sustains the Remand

Redetermination as to: (1) the general and administrative ("G&A") expense ratio Commerce

used to determine the cost of production ("COP") of the foreign like product for Union Steel

Manufacturing Co., Ltd. ("Union"); (2) the Department's decision to calculate Union's interest

expense ratio using financial statements from both the 2007 and 2008 fiscal years; (3) the

Department's application of its modified "sales-below-cost" and "recovery-of-costs" tests to

calculate Union's normal value; (4) the Department's decision to create separate product

categories for laminated CORE and non-laminated, painted CORE for use in a model-match

methodology comparing Union's home market and U.S. sales; and (5) the Department's use of

the "zeroing" methodology to calculate Union's weighted average dumping margin.

The court orders a second remand for further proceedings to address a number of the

Department's decisions in the remand determination: (1) the decision to make a major input

adjustment when calculating Union's interest expense ratio; (2) the application of the modified

"quarterly cost" methodology wherever used in the normal value calculations for Hyundai

HYSCO ("HYSCO"), including the difference-in-merchandise ("DIFMER") adjustments and

constructed value ("CV") determinations; (3) the application of the modified "quarterly cost"

methodology for all aspects of the normal value calculations for Union except the revised

sales-below-cost and recovery-of-costs tests; (4) the decision to depart from the normal method

for selecting a comparison month when determining antidumping margins for Union and

HYSCO; and (5) the decision to depart from the normal method by selecting the date of

shipment, rather than the date of invoice, as the date of sale for certain sales that HYSCO made

through a U.S. affiliate, Hyundai HYSCO USA, Inc. ("HHU" or "HYSCO USA").

 Finally, pursuant to the court's order in *Union Steel Mfg. Co., Ltd.*, 36 CIT at __,

837 F. Supp. 2d at 1337-38, the court concludes that the second remand redetermination must

recalculate the margin for Dongbu based on the redetermined margins for Union and HYSCO.

## I. BACKGROUND

 The background of this case is provided in the court's previous opinion and is

supplemented herein. *Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1311-12.

 Three of the four plaintiffs in this action, Union, HYSCO, and Dongbu Steel Co., Ltd.

("Dongbu"), are Korean producers and exporters of the subject merchandise. Issues & Decision

Mem., A-580-816, ARP 07-08, at 2 (Mar. 15, 2010), *available at*

http://ia.ita.doc.gov/frn/summary/KOREA-SOUTH/2010-6258-1.pdf (last visited Feb. 26, 2014)

("*Decision Mem.*"). Plaintiffs Union and HYSCO were the mandatory respondents in the

fifteenth administrative review and plaintiff Dongbu was a non-examined respondent in the

fifteenth review. *Id.* United States Steel Corporation ("U.S. Steel"), a petitioner in the fifteenth

administrative review, is the fourth plaintiff and a defendant-intervenor in this action. *Id.* at 1;

Compl. 1 (Apr. 21, 2010), ECF No. 6 (Court No. 10-00139). Nucor Corporation ("Nucor"), also

a petitioner in the fifteenth administrative review, is another defendant-intervenor in this action.

*Id.* at 1 n.1.

Union challenged the Department's: (1) exclusive reliance on the 2008 financial statement of Union's parent company to calculate Union's interest expense ratio; (2) application of the quarterly costs and indexing methodologies to various calculations when determining normal value; (3) selection of the comparison month for normal value sales; (4) similar treatment of laminated CORE and non-laminated, painted CORE in the model-match process; and (5) use of zeroing in calculating the weighted average dumping margin for Union. *Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1310, 1312, 1314, 1324. HYSCO challenged the Department's use of the quarterly costs and indexing methodologies and the Department's decision to use a nonstandard method for determining the comparison month. *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1310, 1312, 1324. Dongbu raised the same challenges as Union and HYSCO and sought to be subject to a rate reflecting any modifications to the weighted average dumping margins for Union and HYSCO. *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1310, 1335-36.[2] U.S. Steel challenged the Department's determination of the date of sale for the sales of subject merchandise that HYSCO made through a U.S. affiliate. *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1310, 1312, 1334.

After the parties submitted all briefings in this action, defendant United States requested a voluntary remand so that Commerce could reconsider the quarterly cost and indexing methodologies used in the Final Results in light of an intervening decision by this Court.

In the court's previous opinion in this case, *Union Steel Mfg. Co., Ltd.*, it concluded that Dongbu was entitled to a recalculated margin reflecting any changes made on remand to the

---

[2] Plaintiff Dongbu Steel Co., Ltd. ("Dongbu") also claimed entitlement to an individually-determined dumping margin; the court denied relief on this claim due to Dongbu's failure to exhaust administrative remedies. *Union Steel Mfg. Co., Ltd. v. United States*, 36 CIT __, __, 837 F. Supp. 2d 1307, 1334 (2012) ("*Union Steel Mfg. Co., Ltd.*").

margins for mandatory respondents HYSCO and Union.  *Id.*, 36 CIT at __, 837 F. Supp. 2d

at 1329-34.  The court also concluded that all of the claims brought by Union, HYSCO, and U.S.

Steel required a remand.  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1337-38.  Specifically, the court

determined that it could not uphold the Department's decision to use financial data from Union's

parent company pertaining only to the 2008 fiscal year when determining Union's interest

expense ratio.  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1313-21.  The court also granted defendant's

request for a voluntary remand on the quarterly cost and indexing issues but directed Commerce

to reconsider the quarterly cost and indexing methodologies wherever Commerce applied the

methodologies in the Final Results—including the sales-below-cost test, "recovery-of-costs" test,

constructed value ("CV") determinations, and difference-in-merchandise ("DIFMER")

adjustments.  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1321-25.  As defendant requested, the court

also remanded the Department's decisions to: (1) depart from the normal method for selecting

the comparison month when comparing U.S. and home market sales of Union and HYSCO;

(2) treat Union's laminated CORE and non-laminated, painted CORE as "identical" merchandise

in the Department's model-match methodology; (3) use the "zeroing methodology" in

determining weighted average margins; and (4) use shipment dates as the date of sale for

HYSCO's sales through a U.S. affiliate.  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1325-29, 1334-35.

        In its Remand Redetermination, filed on September 24, 2012, Commerce redetermined

Union's interest expense ratio using both the 2007 and 2008 financial statements of Union's

parent company, Dongkuk Steel Mills Company Ltd. ("DSM").  *Remand Redetermination* 7-8.

Commerce also modified its application of the quarterly cost and indexing methodologies when

determining various aspects of the normal value calculation for Union and HYSCO.  *Id.* at 16-18.

Commerce added a separate product category for non-laminated, painted CORE in its revised

model-match methodology for Union. *Id*. at 32-34.  Commerce again found it appropriate to

depart from the normal method for selecting the comparison months of normal value sales for

Union and HYSCO. *Id*. at 27-29.  Commerce also continued to use zeroing when calculating

Union's weighted average dumping margin. *Id*. at 60.  Finally, Commerce continued to use the

date of shipment as the date of sale for the sales HYSCO made through a U.S. affiliate. *Id*.

at 61-62.

In the Remand Redetermination, Commerce revised Union's weighted average dumping

margin from 14.01% to 9.85% and HYSCO's weighted average dumping margin from 3.29% to

1.46%. *Id*. at 67.  Dongbu's weighted average dumping margin, which was based on the margins

for two mandatory respondents, declined from 8.65% to 5.66%. *Id*.

Union, HYSCO, Dongbu, U.S. Steel, Nucor, and defendant each filed comments on the

Remand Redetermination.[3]  Union Steel's Comments on the U.S. Dept. of Commerce's

Sept. 24, 2012 Results of Redetermination Pursuant to Remand (Nov. 30, 2012), ECF No. 169

("Union's Comments"); Resp. of Hyundai HYSCO to Def.'s Redetermination on Remand

(Nov. 30, 2012), ECF No. 170 ("HYSCO's Comments"); Dongbu Steel's Comments on the U.S.

Dept. of Commerce's Sept. 24, 2012 Results of Redetermination Pursuant to Remand

(Nov. 30, 2012), ECF No. 168 ("Dongbu's Comments"); Comments of U.S. Steel Corp. on the

Results of Redetermination Pursuant to Remand Issued by the Dept. of Commerce

(Dec. 3, 2012), ECF No. 171 ("U.S. Steel's Comments"); Nucor Corp.'s Comments on Remand

Results (Dec. 3, 2012), ECF No. 176 ("Nucor's Comments").  Defendant responded to the

---

[3] Plaintiff-intervenor Whirlpool Corporation, a U.S. importer of subject merchandise, did not make any submissions in support of the motions for judgment on the agency record in this action and did not submit comments on the Remand Redetermination.

various comments on February 15, 2013.  Def.'s Resp. to Comments on the Dept. of

Commerce's Remand Results, ECF No. 204 ("Def.'s Resp.").

   The court held oral argument on May 23, 2013 at which Union, HYSCO, U.S. Steel,

Nucor, and defendant United States appeared to address the various remaining challenges to the

Remand Redetermination.  Order (Mar. 3, 2013), ECF No. 207; Mot. for Oral Argument

(Feb. 27, 2013), ECF No. 206; Oral Tr. 3-4 (July 22, 2013), ECF No. 215.

## II. DISCUSSION

   The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c) (2006), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a, including an action

contesting the final results of an administrative review that Commerce issues under

section 751 of the Tariff Act, 19 U.S.C. § 1675(a).[4]  When reviewing the Department's

redetermination, the court "shall hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law. . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

### A.  Union's Interest Expense and G&A Expense Ratios

   When determining the cost of producing the foreign like product ("cost of production" or

"COP") in the Final Results, Commerce, according to 19 U.S.C. § 1677b(b)(3), calculated

Union's G&A expense ratio using Union's unconsolidated financial statements for fiscal year

2008 and Union's interest ("financing") expense ratio using consolidated financial statements

from Union's parent for fiscal year 2008.  *Decision Mem.* 42-43.  Because both Union and its

---

   [4] All statutory citations herein are to the 2006 edition of the United States Code and all
citations to regulations are to the 2010 edition of the Code of Federal Regulations.

parent company, DSM, use a fiscal year that matches the calendar year, these financial statements did not correspond precisely with the POR in this administrative review (August 1, 2007 to July 31, 2008). *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1314.  In its Rule 56.2 brief, Union challenged the use of the 2008 financial statements on the grounds that these statements "'were aberrational and do not reasonably reflect Union's actual data pertaining to the production and sale of the subject merchandise during the POR.'"  *Id.* (citation omitted).  Union argued that Commerce should have calculated G&A and interest using only the 2007 statement or, in the alternative, a "blended rate," for instance by combining the 2007 and 2008 financial data using a weighted average.  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1314-15 (citation omitted).

In its previous opinion, the court ruled that using only the 2008 DSM financial statement to determine Union's interest expense was unlawful for two reasons.  "First, Commerce failed to consider an important aspect of the question before it, which was whether determining Union's interest expense ratio solely on the basis of data in that financial statement produced the most accurate result."  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1317.  The court noted that "the interest cost ratio derived from the 2008 financial statement of DSM reflects a five-fold increase from the interest cost ratio derived from the 2007 statement and appears to have been affected significantly by currency-related losses that coincided with a massive post-POR decline in the value of the Korean won."  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1319-20.  Second, the court concluded that the Department's use of the 2008 financial statement was based on the incorrect premise "that the Department has a consistent practice of using the single financial statement corresponding to the largest portion" of the POR.  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1319.  The court directed Commerce to "reconsider its decision to base Union's interest expense ratio entirely on data obtained from DSM's 2008 financial statement" and to examine "the relative

merits of alternative methods." *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1320.  Although the court

did not identify the same legal infirmities with respect to the G&A expense ratio, the court

allowed Commerce to reconsider the G&A expense ratio on remand and deferred any ruling on

whether or not that ratio complies with law.  *Id.*

1.  The Court Sustains the Redetermined G&A Expense Ratio for Union

In the Remand Redetermination, Commerce also examined its G&A expense ratio for

Union but continued relying on Union's 2008 financial statement.  Commerce stated that

"[w]hile the change in Korean won to U.S. dollar exchange rates from the beginning of 2007 to

the end of 2008 may be considered aberrational, which directly affected the interest expense rate

calculation, there is nothing unusual with the G&A expenses for 2007 and 2008 that would lead

us to the same conclusion." *Remand Redetermination* at 8-9.  The Department's decision on its

G&A expense complies with the courts' remand order and is not contested by any party in this

action.  The court therefore sustains the G&A expense ratio that Commerce reached in the

Remand Redetermination.

2.  Commerce Permissibly Based Union's Interest Expense Ratio on the 2007 and 2008 Financial
Statements of DSM

In the Remand Redetermination, Commerce reconsidered the interest expense ratio for

Union and calculated a new interest expense ratio using both the 2007 and 2008 DSM financial

statements, weighted according to the number of months of the POR occurring within each fiscal

year.[5] *Remand Redetermination* 7-8.  Commerce explained that, notwithstanding the

---

[5] Because the period of review ("POR") was August 1, 2007 through July 31, 2008,
Commerce based the weighted average rate on five months in 2007 and seven months in 2008.
*Results of Redetermination Pursuant to Remand* 8 (Sept. 24, 2012), ECF No. 161 ("*Remand
Redetermination*").  Commerce articulated its new methodology as follows:

(continued . . .)

Department's longstanding practice of using data from the fiscal year most closely corresponding

to the POR, "inclusion of both fiscal years' financial statements helps to ensure, based upon the

unique facts present in this review as identified by the [Court of International Trade] in its

Remand Order, that financial expenses for both fiscal years that encompass the POR are

reflected in the financial expense ratio."[6] *Id.* at 8.  The use of this blended calculation of 2007

and 2008 data in the Remand Redetermination significantly reduced Union's interest expense

ratio.[7] *Union Steel Accounting Cost Mem.* 2 (Aug. 23, 2012) (Confidential Remand.R.Doc.

No. 10).

Union opposes the revised interest expense ratio, arguing that that the data from the 2007

DSM financial statement are superior to a blended calculation using both the 2007 and 2008

statements because the latter approach still includes aberrationally high interest rate expenses

---

(continued . . .)
The blended financial expense rate is the result of a two-step calculation.  We first
calculated separate financial expense rates for 2007 and 2008.  For each of these
calculations, we used annual net financial expenses in the numerator and annual
[cost of goods sold] in the denominator.  We relied on the 2007 rate calculation that
was used in the preliminary results, and the 2008 rate calculation that was used for
the final determination.

*Remand Redetermination* 14-15.

[6] Upon reconsidering the interest expense ratio on remand as directed by the court,
Commerce chose the blended approach over maintaining its exclusive reliance on the 2008
statement of Dongkuk Steel Mills Company Ltd. ("DSM").  The Remand Redetermination
discloses that Commerce made the change voluntarily instead of making the change "under
protest," *i.e.*, solely in response to the court's having ruled against its previous method.  *Remand
Redetermination* 14 ("While the Court's Remand Order may have left open the option to use
only DSM's 2008 financial statements, we disagree that it is a feasible option considering the
significant devaluation of the Korean won during the year and the fact that the 2008 financial
expense rate was significantly higher than that in the previous year.").

[7] The actual interest expense and general and administrative expense ratios are not
disclosed in this Opinion and Order due to a claim for proprietary treatment.

that occurred predominantly after the POR.[8]  Union's Comments 1-4.  Defendant counters that

the Department's new method accounts for the whole of the POR while mitigating the potential

effect of DSM's post-POR foreign exchange losses.  Def.'s Resp. 6-7, 11-12.  Defendant also

points out that the blended rate methodology is consistent with one favored by Union in its

Rule 56.2 brief.  *Id.* at 7.

In reviewing the revised financial ratio, the court accords Commerce considerable

deference in the choice of methodology.  *See Corus Staal BV v. Dep't of Commerce*,

395 F.3d 1343, 1346 (Fed. Cir. 2005) ("*Corus Staal*").  The Department's revised approach

recognized the need to address the unusual circumstance of the aberrational interest expenses for

DSM, which Commerce reasonably related to post-POR decline in the value of the Korean won.

By drawing on expense data from both the 2007 and 2008 fiscal years, Commerce accounted for

all twelve months of the POR while limiting any distorting effect of the post-POR foreign

exchange losses.  This approach necessarily includes in the calculation the finance cost data for

twelve months outside of the POR, but no option would allow perfect coverage of the POR on

the record facts.  No DSM financial statement on the record corresponds temporally with the

POR, and neither the 2007 nor the 2008 DSM statement reports monthly, or even quarterly,

interest expenses.[9]  Both statements report data as of the end of DSM's fiscal year.  The court

concludes that Commerce reached a decision of the choice of DSM financial statements that

---

[8] At oral argument, Union's attorney stated, consistent with the exhibit Union prepared for its rebuttal brief before Commerce, that the Korean won fell 7% in the seven months of 2008 that include the POR and 26% in the five months afterward.  Oral Tr. 131; *Union Steel Rebuttal Br. to U.S. Steel's Post-Prelim. Case Br.*, Ex. 2 (Jan. 27, 2010) (Admin.R.Doc. No. 5219).

[9] *See Remand Redetermination* 16 ("While [United States Steel Corporation] claims that DSM's financial statements show that the losses were generated, there is no evidence that identifies either the timing or the magnitude of these losses throughout the fiscal year.").

must be sustained.  The Department's approach to this issue addresses the problem of the

aberrational interest expenses but also endeavors to cover the entire POR using a combination of

the two DSM financial statements.

According to Union, only by excluding consideration of the 2008 financial statement

entirely may Commerce eliminate the distorting effect of aberrational finance costs occurring

after the close of the POR.  Union's Comments 3-4.  Union also argues, as it did when originally

contesting the Final Results, that the 2007 financial statement is more appropriate than the 2008

statement.  *Id*. at 4-5.  Union notes that the majority of the home market reporting period, when

calculated according to the so-called "window period" used for average-to-transaction sales

comparisons, which includes the POR plus ninety days before and sixty days after the POR, falls

in 2007.  *Id*.

The court is not persuaded by Union's arguments.  Use of the 2007 statement, although

eliminating any distortion caused by the fall of the Korean won in the latter months of 2008,

would create other distortions by covering only five months of the POR.  Union's argument

based on the window period—any relevance of which is limited to instances in which there are

no home market sales in the corresponding month—does not satisfy the basic objection that the

2007 financial statement covers only the first five months of the POR and thereby fails to cover

the seven months of the POR that fell within the 2008 calendar year.[10]  Commerce acted within

its discretion in using both statements to determine Union's interest expense ratio.  Balancing the

competing considerations, Commerce thereby addressed the problem of aberrational expenses

and also maintained reasonable contemporaneity with the POR.

---

[10] The months outside the POR affect the margin calculation only in instances in which there are no sales of the foreign like product during the same month of the POR in which a U.S. sale of subject merchandise occurred.  *See* 19 C.F.R. § 351.414(e)(2).

U.S. Steel and Nucor also oppose the use of both the 2007 and 2008 statements to determine the interest expense ratio.  Both defendant-intervenors argue that the Department's revised method departs, without providing a reasoned basis, from the Department's longstanding practice of using the financial statement that corresponds most substantially with the POR.  U.S. Steel's Comments 17-26; Nucor Comments 8-12.  However, as the court noted in *Union Steel Mfg. Co., Ltd.*, Commerce does not appear to have a consistent practice of using financial statements from the fiscal year most closely corresponding to the POR when calculating interest expense ratios.  *Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1319.  Moreover, the Remand Redetermination provides a reasoned basis for the Department's choice to rely on the blended approach rather than the 2008 statement, citing the unusual circumstances occurring in 2008, which included a steep decline in the value of the Korean won after the close of the POR.

U.S. Steel contends that Commerce did not comply with the specific instructions set forth in the court's Opinion and Order, having failed to "address whether using the blended rate would produce a dumping margin that was more accurate than using a rate based only on the 2008 financial statements."  U.S. Steel's Comments 20-21.  This argument is not persuasive because the Remand Redetermination explains why Commerce considered a blended rate more accurate than one based solely upon the 2008 financial statement.  Commerce explained that "including both fiscal years' financial statements helps to ensure, based upon the unique facts present in this review as identified by the [Court of International Trade] in its Remand Order, that financial expenses for both fiscal years that encompass the POR are reflected in the financial expense ratio."  *Remand Redetermination* 15.  Commerce added that "[t]he Department's methodology of using a blended financial expense rate for these final remand results recognizes the unique

circumstances of the significant loss in the value of the Korean won that DSM experienced

during 2008." *Id.* at 15-16.

U.S. Steel submits that the decline in the Korean won occurring in 2008 after the close of

the POR was not the "key factor" responsible for DSM's 2008 foreign exchange transaction and

translation losses.  U.S. Steel's Comments 21.  U.S. Steel argues that "[t]o the contrary, the

foreign exchange transaction and translation losses were due primarily to DSM's substantially

expanded commercial activities in 2008."  *Id.*  In support of this argument, U.S. Steel points to

record evidence that "[d]uring fiscal year 2008, DSM's sales increased by fully 50% compared

to 2007—a period of extraordinary growth—and its costs to produce such sales," *i.e.*, the cost of

goods sold ("COGS"), "increased by over 40%."  *Id.*  In further support of its argument, U.S.

Steel states that "the notes to the 2008 financial statements show that DSM's increased

translation losses were based on the company's enormous expansion of foreign borrowing in

2008," adding that "in 2008, DSM's notes payable in dollars increased by over 100%, and its

notes payable in Japanese yen increased by *over 2,578%.*"  *Id.* at 22-23 (emphasis in original).

Even though the 2008 financial statement at issue is not Union's, but DSM's, U.S. Steel also

identifies aspects of Union's business activity during the POR in support of an argument that "it

is certainly proper to attribute the foreign exchange transaction losses in the 2008 financial

statements to interest expense and business activities that took place during the POR."  *Id.* at 22.

The court understands U.S. Steel's argument to be, in essence, that Commerce should use

only the 2008 DSM financial statement because DSM's increased business activity in 2008, and

not the decline in the Korean won following the close of the POR, was the primary cause of the

increased foreign exchange translation and transaction losses reflected in that financial statement.

This argument does not convince the court that Commerce erred in using a rate derived from

DSM's 2007 and 2008 statements.  In making its argument, U.S. Steel itself acknowledges "that the foreign-currency related losses account for the vast majority of DSM's 2008 net financial expenses."  *Id.* at 22 n.13.  U.S. Steel also acknowledges that the increased business activity was related to the foreign exchange-related transaction losses, stating that "[p]lainly, this tremendous burst in business activity would have involved an enormous increase in purchases and sales in other currencies" and that "[a]s a result, it is a key factor in explaining the increases in the foreign exchange transaction losses in the 2008 financial statements."  *Id.* at 21.  That the increased business activity may have made the currency transaction and translation losses larger than these losses otherwise would have been does not compel a conclusion that the fall in the value of the Korean won, particularly the fall occurring after the close of the POR, was not a key factor in DSM's increased currency transaction and translation losses in the 2008 fiscal year.  On this record, Commerce permissibly could infer an effect of post-POR declines in the Korean won because of the unusual level of those declines and the huge increase in the interest expenses DSM incurred from fiscal year 2007 to fiscal year 2008.

U.S. Steel next argues that "[t]here is also no evidence that the translation and transaction losses in question were 'extraordinary' and, as a result, rendered the 2008 financial statements unrepresentative of Union's interest expense during the POR," adding that "[i]t is highly significant that DSM itself treated these gains and losses as ordinary income and expenses in its financial statements."  U.S. Steel's Comments 23.  This argument fails because there is substantial record evidence to support a finding that the currency-related losses incurred by DSM in fiscal year 2008 were a one-time event justifying the use of both of the DSM financial statements.  Under the Department's approach, events transpiring during both fiscal years were

factored into the financial ratio.  U.S. Steel does not make the case that Commerce was required

on this record to use only the 2008 statement to achieve the most accurate margin possible.

    3.  <u>On Remand, Commerce Must Reconsider its Decision to Make a Major Input Adjustment to
Union's Interest Expense Ratio and Address Nucor's Objection to that Decision</u>

        Nucor raises other objections to the Department's method for redetermining Union's

interest expense ratio.  Nucor argues that Commerce should not have made a "major input

adjustment" when calculating this ratio, on the premise that the interest expense ratio should

reflect actual, not hypothetical, costs.  Nucor's Comments 15.  "While Nucor agrees with the

Department's adjustment to direct materials in order to account for what Union should have

theoretically paid to its affiliated party suppliers, Nucor disagrees with the second adjustment

made to Union's COGS in calculating the financial ratio."  *Id.*  According to Nucor, the

adjustment resulted in a COP for Union that fails to comply with 19 U.S.C. § 1677b(f)(3)

because it "does not fully reflect an arm's length transaction."  *Id.*

        The Tariff Act allows Commerce to make a major input adjustment to the COP

calculation when a major input (in this case, coil steel substrate used to produce CORE that

Union obtained from a related party) is obtained from a related party and Commerce has

reasonable grounds to believe or suspect that the amount represented as the value of the input is

less than the cost of producing the input.  19 U.S.C. § 1677b(f)(3).  In determining Union's COP,

Commerce made such an adjustment to Union's cost of coil steel substrate by increasing the

COGS that it used as the denominator for the ratio pertaining to the direct materials input.

*Remand Redetermination* 14-15.  Commerce also made the adjustment to the COGS

denominator when calculating Union's finance cost ratio.  *Id.*

        When responding to the draft remand results Commerce circulated for comment before

issuing the Remand Redetermination, Nucor objected to the Department's making a major input

adjustment when calculating Union's interest expense ratio, on essentially the same grounds

asserted here.  Nucor's Comments 14-15 (citing *Comments on Draft Remand Results* 8-10

(Sept. 6, 2012) (Remand.R.Doc. No. 13).  The Remand Redetermination does not respond to

Nucor's objection.  Commerce has an obligation to address important factors raised by

comments from petitioners and respondents.  *SKF USA Inc. v. United States*,

630 F.3d 1365, 1374 (Fed. Cir. 2011) (citation omitted).  Because Commerce did not meet this

obligation, the court will order Commerce to consider and respond to Nucor's comment in the

second remand redetermination.

In responding to Nucor's comment that Commerce should not have made the major input

adjustment in determining Union's finance cost ratio, defendant states that "[t]o ensure greater

accuracy, the adjustments made by Commerce in its remand calculation of Union's interest

expense ratio eliminated th[e] very distortion recognized by the statute."  Def.'s Resp. 10.  The

court must review the Department's decision on the rationale Commerce put forth (absent in this

case) rather than defendant's post-hoc rationalization.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947) ("[A] reviewing court, in dealing with a determination or judgment which an

administrative agency alone is authorized to make, must judge the propriety of such action solely

by the grounds invoked by the agency.").

Nucor argues in the alternative that even if it is permissible for Commerce to make a

major input adjustment to the interest expense ratio calculation, Commerce still erred by making

the adjustment using an impermissible method.  According to Nucor, Commerce should not have

made the adjustment to the COGS for each of the two fiscal years and instead should have made

the adjustment only once, before weighting the average of the resulting ratios, arguing that the

Department's method double counted the major input adjustment.  Nucor's Comments 13-14;

Oral Tr. 164-65.  Because the question of how any major input adjustment, if permissible, should

be effectuated is dependent on the answer to the primary question Nucor raises, the court defers

any consideration of the "double counting" issue pending consideration of the Department's

answer to that primary question.

B.  Use of Quarterly Cost Averaging Periods

Commerce determines the normal value of subject merchandise when conducting an

administrative review of an antidumping duty order and compares that normal value to the export

price or constructed export price of the subject merchandise.  19 U.S.C. § 1675(a)(2).  In certain

circumstances, Commerce, when calculating normal value, may exclude home market sales of

the foreign like product that are less than the cost of producing the foreign like product ("cost of

production" or "COP").[11]  *Id.* § 1677b(b)(1).  Commerce collects data from each respondent to

determine the COP on a product-specific "control number" (or "CONNUM") basis.  *Decision*

*Mem.* 14-15.  Commerce then uses this CONNUM-specific cost information in various aspects

of its dumping margin calculations.  *Id.* at 14.  Normally Commerce will calculate cost as a

weighted average over the entire POR, but in some circumstances Commerce determines it is

preferable to calculate costs as a weighted average for a shorter period of time, such as on a

quarterly basis, as it did in the fifteenth review.  *Id.* at 15, 21.

---

[11] The antidumping statute provides that Commerce may disregard home market sales
when calculating normal value if certain conditions are met:

> If the administering authority determines that sales made at less than the cost of
> production—
>> (A) have been made within an extended period of time in substantial quantities, and
>> (B) were not at prices which permit recovery of all costs within a reasonable period of
>> time,
> such sales may be disregarded in the determination of normal value.

19 U.S.C. § 1677b(b)(1).

In this action, the circumstance influencing the Department's decision to use quarterly

costs was the fluctuating cost for a major input, steel substrate.  *Id.* at 22-23.  Commerce directed

respondents to submit cost data on a quarterly basis; Commerce then used the quarterly data,

along with its "indexing" methodology,[12] to calculate the quarterly weighted average cost to

produce each foreign like product for each examined respondent.  *Id.* at 21, 24.

Union and HYSCO both challenged the Department's application of indexed quarterly

cost data to aspects of their respective normal value calculations.  *Union Steel Mfg. Co., Ltd.*,

36 CIT at __, 837 F. Supp. 2d at 1312.  Defendant requested a voluntary remand to allow

Commerce to reconsider the quarterly cost methodology as applied to the cost recovery test.

Def.'s Mot. for Partial Voluntary Remand 1 (June 21, 2011), ECF No. 130.  Commerce indicated

that it would review its methodology in light of an intervening decision of this Court.  *Id.* (citing

*SeAH Steel Corp. v. United States*, 34 CIT __, __, 704 F. Supp. 2d 1353, 1364-70 (2010)

("*SeAH*") (holding that the Department's application of quarterly cost methodology for recovery

of costs purposes did not comply with section 773(b)(2)(D) of the Tariff Act)).[13]  The court

---

[12] Commerce described its indexing methodology as follows:

[T]he Department indexed the quarterly material costs to a common period cost level,
thereby neutralizing the effect of the significant cost changes for the input between quarters.
Then . . . the Department calculated a period of review weighted-average per unit cost.
Finally, the weighted average per unit cost for the period of review for the substrate input
was indexed back to the appropriate quarter to keep the weighted-average per unit costs
consistent with the main input's significantly changing price levels occurring between
quarters.

Issues & Decision Mem., A-580-816, ARP 07-08, at 23 (Mar. 15, 2010), *available at*
http://ia.ita.doc.gov/frn/summary/KOREA-SOUTH/2010-6258-1.pdf (last visited Feb. 26, 2014).

[13] The Act provides that "[i]f prices which are below the per unit cost of production at the
time of sale are above the weighted average per unit cost of production for the period of
investigation or review, such prices shall be considered to provide for recovery of costs within a
reasonable period of time."  19 U.S.C. § 1677b(b)(2)(D).

granted the request for voluntary remand but also instructed Commerce to reconsider its

quarterly cost methodology generally (including the use of indexing), wherever it was used in the

Final Results. *Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1321-25.

### 1.  The Department's Revised Sales-Below-Cost and Cost Recovery Tests

On remand, Commerce continued to use quarterly weighted average COPs to identify

Union's and HYSCO's home market sales that were made below cost.  *Remand*

*Redetermination* 17.  However, Commerce removed indexing from its quarterly cost

methodology in most instances, instead relying on "Union's and HYSCO's reported historic

quarterly-cost data." *Id.*  For the sales-below-cost test, Commerce "compared the un-indexed

historical quarterly COPs to sales prices in each respective quarter to determine whether they

were below cost." *Id.*

Seeking conformity with the decision in *SeAH*, Commerce also amended its cost recovery

test, stating in the Remand Redetermination that it "calculated an un-indexed weighted average

per-unit COP for the entire period of review using the historical quarterly costs and production

quantities as reported by respondents." *Id.* at 17.  In doing so, Commerce "first isolated Union's

and HYSCO's sales" that were "disregarded because they failed the below-cost test." *Id.*

Commerce then "calculated CONNUM-specific annual weighted average prices" for each of

these disregarded sales "and compared them, on a CONNUM-specific basis, to the annual

weighted-average un-indexed costs." *Id.* at 17-18.  If, on comparison, the annual weighted

average price for a CONNUM exceeded the annual weighted average unindexed cost for that

CONNUM, Commerce "restored all sales of that CONNUM to the normal value pool of sales

available for comparison with U.S. sales." *Id.*  As a result, Commerce included a greater number

of sales in both Union's and HYSCO's dumping margin calculations in the Remand

Redetermination than it had in the Final Results. *Id.* at 18.

### i.  The Court Sustains the Application of the Department's Revised Sales-Below-Cost and Recovery-of-Costs Tests as Applied to Union

Union does not object to the Department's revised sales-below-cost and cost recovery

tests.  Union's Comments 5-6; Oral Tr. 6-10.  Accordingly, the court sustains this aspect of the

Remand Redetermination as it pertains to Union.

### ii.  Commerce Must Reconsider its Revised Recovery-of-Costs Test as Applied to HYSCO

To calculate the annual weighted average cost under its revised methodology, Commerce

combined cost averages for the different quarters of the POR.  Where a home market sale

occurred in a quarter for which the record contained no cost data for the CONNUM that was

sold, Commerce, in its own words, "fill[ed] gaps with a surrogate or indexed cost."[14] *Remand

Redetermination* 20.  This occurred where a specific CORE product (identified by CONNUM)

was sold but not produced in a particular quarter.  In such an instance, Commerce substituted

cost data pertaining to the actual CONNUM with cost data for a similar CONNUM.  *Remand

Redetermination* at 17 n.3.  In its justification for this practice, Commerce explained that

"[b]ecause it is necessary to calculate a POR-average cost for the cost recovery test, it is

necessary to include a cost for every quarter in which a sale of a CONNUM occurred."  *Id.* at 20.

HYSCO contests the method Commerce used in the Remand Redetermination to

calculate annual weighted average costs under the revised recovery-of-costs test.  HYSCO's

Comments 2-5.  Specifically, HYSCO objects to the Department's using as a surrogate the cost

---

[14] Also, where HYSCO reported a sale made before the POR for which the merchandise
was entered during the POR, Commerce "calculated the [cost of production] by indexing the first
quarter costs back to derive the pre-POR quarterly costs," as there was no quarterly [cost of
production] data on the record for these pre-POR sales.  *Remand Redetermination* at 17 n.2.

data for a similar CONNUM where cost data for the actual CONNUM sold were present on the

record, albeit not cost data for the particular quarter in which the sale occurred.  *Id.* at 4-5.

HYSCO argues that "[t]he Department's method makes no sense when actual costs for those

CONNUMs are on the record."[15]  *Id.*  Defendant counters that the court should uphold the

Department's method, maintaining that "[h]aving found significant cost changes between

quarters, Commerce determined it to be necessary to include a cost—even if a surrogate cost

from the most similar CONNUM—for every quarter in which a sale of a CONNUM occurred to

obtain the most representative POR-average cost in applying the recovery-of-cost[s] test."

Def.'s Resp. 14.

        The relevant statutory provision imposes a straightforward rule: a sale of the foreign like

product in the home market may not be excluded from the normal value calculation as a sale

below cost if the price paid is "above the weighted average per unit cost of production for the

period of . . . review."  19 U.S.C. § 1677b(b)(2)(D).  Under this rule, Commerce must calculate

the weighted average per unit cost of producing the good sold in the home market, and it must do

so on a POR-wide (in this case, yearly) basis.  The statute makes no exception for a situation in

which the COP, or an element of that COP (in this case, the cost of the surrogate), fluctuates

significantly during the POR.  Nor does the statute provide an exception for a situation in which

the good is *sold* but not *produced* in the home market during a period within the POR that is less

than one year.  Commerce nevertheless determined that where both of these situations existed, it

was appropriate to determine "the weighted average per unit cost of production for the period

---

[15] HYSCO also argues that Commerce acted inconsistently in addressing the problem of missing CONNUM-specific quarterly data and the problem caused where there was an absence of pre-POR cost data.  Resp. of Hyundai HYSCO to Def.'s Redetermination on Remand 3-4 (Nov. 30, 2012), ECF No. 170 ("HYSCO's Comments").  The court does not address this argument because it orders a remand for other reasons, as discussed herein.

of . . . review," *Id.* § 1677b(b)(2)(D), using data other than data on how much it cost to produce

the actual good sold in the home market. *Remand Redetermination* 17 n.3.  Commerce is

empowered to use "facts otherwise available" when data necessary for a required determination

are missing from the record.  19 U.S.C. § 1677e(a).  But in this case, the record contained the

data required to perform the calculation required by § 1677b(b)(2)(D): cost of production data

that pertained to both the CONNUM sold in the home market and the period specified in the

statute, *i.e.*, the one-year period of review.  *Remand Redetermination* at 17 & n.3.  The

Department's reasoning that "[b]ecause it is necessary to calculate a POR-average cost for the

cost recovery test, it is necessary to include a cost for every quarter in which a sale of a

CONNUM occurred," *id.* at 20, is not consistent with the language or purpose of the statute.

Because the Department's method does not comply with the rule established by

§ 1677b(b)(2)(D), the court must order Commerce to perform its recovery-of-costs test for

HYSCO in a way that complies with the statutory directive.

   2.  On Remand, Commerce Must Reconsider its Application of Quarterly Cost Methodology to
        Union's and HYSCO's DIFMER Adjustments and Constructed Value Determinations

        With the exception of the Department's revised recovery-of-costs test, the Remand

Redetermination retained the use of the quarterly cost methodology in all instances where it was

used in the Final Results, including difference-in-merchandise ("DIFMER") adjustments when

comparing similar merchandise and constructed value ("CV") determinations.

        In their comments on the Remand Redetermination, neither HYSCO nor Union objected

specifically to the Department's use of unindexed quarterly cost data for DIFMER adjustments

or CV.  However, both maintained general objections to the Department's deviation from the

normal method of using POR-wide cost averages.  *See* HYSCO's Comments 2-8; Union's

Comments 5-6; Oral Tr. 9, 17-18, 25-30; *see also Union Steel Mfg. Co., Ltd.*, 36 CIT at __,

837 F. Supp. 2d at 1324.  As it did in the Final Results, the Department concluded that a 25% or

greater fluctuation in the cost of steel substrate together with a "reasonable correlation" with

price of the good justified the Department's use of the quarterly cost methodology in the Remand

Redetermination, with the exception of the recovery-of-costs test, as discussed *supra*.  *Remand*

*Redetermination* 24-26.  Both plaintiffs argue that, for various reasons, the circumstances of this

administrative review do not warrant the application of shorter cost averaging periods.  Union's

Comments 5-14; HYSCO's Comments 5-8.  For example, both plaintiffs argue that there was not

a sufficient nexus between steel substrate costs and CORE prices to justify the use of shorter

averaging periods and that the Department's previous practice required more than a reasonable

correlation.  Union's Comments 10-14; HYSCO's Comments 6-8.  Union argues that the 25%

threshold for substrate cost fluctuation was met in its case only because Commerce performed a

major input adjustment and instead should have looked at actual, not adjusted, costs.  Union's

Comments 7-9.

        The court does not address all of the objections raised by Union and HYSCO because it

finds insufficient the Department's explanation for the continued use of quarterly cost averaging

periods for DIFMER and CV.  That explanation is that it is "the Department's normal practice"

to calculate COP, CV, and the DIFMER adjustment "in the same manner."  *Remand*

*Redetermination* 20-21.  Standing behind its "normal practice" and providing no further

explanation, Commerce does not address the question of why using unindexed quarterly cost

data in the specific context of DIFMER and CV ensures a more accurate dumping margin.  Also

related to the question of accuracy is the fact that the Remand Redetermination does not inform

the court whether using quarterly costs influenced the Department's decision to use surrogate

costs for CV and DIFMER in the manner similar to that the court found objectionable above, *i.e.*,

in the application of the recovery-of-costs test to HYSCO when quarterly CONNUM-specific

data were not available.  The court directs Commerce to address these matters on remand.

### 3.  Commerce Must Reconsider Its Departure from the Normal Method for the Identification of the Contemporaneous Month

The Department's decision to proceed with a quarterly cost methodology influenced

another decision in the Remand Redetermination, which involved the manner of making

price-to-price comparisons between home market and U.S. sales.  When comparing export prices

to home market sales, Commerce is limited in its averaging of home market prices "to a period

not exceeding the calendar month that corresponds most closely to the calendar month of the

individual export sale."[16]  19 U.S.C. § 1677f-1(d)(2).  In the Final Results, Commerce followed

its standard practice in administrative reviews and calculated dumping margins using an average-

to-transaction comparison method according to 19 C.F.R. § 351.414(c)(2).  *Union Steel Mfg.*

*Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1325.  Under this method, Commerce compares the

price of a weighted average of sales of the foreign like product in the home market to an

individual U.S. sale of subject merchandise.  19 C.F.R. § 351.414(b)(3).  Generally, Commerce

will average, and use for comparison, only those home market sales that incurred during the

"contemporaneous month" of the U.S. sale.  *Id.* § 351.414(e)(1).  Where there are no home

market sales of the foreign like product during the same month as the U.S. sale, the Department's

regulation prescribes a "normal" method to determine the contemporaneous month: the so-called

---

[16] Under section 773(a)(1)(A) of the Tariff Act, normal value is to be based on home market prices, made in the ordinary course of trade, existing "at a time *reasonably corresponding to the time of the sale used to determine the export price or constructed export price . . . .*" 19 U.S.C. § 1677b(a)(1)(A) (emphasis added).

"90/60-day window" method.[17]  *Id.* § 351.414(e)(2).  However, Commerce departed from this

"normal" method in the Final Results, concluding that it was inappropriate to compare U.S. sales

with home-market sales occurring outside the quarter in which the U.S. sale occurred.  *Union*

*Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1325-26.  Instead, Commerce determined

that "it is appropriate in this case to match sales only within the same quarter."  *Id.*, 36 CIT at __,

837 F. Supp. 2d at 1326.

      In contesting the Final Results, Union and HYSCO objected to the Department's

deviation from the 90/60-day window period rule.  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1325.

Reviewing these claims, the court noted that "the Department's decision to use a non-standard

method of determining the contemporaneous month was solely a consequence of the decision to

apply a non-standard quarterly cost methodology."  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1326.

Commerce itself, in its request for voluntary remand, questioned aspects of its quarterly cost

methodology in the fifteenth review, and the court ordered Commerce to reconsider the quarterly

cost methodology as used in the Final Results.  *Id.* at 1325-26.  The court also ordered

Commerce, on remand, to reconsider the decision to depart from the normal method of

determining the contemporaneous month as prescribed in the Department's regulation.  *Id.*

---

     [17] Section 351.414(e)(2) of the Department's regulations describes the "90/60-day window" rule as follows:

    (2) Contemporaneous month.  Normally, the Secretary will select as the contemporaneous month the first of the following which applies:

      (i) The month during which the particular U.S. sale under consideration was made;
      (ii) If there are no sales of the foreign like product during this month, the most recent of the three months prior to the month of the U.S. sale in which there was a sale of the foreign like product.
      (iii) If there are no sales of the foreign like product during any of these months, the earlier of the two months following the month of the U.S. sale in which there was a sale of the foreign like product.

19 C.F.R. § 351.414(e)(2).

On remand, Commerce retained the contemporaneous month methodology it applied in

the Final Results.  *Remand Redetermination* 27.  Commerce explained that it continued to find it

"appropriate to depart from the normal method of determining the contemporaneous month"

because it continued to "determine that the changes in Union's and HYSCO's [cost of

manufacturing] during the POR due to fluctuating raw material input costs [were] significant."

*Id.* at 27-28.  According to Commerce, "[w]hen significant cost changes have occurred during

the POR, these same conditions are typically accompanied by changes in prices as the market

reacts to changing economic conditions."  *Id.* at 28.  In these situations, Commerce argues,

"price-to-price comparisons should be made within the shorter cost-averaging period to lessen

the margin distortions caused by changes in sales prices which result from significantly changing

costs."  *Id.*  Thus, in the Department's view, "comparing home market sales from one quarter to

U.S. sales during another quarter of the POR when the unadjusted comparison market price does

not reflect the contemporaneous price changes that have occurred through the date of the U.S.

sale distorts the dumping analysis" and it is therefore "appropriate in this case to match sales

only within the same quarter."  *Id.* at 29.

Both Union and HYSCO continue to oppose the departure from the 90/60-day window

period.[18]  Union maintains that the Department's methodology is unlawful because the shortened

comparison window led to fewer identical sales matches, contravening the statutory preference

for matching identical merchandise.  Union's Comments 14-19.  HYSCO submits that the

Department's methodology is unreasonable because the artificial three-month comparison

_____

[18] Neither United States Steel Corporation nor Nucor Corporation addressed the comparison window issue in their written comments on the Remand Redetermination. Comments of U.S. Steel Corp. on the Results of Redetermination Pursuant to Remand Issued by the Dept. of Commerce 1 (Dec. 3, 2012), ECF No. 171; Nucor Corp.'s Comments on Remand Results 1 (Dec. 3, 2012), ECF No. 176.

window creates distortions in the final margin that undermine the statutory interest in accuracy. HYSCO's Comments 8-11.

The court concludes that it cannot affirm the Department's departure from the 90/60-day comparison window in favor of a quarterly comparison window on the rationale Commerce provided in the Remand Redetermination.  As the Department's regulation, 19 C.F.R. § 351.414(e)(2), establishes a normal method for selecting the comparison month, Commerce must provide an explanation justifying a deviation from this method.  *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) ("Once Commerce establishes a course of action, however, Commerce is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary."); *see also Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004) ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").  The rationale Commerce offers does not provide such an explanation.

The Department's methodology raises two issues that the Remand Redetermination fails to resolve.  First, by shortening the standard window period by half (*i.e.*, from six months to the three months), the Department's method sacrifices identical matches for the sake of some form of contemporaneity.  It thus caused Commerce to resort more often to matches of similar merchandise or to a CV calculation even though actual price comparisons inherently yield a more accurate margin than do comparisons of similar merchandise or the use of CV.  *See* 19 U.S.C. § 1677b(a), (e).  The Remand Redetermination explains that cost fluctuations in the price of steel substrate, which Commerce presumed to affect price, justify shortening the comparison window.  Commerce, however, provided no reasoning beyond this presumption, nor

does Commerce explain how its method produced the most accurate margin possible.  The court

therefore considers the Department's rationale conclusory.  Commerce must address this

deficiency on remand.

      The second issue raised by the Department's choice of contemporaneous month is

whether Commerce permissibly shortened the comparison window period in the particular way

that it did: by limiting comparisons of a U.S. sale to home market sales occurring only in the

quarter in which the U.S. sale occurred.  By doing so, Commerce largely dispensed with the

hierarchy, reflected in 19 C.F.R. § 351.414(e)(2), of matching a U.S. sale with earlier months of

home market sales before resorting to subsequent months in a situation where no match could be

made in the month in which the U.S. sale occurred.  The Remand Redetermination does not

explain why Commerce chose a method that deviated significantly from this hierarchy by

shortening the comparison window.  For example, if a U.S. sale made in the first month of a

quarter had no match in the month in which it occurred, it could not be matched with a home

market sale (or sales) occurring in the immediately preceding month, despite the preference

embodied in the regulation for the use of earlier months before the use of later months.[19]  Under

---

      [19] At oral argument, the court obtained clarification on the Department's methodology
and the three potential scenarios that could arise thereunder.  First, if a U.S. sale occurred during
the first month of a quarter, Commerce looked to foreign market sales in the current month,
followed by the two subsequent months, in chronological order, to identify the contemporaneous
month (a "0/60 window").  Oral Tr. 53.  If a U.S. sale occurred during the second month of a
quarter, Commerce looked to foreign market sales in the current month, followed by the month
prior and month subsequent, in that order, to identify the contemporaneous month (a "30/30
window").  *Id*. at 53-54.  And if a U.S. sale occurred during the third month of a quarter,
Commerce looked to foreign market sales in the current month, followed by the two prior
months, in reverse chronological order, to identify the contemporaneous month (a "60/0
window").  *Id*. at 54.  If Commerce was unable to find a match of identical products (identified
by "control number," or "CONNUM") using its quarterly window period methodology, it
applied the same methodology as to matches of similar CONNUMs before resorting to the use of
constructed value.  *Id*.

the regulation, a match occurring as early as the third month before the month of the U.S. sale is

preferred to a match occurring in the month following the month of the U.S. sale.  *See* 19 C.F.R.

§ 351.414(e)(2).

Accordingly, in a second remand redetermination, Commerce must reconsider its

methodology for identifying reasonably corresponding contemporaneous months for Union's and

HYSCO's sales of subject merchandise and, in so doing, address the two specific issues the court

has raised.

The cases Commerce cited for the point that courts have sustained its method are not

binding on the court.  This includes the decision in *Garofalo*, which the United States Court of

Appeals for the Federal Circuit ("Court of Appeals") issued pursuant to Federal Circuit Rule 36

and therefore is not precedential.  *See* Fed. Cir. R. 36 (allowing entry of a judgment of

affirmance without opinion when certain conditions exist and an opinion would have no

precedential value).  Moreover, the court must consider the methodology on the facts of this case

and according to the rationale Commerce put forth.

Finally, the Department's insistence that neither Union nor HYSCO identified

unreasonable matches resulting from the Department's methodology does not convince the court

that this methodology must be sustained.  *See Remand Redetermination* 31.  The methodology

has the inherent characteristic of reducing the number of identical matches, as defendant

concedes.[20]  Def.'s Resp. 27 ("[T]he shortened window may not have provided for every

identical match that could have been made using the standard window period . . . .").

_____

[20] At oral argument, Union's counsel was unable to identify the extent of the
Department's use of constructed value resulting from the quarterly comparison window but did
indicate that there were fewer identical matches than there would have been under the normal
90/60-day comparison window.  Oral Tr. 43-44.

Before the court, defendant, citing 19 C.F.R. § 351.414, argues that "Commerce reasonably exercised the discretion permitted by the regulation's use of the term 'normally'" after determining that the factual scenario presented warranted a shortening of the comparison window period.  Def.'s Resp. 26.  Defendant submits that this Court has held that the use of the term "normally" affords Commerce discretion in determining when the normal situation does not apply, based on the circumstances presented.  *Id*. (citing *KYD v. United States*, 33 CIT 299, 311, 631 F. Supp. 2d 1371, 1382; (2009), *SeAH*, 34 CIT at __, 704 F. Supp. 2d at 1376).  The non-precedential cases defendant cites, like those cited by Commerce in the Remand Redetermination, do not offer the court a basis upon which to sustain the Department's decision as to contemporaneous month.  The regulation affords Commerce discretion in its sales comparison methodology, but in this case, the particular method Commerce adopted as an alternative to the normal method raises unanswered questions that relate to the accuracy of the result.

 C.  The Remand Redetermination Lawfully Determined that the Non-Laminated, Painted CORE May Not Be Compared to the Laminated Core as Products "Identical in Physical Characteristics"

Prior to the court's first opinion in this action, defendant requested, and the court granted, a voluntary remand to allow Commerce to reconsider aspects of the "model-match" methodology applied to Union under section 771(16)(A) of the Tariff Act, 19 U.S.C. § 1677(16)(A).[21]  *Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1327.  The model-match methodology is used by Commerce to compare prices of subject merchandise with home market prices of the foreign like product.  Specifically, Commerce wanted to reconsider its decision to treat Union's

---

[21] Section 1677(A) of the Tariff Act directs that Commerce, in determining the foreign like product, first seek to compare a U.S. sale of subject merchandise with a comparison-market sale of merchandise "which is identical in physical characteristics with, and was produced in, the same country by the same person as, that merchandise."  19 U.S.C. § 1677(A).

plastic-laminated CORE (specifically, polyethylene terephthalate (PET) or polyvinyl chloride

(PVC) plastic film) as "identical in physical characteristics" with certain painted, non-laminated

CORE.  *Id.*  During the administrative review, Commerce had rejected a proposal made by

Union to treat laminated CORE as a separate model-match category.  *Id.*  Before the court,

Union argued that on the basis of obvious physical differences between laminated and painted

CORE, the Department's finding that the two groups of products are "identical" is unsupported

by substantial record evidence.  *Id.*  In remanding the issue, the court held that Commerce "may

not compare as identical merchandise Union's sales of the painted and non-laminated CORE

with Union's sales of laminated CORE absent a finding, supported by substantial evidence on

the record, that the physical differences distinguishing the two product groups are minor and not

commercially significant."  *Id.*

     On remand, Commerce altered its model-match methodology so that Union's laminated

CORE products and non-laminated, painted CORE products are no longer considered identical in

physical characteristics under § 1677(16)(A).  *Remand Redetermination* 32-33.  Commerce

found, based on an examination of Union's antidumping questionnaire responses, that

"laminated CORE products by their very nature are not painted products" as the laminated

products are "coated by attaching a plastic film to a CORE substrate, and lamination is done in

lieu of painting."  *Id*. at 35.  Commerce also found that "'[l]aminating the steel substantially

increases both the production costs and the sales prices of laminated products vis-à-vis other

painted products.'"  *Id.* at 36 (quoting *Union Steel Questionnaire Resp.* 6 (Feb. 5, 2009)

(Admin.R.Doc. No. 4845) ("*Union's Questionnaire Resp.*").  Based on an examination of

Union's price and cost data, Commerce noted that "PET film and PVC film are more expensive

than the various paints used to produce non-laminated, painted CORE products."  *Id*. at 35

(citing *Union Steel Supplemental Questionnaire Response* 15 (Apr. 9, 2009) (Admin.R.Doc.

No. 4915) ("*Union's Supplemental Questionnaire Resp.*")).   Commerce identified record

evidence showing that "Union's customers sometimes require specific characteristics related to

PET or PVC film, while other painted products are not suitable" and that "Union specifically

distinguishes laminated products from other painted products in product codes."  *Id.* at 36 (citing

*Union's Supplemental Questionnaire Resp.* at 13-14, B-21).   Commerce concluded that because

"[r]ecord evidence establishes significant differences in the physical characteristics between

laminated CORE products and non-laminated, painted CORE products . . . compelling reasons

exist for the Department to alter its classification of the physical characteristics in this remand

proceeding."  *Id.* at 37.

        The Department's separation of laminated CORE products from non-laminated, painted

CORE products for purposes of its model-match methodology complies with the court's remand

order and is supported by substantial record evidence of the physical and commercial differences

between the respective products.   No party opposes this redetermined model-match methodology

in comments filed before the court.  *See* Union's Comments 19-20.   The court, therefore, affirms

this aspect of the Remand Redetermination.

        D.  The Court Sustains the Department's Use of Zeroing in the Final Results to Calculate
                           Union's Weighted Average Dumping Margin

        In the Final Results, Commerce applied its "zeroing" methodology to calculate Union's

weighted average dumping margin, under which it determines a dumping margin for each sale of

subject merchandise and then converts negative margins to zero margins before calculating a

weighted average percentage margin.  *See Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F.

Supp. 2d at 1327-28.  Noting that Commerce abandoned the use of zeroing in antidumping

investigations while continuing to apply zeroing in periodic administrative reviews, Union

challenged the Department's use of zeroing, arguing that Commerce inconsistently and

unlawfully interpreted the statutory provision defining "dumping margin," 19 U.S.C.

§ 1677(35)(A), contrary to basic rules of statutory construction.[22]  *Id*., 36 CIT at __, 837 F. Supp.

2d at 1328 (citation omitted).   Defendant requested, and the court granted, a voluntary remand on

the zeroing issue in light of the decision of the in *JTEKT Corp. v. United States*, 642 F.3d 1378,

1383-85 (Fed. Cir. 2011) ("*JTEKT Corp.*"), in which the Court of Appeals questioned the

legality of the Department's construction of section 1677(35)(A) and required the Department to

provide an adequate explanation of the Department's inconsistent interpretation of the statute

vis-à-vis administrative reviews and investigations.  *Id*.  The court directed the Department, on

remand, to "either modify its decision to apply the zeroing methodology in the fifteenth review

or, alternatively, provide an explanation that satisfies the requirements the Court of Appeals

imposed in . . . *JTEKT Corp.*"  *Id*., 36 CIT at __, 837 F. Supp. 2d at 1329.

     In the Remand Redetermination, Commerce continued to use zeroing but, as directed by

the court's remand order, provided an explanation as to why it considered the use of that

methodology to be in compliance with the Tariff Act despite the Department's discontinuation of

zeroing in antidumping duty investigations.  *Remand Redetermination* 44, 48-60 (stating that the

Department's interpretation reasonably resolves the ambiguity in section 771(35) of the Act "in a

way that accounts for the inherent differences between the result of an average-to-average

comparison," as used in investigations, and "the result of an average-to-transaction comparison,"

as used in administrative reviews).

---

[22] The relevant statutory provision defines a dumping margin as "the amount by which
the normal value exceeds the export price or constructed export price of the subject
merchandise."  19 U.S.C § 1677(35)(A).

The Court of Appeals decided *Union Steel, LG Hausys, Ltd. v. United States*, 713 F.3d 1101, 1101 (Fed. Cir. 2013) ("*Union Steel*"), on April 16, 2013, after Commerce had already issued its Remand Redetermination.  In *Union Steel*, the Court of Appeals affirmed the Department's use of the zeroing methodology in circumstances analogous to those presented by this case involving an administrative review of an antidumping duty order.  The court considers *Union Steel* dispositive of the zeroing issue presented by this case and sustains the use of zeroing in the Final Results.

> E.  The Court Must Order a Second Remand of the Department's Decision to Use the Date of
> Shipment as the Date of Sale for HYSCO's Constructed-Export-Price Sales

In the Final Results, Commerce used the date the subject merchandise was shipped from Korea to HYSCO's U.S. affiliate, Hyundai HYSCO USA ("HHU" or "HYSCO USA"), as the date of sale for HYSCO's constructed-export-price ("CEP") sales of subject merchandise.  *Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1334.  In contesting the Final Results, U.S. Steel claimed the decision to use the date of shipment as the date of sale, rather than the date that the subject merchandise was invoiced, violated the Department's regulation, 19 C.F.R. § 351.401(i),[23] and was unsupported by substantial evidence.  *Id*.  Defendant requested, and the court granted, a voluntary remand to allow Commerce to reconsider the date-of-sale decision Commerce made in the Final Results for HYSCO's CEP sales.  *Id.*, 36 CIT at __, 837 F.

---

[23] Section 351.401(i) provides as follows:

In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business.  However, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

19 C.F.R. § 351.401(i).

Supp. 2d at 1335.  On remand, Commerce again decided to use the date of shipment as the date

of sale.  *Remand Redetermination* 62.

　　In opposing the Remand Redetermination, U.S. Steel argues, *inter alia*, that 19 C.F.R.

§ 351.401(i) implements the congressional intent that the date of sale is the date on which the

material terms of sale are established, as demonstrated by the Statement of Administrative

Action Accompanying the Uruguay Round Agreements Act ("SAA").  U.S. Steel's Comments

5-6 (citing *Statement of Admin. Action Accompanying the Uruguay Round Agreements Act*

at 810), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4153 ("Article 2.4.1 specifies that currency

conversions should be made using the rate of exchange on the date of sale, which is defined as a

date when the material terms of sale are established.")  According to U.S. Steel, "[t]here is not a

single shred of evidence showing that the price to be charged to HYSCO's unaffiliated customer

was fixed at the time of shipment or at any time prior to the invoice date: no emails, offers,

confirmations, contracts or other documents of any kind."  *Id.* at 7.

　　The Remand Redetermination maintains that using the date of shipment as the date of

sale is the Department's consistent and "normal" practice "[i]n cases where the shipment date

precedes the invoice date."  *Remand Redetermination* 61-62.  Commerce explained that "[i]n this

administrative review, the Department finds no reason to depart from its normal practice *not* to

consider dates subsequent to the date of shipment from the factory as appropriate for date of sale

because once merchandise is shipped the material terms of sale are presumed to be established."

*Id.* at 62 (emphasis in original).

　　The court considers, first, whether the decision challenged by U.S. Steel is governed by

19 C.F.R. § 351.401(i).  It might be questioned whether this regulation applies to CEP sales,

which are sales made to the first unrelated buyer in the United States, 19 U.S.C. § 1677a(b), or

whether the regulation applies only to export price sales. Like the transactions at issue in this

case, CEP sales typically involve a U.S. reseller affiliated with the exporter or producer, and the

invoice may be issued by the reseller after the date the merchandise is shipped to the United

States. The first sentence of Section 351.401(i) might be read to contemplate an export price sale

in identifying as the presumptive date of sale "the date of invoice, as recorded in the *exporter or*

*producer's* records kept in the ordinary course of business." 19 C.F.R. § 351.401(i) (emphasis

added). The second sentence also vaguely suggests an export price sale in referring to a date that

"better reflects the date on which the *exporter or producer* establishes the material terms of

sale."[24] *Id.* (emphasis added).

Nevertheless, the text of 19 C.F.R. § 351.401(i) does not expressly limit the provision to

export price sales, and no other regulatory provision addresses the date-of-sale determination.

Notably, the Remand Redetermination does not conclude that the scope or intent of 19 C.F.R.

§ 351.401(i) is limited to export price sales. Rather, the Remand Redetermination considers the

regulation to apply to the CEP issue before the court, *Remand Redetermination* 61, instructing

that "Section 351.401(i) of the Department's regulations states that the Department 'normally

will use the date of invoice' as the date of sale, unless 'the Secretary is satisfied that a different

date better reflects the date on which the exporter or producer establishes the material terms of

sale.'" *Id.* (quoting 19 C.F.R. § 351.401(i)). The Remand Redetermination adds that "[i]f the

Department determines that another date better reflects the date on which the exporter or

producer establishes the material terms of sale, the Department may use this date." *Id.* The

---

[24] The reference to only the "exporter or producer" raises a question in that "establishing"
the material terms of sale would appear to require the participation of a buyer. However, the
general context may recognize the routine situation in which the producer/exporter accepts a
customer's order by issuing a commercial document such as an invoice.

Remand Redetermination proceeds to discuss the Department's date-of-shipment practice in the

context of 19 C.F.R. § 351.401(i).  *Id.* at 61-66.

Because the Remand Redetermination applies 19 C.F.R. § 351.401(i), as well as the

date-of-shipment practice, in deciding the date of sale for HYSCO's CEP sales, the court reviews

the Department's decision on the basis Commerce put forth, *i.e.*, as grounded in both the

regulation and the claimed date-of-shipment practice.  And because the factual situation

presented here involves CEP sales, applying the regulation to that factual situation requires the

court to construe the second sentence of the regulation more broadly than in the literal sense—

*i.e.*, the court must construe the sentence to refer to a date on which the material terms of sale

were established, despite the limiting reference to the exporter or producer.  *See* 19 C.F.R.

§ 351.401(i) ("However, the Secretary may use a date other than the date of invoice if the

Secretary is satisfied that a different date better reflects the date on which the *exporter or*

*producer* establishes the material terms of sale.") (emphasis added).  This broader construction

also conforms to the underlying purpose of the regulation.  As U.S. Steel points out, Congress

intended the date of sale for antidumping law purposes to be the date on which the material terms

of sale are established.  *See also Corus Staal*, 502 F.3d at 1376 ("Neither a sale nor an agreement

to sell occurs until there is mutual assent to the material terms (price and quantity).").

The second sentence of 19 C.F.R. § 351.401(i) requires a finding of fact.  This case,

therefore, raises a question of whether the regulation permitted Commerce to use a date of sale

other than the date of invoice without making a lawful finding according to that sentence, *i.e.*, a

finding supported by substantial record evidence, that some date other than the invoice date (in

this case, the date of shipment) better reflected the date on which the material terms of sale were

established.  It could be argued that the word "normally" in the first sentence of the regulation

plausibly could be interpreted to allow deviation from the normal "date-of-invoice" method even in situations other than the specific situation identified in the second sentence.  Under such an interpretation, Commerce arguably could rely on its date-of-shipment practice without making the specific finding required by the second sentence.  Alternatively, the regulation could be construed such that the only exception to the normal method identified in the first sentence of § 351.401(i), which presumes date of invoice will control, is a finding made pursuant to the second sentence.  Supporting the latter construction is the use of the word "however," a word of qualification, to introduce the second sentence and relate the second sentence to the first.  This construction, consistent with the SAA and the Antidumping Agreement, links the first sentence (and thereby the regulation as a whole) to the concept of a date on which the material terms of sale are established.

The plain language of 19 C.F.R. § 351.401(i) is susceptible to both interpretations.  Therefore, the court considers it appropriate to examine the Department's stated intent at the time it promulgated the regulation.  In the preamble to the 1997 promulgation notice ("Preamble"), Commerce explained that in "[i]n paragraph (i) [of § 351.401], we merely have provided that, absent satisfactory evidence that the terms of sale were finally established on a different date, the Department will presume that the date of sale is the date of invoice." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,349 (May 19, 1997) ("*Preamble*").  The Preamble thus explains the intended relationship of the two sentences in 19 C.F.R. § 351.401(i).  Commerce intended the presumption in favor of invoice date to apply except in the circumstance identified in the second sentence, *i.e.*, when Commerce can make a finding of fact based on "satisfactory evidence" that "the terms of sale were finally established on a different date."  *Id.*  The Preamble underscores this point by stating that a respondent "will

be free to argue that the Department should use some date other than the date of invoice, but the

respondent must submit information that supports the use of a different date" and that a

respondent's description of its selling processes, like all submitted information, "will be subject

to verification." *Id.* The Preamble clarifies that the second sentence of 19 C.F.R. § 351.401

requires a case-specific factual determination, not a mere presumption based solely on the

sequence of the date of shipment and the date of invoice.

In the second sentence, the regulation refers to "a different date" than the date of invoice

but makes no specific reference to the date of shipment. In fact, the Preamble discusses the

Department's reasons for rejecting the suggestion of some commenters that "if the Department

uses a uniform date of sale, it should use date of shipment rather than date of invoice." *Id.* The

Preamble responded to the suggestion as follows:

> For several reasons, the Department has not adopted this suggestion. First, date of
> shipment is not among the possible dates of sale specified in note 8 of the AD
> Agreement.[25] Second, based on the Department's experience, date of shipment
> rarely represents the date on which the material terms of sale are established.
> Third, unlike invoices, which can usually be tied to a company's books and
> records, firms rarely use shipment documents as the basis for preparation of
> financial reports. Thus, reliance on date of shipment would make verification
> more difficult.

*Preamble,* 62 Fed. Reg. at 27,349. In this way, the Preamble casts doubt on the notion that the

date-of-shipment practice conforms to the regulation. It is questionable that Commerce, at the

time of promulgation, intended 19 C.F.R. § 351.401(i) to authorize a practice under which the

date of sale is presumed to be the date of shipment, which according to Commerce "rarely

---

[25] The Antidumping Agreement, to which the passage refers, states that "[n]ormally, the
date of sale would be the date of contract, purchase order, order confirmation, or invoice,
whichever establishes the material terms of sale." Agreement on Implementation of Article VI
of the General Agreement on Tariffs & Trade 1994 (Antidumping Agreement), 1868
U.N.T.S. 201, Annex 1A, Art. 2.4.1, n.8.

represents the date on which the material terms of sale are established." *Id.* At the time of

promulgation, Commerce explicitly recognized that the shipment date may precede the invoice

date but still rejected the notion that the shipment date should be presumed to control in that

circumstance. Addressing a comment that shipment date, not invoice date, should be presumed

to control because use of the latter as the date of sale could lead to manipulation of dumping

calculations by respondents, Commerce opined that "most firms have a standard invoicing

practice (*e.g.*, three days after shipment, every two weeks)." *Id.* Despite these indications to the

contrary, the Remand Redetermination applies the general principle that "once merchandise is

shipped the material terms of sale are presumed to be established." *Remand Redetermination* 62.

By so doing, the Remand Redetermination adopted a presumption in favor of the shipment date

even though Commerce intended when promulgating § 351.401 that the presumption would be in

favor of the invoice date, regardless of the sequence of the two dates.

Although it appears that the Department's date-of-shipment practice is inconsistent with

the interpretation of 19 C.F.R. § 351.401(i) in the Preamble, the court need not decide the

question of whether the regulation renders that practice impermissible *per se.* Rather, it is

sufficient for the court to conclude that the Department may not substitute the presumption on

which this practice is based, *i.e.*, that material terms of sale are established as of the date of

shipment, in lieu of a finding under the second sentence of § 351.401(i) that is supported by

substantial record evidence. The regulation presumes that date of invoice will control in the

absence of a finding in the particular circumstances of a case "that a different date better reflects

the date on which the exporter or producer establishes the material terms of sale." 19 C.F.R.

§ 351.401(i).

In applying the date-of-shipment practice to determine a uniform date of sale for

HYSCO, the Remand Redetermination concluded that there was an absence of evidence that the

sales prices "actually changed" after the date of shipment and also found that the "price remained

stable after the date of shipment." *Remand Redetermination* 62.  These findings do not satisfy

the condition imposed by 19 C.F.R. § 351.401(i), which does not permit Commerce to base a

decision to use the date of shipment as the date of sale on an *absence* of record evidence that the

sales prices changed after the date of shipment.  The finding that the "price remained stable after

the date of shipment," even if presumed valid, would not establish conclusively the intent of the

three parties to the HYSCO sales as to when the material terms of sale were established.

Moreover, this finding is unsupported by substantial record evidence.  At oral argument, counsel

for defendant did not dispute that Commerce reached the finding based on certain sales

documentation pertaining to a single sale.  Oral Tr. 100.  This evidence is minimally probative

on the question of whether prices were stable after shipment and even less probative on the larger

question of whether the parties intended the prices to be established as of the time of shipment.

The Remand Redetermination also finds that "[t]he evidence with regard to price shows

that the transfer price from HYSCO to HYSCO USA did not vary from the offer to the

commercial invoice, which was issued on the shipment date." *Remand Redetermination* 65

(citing *HYSCO Section A Questionnaire Resp.*, Ex. A-10 (Feb. 12, 2009) (Admin.R.Doc.

No. 4850) ("*HYSCO's Section A Resp.*").  This evidence, which does not pertain directly to the

prices at issue, has little probative weight on the question of whether the parties intended the

price to an unaffiliated customer to be established as of the date of shipment.

More probative on the question of when the three parties to the HYSCO sales intended to

establish the material terms of sale is HYSCO's Section A Questionnaire Response.  The

questionnaire response on page A-22 describes the HYSCO's U.S. sales process as follows:

> Upon receipt of the customer's inquiry, HHU will begin to negotiate the terms of
> sale with the customer, while making a corresponding inquiry with HYSCO.
> Although the negotiations may continue *until actual shipment*, once an initial
> agreement is reached between the customer and HHU as well as between HHU
> and HYSCO, HYSCO issues an order confirmation and schedules production of
> the merchandise.  Once production is complete, HYSCO ships the merchandise to
> the United States, while issuing the relevant sales documentation, including the
> commercial invoice, packing list, and mill certificate, to HHU . . . .  Upon arrival
> of the merchandise in the United States, HHU issues an invoice to the customer
> and is responsible for collecting payment from the customer.

*Id.* at A-22 (emphasis added).  The questionnaire response elaborated further on page A-23 that

"[n]egotiations with customers can continue through the entire sales process" and that "[f]or U.S.

sales, quantity can also change up until the merchandise is shipped from HYSCO's factory, and

price can change up until HHU issues its invoice to the unaffiliated U.S. customer."  *HYSCO's*

*Section A Resp.* at A-23, A-24.  According to defendant, the passage on page A-22 indicates that

negotiations do not continue after actual shipment.  Oral Tr. 96-97.  The court, however, looks at

both of the passages quoted and concludes that there is not substantial evidence to support a

finding that the prices to the unaffiliated buyers in HYSCO's sales were established as of the

date of shipment.  The passage on page A-22 suggests, but does not state definitively, that

negotiations did not continue after shipment.  The passage on page A-23 speaks directly to that

question, clarifying that price, as opposed to quantity, could change until HHU issues the

invoice.  Notably, the sentence in the passage on page A-22, on which defendant relies for its

contention that negotiations did not continue after shipment, states that production is scheduled

according to what is described as an "initial" agreement, suggesting that the "agreement" reached

as of that point is subject to change after production.  *See HYSCO's Section A Resp.* A-22

("Although the negotiations may continue until actual shipment, once an *initial* agreement is reached between the customer and HHU as well as between HHU and HYSCO, HYSCO issues an order confirmation and schedules production of the merchandise." (emphasis added)).  The two passages can be read to be consistent with one another, and together they connote that quantity is established as of the date of shipment but price is not.  As Commerce itself acknowledged in the Remand Redetermination, "nothing on the record refutes HYSCO's statement that negotiations for sales to U.S. customers continued *after shipment . . . .*"  *Remand Redetermination* 62 (emphasis added).

The Remand Redetermination discusses record evidence but does not explicitly find that the parties to the HYSCO sales intended all material terms of sale to be established on the shipment date.[26]  It is in this respect that the date-of-shipment practice was unlawful as applied to HYSCO's CEP sales in the fifteenth review: Commerce impermissibly interpreted § 351.401(i) to be satisfied by the presumption underlying that practice, applying the principle that "once merchandise is shipped the material terms of sale are presumed to be established."  *Remand Redetermination* 62.  This principle is contrary to § 351.401(i) as explained in the Preamble.  The regulation presumes invoice date, not shipment date, is the date of sale absent a valid finding that some other date better reflects the date on which the material terms of sale were established.

---

[26] This case is distinguishable from *U.S. Steel Corp. v. United States*, 37 CIT __, Slip Op. 13-156 (Dec. 27, 2013), which affirmed the Department's decision to use shipment date as the date of sale for a respondent in the seventeenth administrative review of the same antidumping duty order at issue here.  *Id.*  In contrast to the facts in this case, which concerns the fifteenth administrative review, the respondent in *U.S. Steel Corp.* confirmed that it "and its unaffiliated customers generally set price and quantity terms through e-mail correspondence" prior to shipment and that changes to material terms could only be made before shipment.  *Id.,* 37 CIT at __, Slip Op. 13-156, at 8-9 (citations omitted).

In contrast, the Department's decision to use date of shipment for HYSCO's sales relies on a regulatory interpretation of § 351.401(i) that requires no such finding and instead is satisfied by a presumption that the date of shipment is the date on which the material terms of sale are established.  The court does not grant this interpretation the measure of deference afforded by *Auer v. Robbins*, 519 U.S. 452, 461 (1997), because "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'"  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. __, __, 132 S. Ct. 2156, 2169 (2012) (quoting *Auer*, 519 U.S. at 462).[27]  Instead, the court examines the Department's interpretation for "those factors which give it the power to persuade" in accordance with the level of deference afforded by *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Because the Remand Redetermination devotes only scant attention to 19 C.F.R. § 351.401(i), *Skidmore* deference to a regulatory interpretation in the Remand Redetermination does not suffice to sustain the department's decision on date of sale.

Defendant argues that "Commerce's normal practice is *not* to consider dates subsequent to the date of shipment," a practice which, according to defendant, "has been 'implicitly approved by the courts.'"  Def.'s Resp. 39 (quoting *Mittal Steel Point Lisas Ltd. v. United States*, 31 CIT 638, 647, 491 F. Supp. 2d 1222, 1231 (2007) (citing *AIMCOR v. United States*,

---

[27] In *Auer v. Robbins*, 519 U.S. 452 (1997), the United States Supreme Court held that an agency's interpretation of its own regulation is entitled to deference unless it is "plainly erroneous or inconsistent with the regulation."  *Id.* at 461.  The Supreme Court declined to grant *Auer* deference in *Christopher v. SmithKline Beecham Corp.*, 567 U.S. __, 132 S. Ct. 2156 (2012), to an interpretation by the Department of Labor of its own regulation and instead reviewed the interpretation for persuasiveness, deciding that the interpretation lacked "the hallmarks of thorough consideration."  *Id.* 567 U.S. at __, 132 S. Ct. at 2169.  The Supreme Court concluded that the interpretation "should instead be given a measure of deference proportional to its power to persuade."  *Id.*, 567 U.S. __, __, 132 S. Ct. 2156, 2160 (2012) (citing *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)).

141 F.3d 1098, 1104-05) (Fed. Cir. 1998))).  However, none of the cases defendant cites holds

that the date-of-shipment practice, as described in the Remand Redetermination, is permissible

under 19 C.F.R. § 351.401.

    Defendant also argues that 19 C.F.R § 351.401(i) "establishes only a presumption that

Commerce use the date of invoice as the date of sale." *Id.* at 40.  Implicit in this argument is that

the presumption established by the regulation may be rebutted by something short of a finding

that a date other than the date of invoice better reflects the date on which the material terms of

sale were established.  For the reasons the court has discussed, the regulation is properly

interpreted according to the intent Commerce had at the time of promulgation, under which the

second sentence is exhaustive of the situations in which the normal practice described in the first

sentence will not apply.

    Defendant argues, further, that "available record evidence establishes that price remained

stable for at least a period of time," noting the Department's finding that "[t]he transfer price

from HYSCO to HYSCO USA did not vary from the offer to the commercial invoice, which was

issued on the shipment date."  Def.'s Resp. 41.  According to defendant, "[w]hile Commerce

normally does not use transfer price as a basis for United States price, the way in which

Commerce relied upon that information in the remand results is reasonable because it is the only

evidence on the record indicative of HYSCO's actual price-setting behavior."  *Id.*  This argument

ignores the presence on the record of HYSCO's Section A Questionnaire Response, which

indicates that prices could change up until the invoice is issued to the unaffiliated purchaser.

    Regarding the questionnaire response, defendant at oral argument cited the above-quoted

passage on page A-22 as creating an ambiguity on whether negotiations on price could continue

after the date of shipment.  Oral Tr. 96-97.  Defendant suggested, in addition, that pages A-22

and A-23 could be read to be consistent with one another and to mean "that the price per unit doesn't change once the product is shipped, but because quantity can vary slightly within a certain tolerance level . . . the end, the total price may change at the end of the day." *Id.* at 105. These arguments rest on a *post hoc* rationale not articulated in the Remand Redetermination, which itself conceded that no record information rebuts HYSCO's statement that negotiations for sales to U.S. customers continued after shipment. *Remand Redetermination* 62. The court must review the Department's decision on the rationale the agency puts forth. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."). Moreover, as the court discussed *supra*, the evidence of record does not support a finding that the parties to the sales intended the price term to be established as of the date of shipment. Defendant's argument that the statement on page A-23 of the questionnaire response that the price term could change up until the invoice was issued refers only to the total price on the shipment, and not the per-unit price, is not convincing because it is based on a strained reading of the questionnaire response. There is no indication in the questionnaire that HYSCO intended the statement it made on page A-23 to be limited in the way defendant suggests.

Defendant also suggested at oral argument that reliance on the invoice date in the fifteenth review might have caused some sales to be unexamined because Commerce used date of shipment as the date of sale in the previous review. Oral Tr. 100-01. If Commerce shared this concern, it chose not to mention it in the Remand Redetermination. In any event, the problem that defendant identifies does not allow the court to disregard 19 C.F.R. § 351.401(i), a

regulation that is binding on both the court and Commerce, and which controls the disposition of

the date of sale claim U.S. Steel raises in this case.

In support of the Department's use of the date of shipment in the First Remand

Redetermination, HYSCO argues that substantial record evidence supported "the conclusion that

the date of shipment from HYSCO's factory in Korea, which preceded the date of invoice to the

unaffiliated U.S. customer, reflects the date on which HYSCO established the material terms of

sale for U.S. sales." HYSCO's Comments 11. The record lacks substantial evidence to support

such a conclusion. Most significantly, HYSCO's statement on page A-23 of the Section A

Questionnaire Response is to the contrary, and, as the Remand Redetermination acknowledged,

nothing on the record refutes that statement. *Remand Redetermination* 62. Contending that it

"met its burden of establishing that the date of sale occurred on a date after the invoice date,"

HYSCO points to the sample sales documentation it provided and the fact that Commerce did

not seek additional documentation. HYSCO's Comments 12 (quotations omitted). According to

HYSCO, "[t]he Department typically will not change its date of sale methodology unless it finds

that a date of sale was determined erroneously or the respondent changed its business practice,

neither of which applied here." HYSCO's Comments 12. *See also* Oral Tr. 124. This argument

misses the essential point that Commerce, regardless of its "typical" methodology, was required

to determine the date of sale in this review in compliance with 19 C.F.R. § 351.401(i).

In summary, the court concludes that Commerce erred in using the date of shipment as

the date of sale for HYSCO's sales without a valid finding satisfying the second sentence of

19 C.F.R. § 351.401(i). On remand, Commerce must redetermine HYSCO's margin according

to a method of determining the date of sale that complies with the Department's regulation.

F.  On Second Remand, Commerce Must Recalculate the Rate Assigned to Dongbu to Incorporate Any Adjustments Resulting from Changes in the Margins for Union and HYSCO

In the Final Results, Commerce assigned to Dongbu a margin of 8.65%, a simple average of the margins assigned to Union and HYSCO.  *Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1335.  In moving for judgment on the agency record, Dongbu incorporated the arguments raised by Union and HYSCO, seeking the benefit of any modifications to the margins assigned thereto on remand.[28]  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1335-36.  The court ordered Commerce, on remand, to reflect any changes to the margins for Union and HYSCO in the margin applied to Dongbu.  *Id.*, 36 CIT at __, 837 F. Supp. 2d at 1336.  The court noted, additionally, that the Department's recalculation of the rate applicable to Dongbu also must incorporate any modifications to the rate applied to HYSCO as a result of U.S. Steel's claim regarding the date of sale.  *Id*.

In the Remand Redetermination, Commerce recalculated the rate assigned to Dongbu to reflect changes to the weighted average dumping margins calculated for Union and HYSCO arising from the final remand results.  *Remand Redetermination* 66.  Commerce indicated that Dongbu's rate remains "a simple average of the revised weighted average dumping margins calculated for the mandatory respondents." *Id*.

In its comments on the Remand Redetermination, Dongbu incorporates by reference those comments filed by Union Steel and HYSCO while asking the court to order Commerce, on second remand, to recalculate Dongbu's margin to incorporate any additional changes made to

---

[28] Because Dongbu's motion for judgment on the agency record limited the claim to those arguments raised by Union and HYSCO, the court concluded that other claims set forth in Dongbu's complaint that were not raised in Union's or HYSCO's motions for judgment on the agency record had been abandoned.  *Union Steel Mfg. Co., Ltd.*, 36 CIT at __, 837 F. Supp. 2d at 1336.

Union's and HYSCO's margins.  Dongbu's Comments 2.  Because Dongbu's request is

appropriate in light of Dongbu's status as an unexamined respondent, the court will require

Commerce, on second remand, to recalculate Dongbu's margin based on any changes to Union's

and HYSCO's margins.  As Dongbu is to receive the benefit of any downward revisions to the

weighted average dumping margins for Union or HYSCO, it also must be made subject to any

increases in those margins.  Accordingly, any changes in Union's and HYSCO's margins should

be reflected in the derivative margin applied to Dongbu, including any changes resulting from

the reconsideration of U.S. Steel's claim challenging HYSCO's date of sale.

### III. Conclusion and Order

For the reasons discussed in the foregoing, the court affirms in part, and remands in part,

the Remand Redetermination, *Results of Redetermination Pursuant to Remand* (Sept. 24, 2012),

ECF No. 161, issued by the International Trade Administration, U.S. Department of Commerce

("Commerce" or the "Department") in the fifteenth administrative review of an antidumping

order on certain corrosion-resistant carbon steel flat products ("CORE") from the Republic of

Korea.  Accordingly, upon consideration of the Remand Redetermination, the comments of the

parties thereon, and all papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the Remand Redetermination submitted by Commerce on
September 24, 2012, be, and hereby is, affirmed in part and remanded in part for reconsideration
and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that the Remand Redetermination be, and hereby is, sustained as to: (1) the
general and administrative ("G&A") expense ratio Commerce used to determine the cost of
production of the foreign like product for Union Steel Manufacturing Co., Ltd. ("Union"); (2) the
Department's decision to calculate Union's interest expense ratio using financial statements from
both the 2007 and 2008 fiscal years; (3) the Department's application of its modified
"sales-below-cost" and "recovery-of-costs" tests to calculate the normal value of Union's subject
merchandise; (4) the Department's decision to create separate product categories for laminated
CORE and non-laminated, painted CORE for use in a model-match methodology comparing
Union's home market and U.S. sales; and (5) the Department's use of the "zeroing" methodology
to calculate Union's weighted average dumping margin; it is further

**ORDERED** that on remand, Commerce, in accordance with this Opinion and Order, shall reconsider its decision to make a major input adjustment when calculating the interest expense ratio for Union and address Nucor Corporation's related objections; it is further

**ORDERED** that on remand, Commerce, in accordance with this Opinion and Order, shall reconsider the application of its modified "quarterly cost" methodology to (1) the revised "sales-below-cost" and "recovery-of-costs" tests used in the normal value calculations applied to Hyundai HYSCO ("HYSCO") and (2) the constructed value determinations and difference-in-merchandise ("DIFMER") adjustments applied to Union and HYSCO; it is further

**ORDERED** that, on remand, Commerce, in accordance with this Opinion and Order, shall reconsider the decision to depart from the "normal" method prescribed by regulation, 19 C.F.R. § 351.414(e)(2), for identifying the reasonably corresponding contemporaneous month used in comparing Union's and HYSCO's U.S. and home market sales; it is further

**ORDERED** that, on remand, Commerce, in accordance with this Opinion and Order, shall reconsider the decision to depart from the normal date prescribed by regulation, 19 C.F.R. § 351.401(i), when determining date of sale for HYSCO's U.S. sales sold through its U.S. affiliate, Hyundai HYSCO USA, Inc.; it is further

**ORDERED** that, on remand, Commerce shall redetermine the weighted average dumping margins for Union and HYSCO as necessary and shall redetermine the margin for Dongbu Steel Company, Ltd., as a non-examined respondent, based on any adjustments made to Union's or HYSCO's weighted average dumping margins in the results of the second remand; it is further

**ORDERED** that Commerce shall file the results of the second remand within ninety (90) days of the date of this Opinion and Order; it is further

**ORDERED** that plaintiffs, plaintiff-intervenor, and defendant-intervenor each may file comments on the results of the second remand within thirty (30) days from the date on which these results are filed; and it is further

**ORDERED** that defendant may file any response to those comments on the results of the second remand within fifteen (15) days from the date on which the last comment is filed.

/s/Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated:  March 4, 2014
        New York, New York